UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

HEIDI A. BAER,                          )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )        Civil Action No.
                                        )        05-CV-10724-GAO
NATIONAL BOARD OF                       )
MEDICAL EXAMINERS,                      )
                                        )
                    Defendant.          )
_____)


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION**

Joseph F. Savage, Jr., Esq.
Inez H. Friedman-Boyce, Esq.
Melissa Briggs Hutchens, Esq.
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02019
(617) 570-1000

COUNSEL FOR NATIONAL BOARD OF
MEDICAL EXAMINERS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

ARGUMENT .................................................................................................................. 5

I.     PLAINTIFF HAS FAILED TO ESTABLISH
       AN IMMINENT THREAT OF IRREPARABLE HARM............................................ 6

II.    PLAINTIFF IS NOT DISABLED UNDER THE ADA OR
       MASSACHUSETTS' STATE LAW AND THUS CANNOT
       ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS .......................... 8

       A.  Plaintiff Cannot Prove That She Is Impaired................................................ 10

       B.  Plaintiff Cannot Prove That Her Alleged
           Impairments Impact a Major Life Activity ................................................ 15

       C.  Plaintiff Cannot Prove A Substantial Limitation In A Major Life Activity.................. 16

III.   THE BALANCE OF HARDSHIPS AND PUBLIC POLICY
       FAVOR DENIAL OF THE PRELIMINARY INJUNCTION .................................. 18

CONCLUSION ............................................................................................................. 20

## INTRODUCTION

Plaintiff Heidi A. Baer is a 30 year old woman with a track record of substantial academic success – graduating from Milton Academy with As and Bs, achieving above average PSAT and SAT scores, and gaining admission to and graduating from Duke University with a 2.95 GPA.  She did, however, struggle with science in high school, get lower grades in science courses in college, and did not get as high a score as she wanted on the science-testing MCAT.  After obtaining an accommodation of extra time on the MCAT she was admitted to the Drexel University College of Medicine ("Drexel"), which her mother, father and brother attended.  As science material in her chosen curriculum has become more difficult, her performance has been less stellar and her requests for accommodation more persistent.  She seeks an extraordinary order from this Court requiring the National Board of Medical Examiners (the "NBME" or the "Board") to give her 50% more time than allowed other examinees when she takes the United States Medical Licensing Examination ("USMLE") Step 1.  Her request should be denied.

The USMLE is an examination utilized throughout the United States to test the minimum competency of individuals who wish to become physicians.  The USMLE is administered by the defendant NBME.  All fifty states and four U.S. territories require the successful completion of the USMLE as a prerequisite to obtaining a medical license.  States have chosen to rely on the USMLE due to the integrity and validity of the test.  As a screening process for physicians, the USMLE tests the minimum knowledge required to be a physician.  Thus, the integrity of the USMLE is essential.  The NBME is responsible for ensuring that the USMLE impartially tests the qualifications of aspiring physicians.  See Affidavit of Carol Morrison Featherman, Ph.D. ("Featherman Aff.") ¶ 3, attached as Exhibit 1 hereto.

Plaintiff requests an injunction mandating that the NBME allow her one and one-half times the regular allotted time provided for the taking of Step I of the USMLE (the "Exam") because of an alleged learning disorder and Attention Deficit / Hyperactivity Disorder ("ADHD").  Plaintiff has repeatedly been denied extra time by NBME because she cannot prove that she is

disabled within the meaning of the Americans with Disabilities Act (ADA).[1] The NBME has thoroughly reviewed Plaintiff's requests for extra time according to well-established and respected procedures. The information submitted in support for her requests – testing results, academic records, and expert reports – show a history of success without accommodations and no evidence of an impairment that limits her ability to read or learn in comparison to most people. Accordingly, Plaintiff cannot meet the standards for a preliminary injunction for at least three reasons.

First, Plaintiff cannot demonstrate any imminent, irreparable injury sufficient to support a preliminary injunction ordering extra time for the Exam. Plaintiff has only asserted that her particular review course ends a few days prior to her self-selected test date and her particular school will not allow her to take the exam again. She does not demonstrate (since she cannot) that no medical school will allow her to complete her studies. Also, failing to become a doctor does not constitute irreparable harm.

Second, Plaintiff has failed to demonstrate a likelihood of success on the merits of her claims. In order to establish a cognizable disability under the ADA, Plaintiff must prove that she has a disability – she claims that it is her inability to read and learn material – that substantially limits her in comparison to the average person. But the reports of the "experts" who have evaluated Plaintiff simply do not show this, and her own academic achievement refutes it. Plaintiff has failed to introduce evidence that she is disabled, much less that her alleged impairments substantially affect any major life activity.

Finally, the balance of hardships and public policy strongly favors the denial of a preliminary injunction. The NBME grants appropriate accommodations to qualified examinees to ensure that every examinee takes the Exam on equal footing and to allow states to determine whether physician candidates meet the minimum prerequisites for medical knowledge. Featherman Aff. ¶10. The NBME is entrusted with the responsibility of ensuring that the Exam

---

[1] Plaintiff has also alleged violations of the Massachusetts Public Accommodations Statute Mass. Gen. Laws ch. 272, § 98 which provides the same protections as the ADA. See footnote 12, supra..

is administered in a manner that properly identifies those individuals qualified to become physicians. To accomplish this goal, the NBME carefully reviews, and, when appropriate, grants requests for accommodations due to disabilities. Id. However, the NBME cannot, and will not, grant any request for an accommodation by an examinee who is not actually impaired in performing major life activities as compared to the general population. To do so would undermine the integrity of the Exam, and the method for determining minimum standards for the medical profession, potentially put patients at risk, be unfair to those taking the exam without accommodation, and undermine the goal of the ADA to put the disabled on an equal footing with others (if it guaranteed someone without an impairment an advantage).

Thus, Plaintiff's motion for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

Plaintiff Baer, who has completed the first two years of medical course work[2] at Drexel, is currently registered to take the Exam in the testing period from May 1 to July 31, 2005. Featherman Aff. ¶ 20. Upon registration, Ms. Baer alleged she suffered from a learning disability and Attention Deficit/Hyperactivity Disorder and requested the accommodation of additional exam time to complete the exam. See Verified Complaint and Request for Injunctive Relief ("Compl.") ¶ 51. Plaintiff has previously failed the Exam in June 2003, December 2003, and August 2004. See id. ¶¶ 33, 38, 42. It was after this period of unsuccessful test taking that she was "diagnosed" for the first time with ADHD. Ms. Baer sought additional time on each of those exams based on other alleged disabilities. See id. ¶¶ 32, 34, 39. Each time upon review (or re-review)[3] of her application by its experts, the NBME rejected her request for accommodations. Featherman Aff. ¶ 16-20.

---

[2] Plaintiff has completed the first two years of medical school course work in a program that allowed her to re-take her first year, and then complete her second year, while taking a half course load. Compl. ¶¶ 26-28.

[3] See Featherman Aff. ¶ 16-19; Affidavit of Joseph E. Bernier, Ph.D. ("Bernier Aff.") ¶ 8, attached as Exhibit 2 hereto.

Plaintiff obtained a bachelor's degree from English from Duke University in 1996 with a 2.95 GPA without accommodations.  See Compl. ¶ 18 and Ex. E.  She was on the Dean's List her last semester there and earned A's in difficult courses.  See id. Ex. E.  Before graduation, she took the MCAT and was unhappy with her score.  See Memorandum in Support of Plaintiff's Motion for a Permanent and Preliminary Injunction ("Moving Brief" or "Mov. Br.") at 4.  She then engaged in various study programs, yet again failed to obtain a score to her satisfaction.  See Compl. ¶¶ 19-23.  It was at that time that Ms. Baer was diagnosed with an alleged disability.  See id. ¶¶ 24-25.  She was granted additional time on her MCAT based on her alleged disabilities and then obtained admission to Drexel.  See id. ¶ 25.  The MCAT was the first standardized test she took with accommodations.  See id.  On the SAT, she obtained a score of 530 on the Verbal section and a 560 on the Math section, a score well-above the mean.[4]  Bernier Aff. ¶ 28.  Likewise, she preformed above average on the PSAT, scoring in the 60th percentile on the Verbal section and 66th percentile in the Math section of the PSAT.  See id. ¶ 28.

Similarly, Plaintiff neither sought nor obtained any accommodations in medical school until after her unsuccessful first year.  See Compl. ¶¶ 26-7.  No learning disabilities were ever documented, and thus, no accommodations were made during her entire primary and secondary school career at Milton Academy.  See Affidavit of Kevin R. Murphy ("Murphy Aff.") ¶ 14, attached as Exhibit 3 hereto.  Her records from Milton Academy (Compl. Ex. D) indicate that Ms. Baer was a successful student.  Likewise, she never sought nor was ever granted any accommodations during her career at Duke University.  Compl. ¶ 18 and Ex. E.

In support of her most recent request for accommodations, Plaintiff submitted a personal statement, the reports of four experts and various school records.  See Compl. Exs. A-N, P, S.  However, the experts did not follow established diagnostic criteria and have not compared her to the general population.  Following the NBME's standard practices and procedures, that material

---

[4]  According to the College Board website, www.collegeboard.com/press/senior97/table01.html, the average score for females in 1991, the year in which Ms. Baer took the test, was 495 on the Verbal portion of the test and 482 on the Math portion.

was reviewed by two experts in the field of ADHD and adult learning disabilities, Dr. Kevin R. Murphy and Dr. Joseph E. Bernier, respectively. See Featherman Aff. ¶ 19. Dr. Murphy concluded that Ms. Baer did not suffer from ADHD. Murphy Aff. ¶ 11. Dr. Joseph Bernier also reviewed Plaintiff's submissions and concluded that she did not suffer from a reading disability. Bernier Aff. ¶ 33. Indeed, 26 of the 27 tests given to Ms. Baer between August of 2003 and March of 2004 showed her reading skills to be average or above. Bernier Aff. Ex.G. The single below-average test result – which standing alone would not be a basis for a diagnosis of a reading disability – was on a test Ms. Baer had previously taken and scored well in the average range, 44 points higher than on the later administration. Id. Based on those recommendations and based on its well-established procedures, the NBME denied Ms. Baer's request for accommodation on January 14, 2005. See ¶ Ex. U. Plaintiff did not file her complaint in this case, motion for preliminary injunction, and request for short order notice until April 12, 2005.

## ARGUMENT

Plaintiff carries a heavy burden in order to justify the extraordinary relief of a preliminary injunction. "Absent something that indicates a need for immediate relief, a plaintiff's request for a preliminary injunction ordinarily ought to be rejected." Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d 68, 74 (1st Cir. 2004). See also Augusta News Co. v. News Am. Publ'g, Inc., 750 F. Supp. 28, 31 (D. Me. 1990) ("Preliminary injunctions must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain."). Since the plaintiff seeks a "mandatory" injunction, the First Circuit requires this Court to find the plaintiff has met the highest standard for preliminary relief.[5] She has not.

---

[5] Although ordinarily the "'purpose of a preliminary injunction is to preserve the status quo,'" "[t]he mandatory preliminary injunction sought by plaintiff in this case would disturb the status quo." Lewis v. General Elec. Co., 37 F. Supp. 2d 55, 63 (D. Mass. 1999) (citation omitted). "[T]he First Circuit has cautioned that a preliminary injunction that has the effect of disturbing, rather than preserving, the status quo 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" Rarities Group, Inc. v. Karp, 98 F. Supp. 2d 96, 104 (D. Mass. 2000) (quoting Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency, 649 F.2d 71, 76 n.7 (1st Cir. 1981)). Thus, here as in other courts, plaintiff's burden in seeking a mandatory injunction is particularly heavy. See Lewis, 37 F. Supp. 2d at 62 ("Other courts reflect the First Circuit's disfavor of mandatory injunctions by requiring parties to meet a higher standard than in an ordinary case.").

The parties agree that Plaintiff must prove four factors for a preliminary injunction: (1) a likelihood of success on the merits; (2) irreparable harm if the injunction is denied; (3) that the balancing of hardships favors the issuance of the injunction; and (4) that the issuance of the injunction will not be contrary to public interest. <u>Bercovitch v. Baldwin Sch., Inc.</u>, 133 F.3d 141, 151 (1st Cir. 1998). Plaintiff, however, cannot satisfy any of those factors. As a threshold matter, Plaintiff has failed to present <u>any</u> evidence proving that she will be irreparably harmed if this injunction does not issue. Moreover, Plaintiff cannot demonstrate a likelihood of success on the merits, because she is <u>not</u> "disabled" under the ADA. Finally, the balance of hardships and public policy strongly militate in favor of denying a preliminary injunction.

## I.    PLAINTIFF HAS FAILED TO ESTABLISH AN IMMINENT THREAT OF IRREPARABLE HARM

Irreparable harm in the preliminary injunction context is defined as "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." <u>Rio Grande Cmty. Health Ctr., Inc. v. Rullan</u>, 397 F.3d 56, 76 (1st Cir. 2005). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." <u>Charlesbank Equity Fund II v. Blinds To Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004). Moreover, a plaintiff "must establish [an] injury that is not remote or speculative, but is actual and imminent." <u>Sierra Club v. Larson</u>, 769 F. Supp. 420, 422 (D. Mass. 1991), <u>aff'd</u>, 2 F.3d 462 (1st Cir. 2003).[7] "In other words, the applicant must show that the injury complained of is of such imminence that there is a 'clear and present need for relief to prevent irreparable harm.'" <u>Id.</u> Plaintiff cannot meet this standard.

In an effort to conjure up imminent, irreparable harm, Plaintiff asserts that "her career in medicine will be over," "then she will be summarily expelled from medical school" and that "her

---

[7] <u>See also</u> <u>Hannon v. Allen</u>, 241 F. Supp. 71, 73 (D. Mass. 2003) ("Plaintiff must establish "an <u>imminent</u> threat of irreparable harm in the absence of a preliminary injunction.") (emphasis added).

dream of becoming a physician will come to an end" if she is not granted extra time on the May 5 Exam.[8]  See Compl. ¶¶ 3, 53.  These justifications for the preliminary injunctive relief are inadequate in at least two respects.

First, plaintiff presents absolutely no explanation as to why May 5, 2005 is a significant date.  Plaintiff's Exam registration entitles her to take the Exam any time from May 1, 2005 to July 31, 2005 and she is completely free to register for a later exam.  Featherman Aff. ¶ 9.  Plaintiff has produced nothing to indicate that Drexel requires her to take the Exam on May 5, 2005, or by any particular date at all.  Indeed, no evidence supports the May 5 date as a "drop-dead" deadline of any sorts.  Plaintiff asserts only that this date is a few days after the conclusion of a test preparation course she is taking.  See Affidavit of Heidi A. Baer ¶ 9.  Obviously, a showing that May 5 is a convenient date for the Exam does not meet this Court's exacting standards for showing that adequate relief cannot be obtained at a later date.

Second, Plaintiff does not come close to showing that failure to take a test on May 5, means that "her career in medicine will be over."  Of the 138 accredited medical schools in the United States, 42 do not require passage of the Exam in order to advance to third-year studies.  Featherman Aff. ¶ 8.  Indeed, 22 medical schools never require their students to receive a passing grade on the Exam.  Id.  As for the states' license requirements, there is no significance to the May 5 date at all so long as she eventually passes the test.

At most, Plaintiff has alleged that her medical education might be delayed if she is not allowed to take the Exam with accommodations on May 5, 2005, and instead is forced to wait until after Court considers the merits of her claim, either because she must miss a semester before she can begin her third academic year at Drexel, or because she must transfer to another medical school that does not require the Exam as a condition to promotion or graduation.  However, "mere delay of educational opportunities does not constitute irreparable harm."

---

[8]  Plaintiff's complaint asks the court to assume that the extra time will give her an advantage and will alleviate her poor performance on previous exams.  However, Plaintiff admits that when she took the practice Exam with extra time, she failed, only scoring in the "30th percentile of her class."  Compl. ¶ 30.

Rothberg v. Law Sch. Admission Council, No. 04-1060, 2004 WL 1345130, at *3 (10th Cir. June 16, 2004).  See also Dogon v. National Bd. of Med. Exam'rs, No. 98-10967-PBS, slip op. at 2 (D. Mass. June 10, 1998) ("Even the possibility of delayed graduation from medical school is not a basis for irreparable harm necessary to satisfy the standard for preliminary injunction."), attached as Exhibit 4 hereto.  Moreover, such potential injury – delay and the possibility of having to transfer to another medical school – is precisely the kind of injury that is redressed by monetary damages and is insufficient to support a finding of irreparable harm.[9]

In sum, nothing in Plaintiff's Motion explains why a later-issued permanent injunction after a full adjudication of the merits of her claim or money damages would not be an adequate remedy.  Plaintiff's bare allegations that her career in medicine will be over if not allowed to take the Exam with accommodations on May 5, 2005 fails to meet this Court's requirements for proving irreparable harm.

## II.    PLAINTIFF IS NOT DISABLED UNDER THE ADA OR MASSACHUSETTS STATE LAW AND THUS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

The First Circuit regards the probability of success inquiry "as critical in determining the propriety of injunctive relief."  Lancor v. Lebanon Hous. Auth., 760 F.2d 361, 362 (1st Cir. 1985).  In the First Circuit, a showing a likelihood of success on the merits is "[t]he sine qua non of [the] four-part inquiry."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  Thus, "if the moving party cannot demonstrate that [she] is likely to succeed in [her] quest, the remaining factors become matters of idle curiosity."  Id.[10]

---

[9]  See, e.g., McDonough v. Trustees of Univ. Sys. of N.H., 704 F.2d 780, 784 n.2 (1st Cir. 1983) (denying injunctive relief to a terminated college professor because money damages could offer a complete remedy); Micro Networks Corp. v. HIG Hightec, Inc., 188 F. Supp. 2d 18, 22 (D. Mass. 2002) ("As a general rule, the possibility of monetary injury does not constitute irreparable harm."); Costello, Erdlen & Co. v. Winslow, King, Richards & Co., 797 F. Supp 1054, 1065-66 (D. Mass. 1992) (injunctive relief denied because irreparable injury was not shown and money damages would fully alleviate harm).

[10]  See also Air Line Pilots Ass'n, 399 F.3d at 95 (same); Pharmaceutical Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 84 (1st Cir. 2001) ("Having concluded that PhRMA is not likely to succeed on the merits of its

This threshold showing is no mere formality: "In the ordinary course, plaintiffs who are unable to convince the trial court that they will <u>probably</u> succeed on the merits will not obtain interim injunctive relief." <u>Weaver v. Henderson</u>, 984 F.2d 11, 12 (1st Cir. 1993) (emphasis added). Plaintiff no doubt recognizes that she cannot meet this standard and thus urges the Court to adopt the novel position that she need only show "<u>some</u> likelihood of success". Mov. Br. at 16. That is not the law. In this case, Plaintiff simply cannot establish that she will probably succeed on the merits of her claim—in fact, as set forth more fully below, Plaintiff cannot even show that she is disabled under either the ADA or Massachusetts state law. <u>See</u> <u>infra</u> at 9-18.

The ADA prohibits discrimination against disabled individuals in public accommodations, including professional exams such as USMLE, Step 1. The NBME provides reasonable accommodations in accordance with the ADA for individuals with documented disabilities who demonstrate a need for accommodation. The ADA, however, "is not designed 'to allow individuals to advance to professional positions through a back door. Rather, it is aimed at rebuilding the threshold of a profession's front door so that capable people with unrelated disabilities are not barred by that threshold alone from entering the front door." <u>Price v. National Bd. of Med. Exam'rs</u>, 966 F. Supp. 419, 421-22 (S.D. W. Va. 1997) (citation omitted). As the <u>Price</u> court explained:

> If a court were to grant testing accommodations to persons that do not have disabilities within the meaning of the ADA, it would allow persons to advance to professional positions through the proverbial back door. In so undermining the integrity of the USMLE, that court would hinder the Board's ability to distinguish between qualified students and unqualified students.

<u>Id.</u> at 422. The NBME requires individuals seeking an accommodation to submit documentation establishing that the individual is, in fact, disabled within the meaning of the ADA. The

---

constitutional challenges, we need not delve into the three remaining preliminary injunction factors (risk of irreparable harm, the balance of equities and the public interest).", <u>aff'd sub nom. Pharmaceutical Research & Mfrs.</u>

documentation must also reflect why the particular accommodation sought addresses the impairment. Here the request for 50% more time is unsupported. The request is arbitrary because the impairment is missing.[11]

In determining whether a plaintiff has a disability under the ADA, the First Circuit applies an individualized three-part inquiry into: (1) whether the plaintiff's condition constitutes a mental or physical impairment; (2) whether the life activities on which the plaintiff relies are major life activities; and (3) whether the impairment substantially limits the major life activities identified. Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1167 (1st Cir. 2002). The plaintiff bears the burden of proving all three elements. Id. Plaintiff fails to prove any of these elements, much less all three.[12]

### A. Plaintiff Cannot Prove That She Is *Impaired.*

Plaintiff cannot demonstrate that she suffers from the impairments of a learning disability and ADHD.[13] The mere opinion of an expert that a plaintiff has academic or test-taking difficulties does not mean that a plaintiff suffers from a learning impairment.[14] Poor

---

of Am. v. Walsh, 538 U.S. 644 (2003).

[11] Indeed, Baer concedes that she has already failed the practice exam even when allowed additional time, thus confirming that her issue is not that it is a timed exam but instead her difficulty with the material. Compl. ¶ 30.

[12] In order to state a claim under the Massachusetts Public Accommodation Act, plaintiff would have to meet the same three-part standard required under the ADA — that she has a physical or mental impairment that "substantially limits a major life activity." See City of New Bedford v. Mass. Comm'n Against Discrimination, 799 N.E.2d 578, 589 (Mass. 2003) (adopting the three part test applied by federal courts in ADA cases for cases of handicap discrimination brought under Massachusetts state law); Lesley v. Chie, 250 F.3d 47, 58 n.17 (1st Cir. 2001) (explaining that interpretation of the Massachusetts law generally proceeds "hand in hand" with the interpretation with the ADA.). Accordingly, because she cannot prove her ADA claim, her Massachusetts state law claim also necessarily fails.

[13] The First Circuit has recognized that ADD/ADHD may, under some circumstances, be considered a mental impairment for purposes of the ADA. See Bercovitch, 133 F.3d at 155.

[14] See, e.g., Dogon, slip op. at 3-4 (finding insufficient evidence to support a finding of mental impairment when defendant's experts testified that plaintiff "performs at the average level one might expect given his average IQ"); Tatum v. NCAA, 992 F. Supp. 1114, 1123 (E.D. Mo. 1998) (finding plaintiff was not impaired because poor performance could be related to lack of effort or preparation).

performance can be the result of a myriad of factors besides disability such as ability, aptitude in the subject area, diligence, or poor test-taking skills.[15]

Moreover, the opinion of an expert that a plaintiff has a learning disability or a diagnosis under the American Psychiatric Association's <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 1994) ("DSM-IV") does not necessarily equal an impairment or disability under the ADA.  As the First Circuit explained in <u>Bercovitch</u>:

> We particularly note that the DSM-IV admonishes that because of the "imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis[,] in most situations, <u>the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a 'mental disorder,' 'mental disability,' 'mental disease,' or 'mental defect.'</u>  In determining whether an individual meets a specified legal standard . . . additional information is usually required beyond that contained in the DSM-IV diagnosis. . . . It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability."

133 F.3d at 155 n.18 (emphasis added) (quoting the DSM-IV).  <u>See also</u> <u>Whitlock v. Mac-Gray, Inc.</u>, No. Civ.A. 00-10546-GAO, 2002 WL 31432688, at *12 (D. Mass. Oct. 30, 2002) ("submitting evidence of a medical diagnosis does not prove one is disabled for the purposes of the ADA"), <u>aff'd</u>, 345 F.3d 44 (1st Cir. 2003).

Here, Plaintiff fails to establish that she suffers from any real impairments as compared to the general population.  With regard to her ADHD claim, the documentation does not even support the diagnosis.  As Dr. Murphy notes, ADHD is a developmental disability with childhood onset that typically results in a chronic and pervasive pattern of functional impairment in academic, social, or vocations areas, and often in daily adaptive functioning.  Murphy Aff. ¶

---

[15]  <u>See</u>, <u>e.g.</u>, <u>Axelrod v. Phillips Academy, Andover</u>, 46 F. Supp. 2d 72, 86 (D. Mass. 1999) ("For the past three years, Phillips Academy has been attempting to tell Nicholas and his mother that Phillips Academy was not a good choice for Nicholas, not because of his ADHD, but because of Nicholas' failure to meet the academic standards of the school."); <u>Tatum</u>, 992 F. Supp. 1123 (rejecting plaintiff's claim because own expert admitted on cross-

12.  By definition, ADHD first exhibits in early childhood and manifests itself in more than one setting.  Id.  Plaintiff's documentation, however, does not reflect a frequency, intensity, or magnitude of symptomology or impairment sufficient to support a clinical diagnosis of ADHD, either now or during childhood.  Id. ¶ 13.

With respect to Plaintiff's childhood, her early functioning appeared to be quite satisfactory and did not reflect significant symptoms of any ADHD impairment.  Id. ¶ 14.  Based on her academic records at Milton Academy, which Plaintiff attended from kindergarten through high school, the overwhelming majority of her teachers viewed her as an intelligent, hard-working, dedicated student who was a pleasure to have in class.  Plaintiff was never referred for any formal treatment or accommodations related to ADHD during her childhood.  Id.  Indeed, Plaintiff was evaluated by numerous diagnosticians over a period of nearly two decades who did not conclude that ADHD was a valid diagnosis for her.  As such, the documentation is inconsistent with both the childhood onset and pervasive pattern of functional impairment criteria for a proper ADHD diagnosis.  Id. ¶ 15.

It was not until 2004, after failing USMLE, Step 1, that Plaintiff was first diagnosed with "mild AD/HD, Inattentive Type" by Dr. Marilyn F. Engleman.  Id. ¶ 16.  In making this diagnosis, however, Dr. Engleman did not even attempt to apply the full diagnostic criteria set forth in the DSM-IV.  Id.[16]  For example, Dr. Engleman did not specify which or how many of

---

examination that "plaintiff's poor performance on standardized tests could possibly be related to a lack of motivation or preparation").

[16]  Rather than apply the DSM-IV criteria, Dr. Engleman instead used the self-reported Brown ADD Scales and the results of several tests that are not diagnostic of ADHD, including the Nelson Denny Reading Test and the Woodcock-Johnson Psycho-Educational Battery, in making her ADHD diagnosis.  Murphy Aff. ¶ 23.  These tests do not evaluate the DSM-IV criteria for the ADHD disorder and are not diagnostic of ADHD.  Id.  The Brown ADD Scales are especially unreliable, as they depend on the subject's truthful self-report of symptoms.  Here, Plaintiff has demonstrated that she is an unreliable reporter of her own experiences.  For example, she reported to Dr. Connolly and Danielle Kerns that she received a 1250 and 1225 combined score on her SAT's, respectively.  She states in her

the itemized symptoms of inattention or hyperactivity-impulsivity Plaintiff manifested currently

or during childhood to determine if she met the symptom threshold required for a DSM-IV

diagnosis of ADHD. Id. ¶ 17. Dr. Engleman also failed to find that Plaintiff manifested

"clinically significant impairment" in at least two life domains, as required by the DSM-IV. Id. ¶

18. Instead, Dr. Engleman described impairment in only one area – academics – and even there

the described impairment was limited to the setting of timed testing. Id. Because Dr. Engleman

did not find that Plaintiff met the symptom thresholds for inattention or hyperactivity-impulsivity

or find "clinically significant impairment" in at least two life domains, her ADHD diagnosis fails

to meet the DSM-IV criteria, and her diagnosis that Plaintiff suffers from ADHD is

professionally unsound. Id. ¶ 22.[17]

     As for Plaintiff's claim that she suffers from reading and learning disorders, Plaintiff's

brief presents a very selective record of these alleged impairments. As Dr. Bernier explains in

his affidavit, Plaintiff's reading and learning disorder "diagnoses" are significantly flawed. See

Bernier Aff. ¶ 33-35. In reaching their respective reading and learning disability diagnoses, the

various "experts" who examined Plaintiff routinely overlooked average or better diagnostic test

scores and a history of average or better unaccommodated achievement on the PSAT and SAT,

as well as primary school, secondary school, and undergraduate level coursework. Id. ¶ 33.

Plaintiff's achievements are inconsistent with a reading disorder diagnosis. Id. ¶ 33. Ms. Baer

---

personal statement to the NBME that she received an 1190 combined score on her SAT's. In fact, however,
Plaintiff's best score on the SAT's was 1090, 160 points less than the score she reported to Dr. Connolly.

[17] Dr. Cheryl Weinstein also diagnosed Plaintiff as having "attention deficit disorder secondary to language based
learning disorder." However, Dr. Weinstein did not conduct any tests that are diagnostic of ADD or ADHD, made
no finding regarding the official criteria for ADD disorder, and appears to have based her ADD diagnosis on a
selective reading of historical documentation provided by Ms. Baer and on Dr. Engleman's earlier diagnosis.
Murphy Aff. ¶ 24. As such, Dr. Weinstein's diagnosis of ADD is also professionally unsound. Id.

also had high grades in her college classes that demand the most reading.[18]  Also, while plaintiff's only expert affidavit states that it is "impossible for her to rapidly read and organize information as such a way as to be able to succeed on timed mastery examinations...."  Affidavit of Cheryl Weinstein ¶ 4.  Ms. Baer did exactly that at least four times with the PSAT and SATs getting average or better scores.  In Dr. Bernier's professional opinion, Plaintiff has no reading disorder.  Id. ¶ 33.

Additionally, the evidence is inconsistent with any diagnosis of language-based learning disability or executive dysfunction.  Id. ¶ 34-35.  In reaching her language-based learning disability diagnosis, for example, Dr. Weinstein relied on purported deficits in sound blending skills, listening comprehension, and writing fluency.  However, Plaintiffs' recorded average or better scores on numerous diagnostic tests designed to measure these very skills.  Id. ¶ 34.  Furthermore, Ms. Baer's Wechsler Adult Intelligence Scale-III ("WAIS-III") Verbal IQ and Verbal Comprehension scores are all well above average (94th percentile and 86th percentile, respectively), a finding that is inconsistent with language-based learning disability.  Id. ¶ 34.  Ms. Baer also achieved average or better scores on the PSAT, SAT, and SAT-Achievement tests.  This evidence conflicts with the diagnosis of language-based learning disorder or disability.  Id. ¶ 34.  Likewise, Plaintiff's scores on the WAIS-III Picture Completion and Similarities and Matrix Reasoning tests (95th and 99th percentile, respectively) are incompatible with any pervasive difficulties processing complex information or solving complex problems and inconsistent with an executive dysfunction diagnosis.  Id. ¶ 35.

---

[18] She claims her lower grades in science courses are due to timed tests but supplies no evidence that the science grades were derived mostly from such tests. Typically they are not and generally the grades are also based on problem solving tests and lab work along with some timed testing in some courses.

Moreover, Plaintiff's own experts' reports are riddled with inconsistencies and repeatedly acknowledge possible causes for Plaintiff's poor performance other than her alleged impairments. Plaintiff's carefully selected portrait of her alleged disability fails to mention a number of issues that her own experts observed are not disabilities but that may contribute to low test scores on the Exam:

- Dr. Connolly stated that Ms. Baer "clearly does not have a severe or comprehensive problem." See Murphy Aff. ¶ 19.

- The conclusions of the experts at Drexel were that it is "unclear the reason for" Plaintiff's difficulties, and one possibility might simply be her demonstrated need to be extremely careful. See Forman/Kerns Report (Compl. Ex. M).

- Dr. Prather's report notes that plaintiff is "a little but not remarkably slow" and also concluded that Plaintiff had "test anxiety" and as a result she became disorganized and obsessive and that the anxiety was problematic enough that medication was prescribed. See Prather Report (Compl. Ex. P) at 3.

- Dr. Weinstein attributed some of plaintiff's difficulties to her "inefficient style" and noted that plaintiff used "idiosyncratic strategy" and when "pushed" to use a more effective strategy, she benefited. See Complaint ¶ 49; Weinstein Report (Compl. Ex. A) at 4.

- Science is likely not her strength as Plaintiff admitted that she "She decided to major in English at Duke because she 'didn't like science labs.'" Kerns and Forman Report, Compl. Ex. M. She "struggled" with science in high school (see e.g.,., Compl. Ex.D, report of advisor Pamela White 2/9/90) and her performance in science courses at Duke did not match her achievement in other subjects. See Compl. Ex. E.

Plaintiff fails to demonstrate that she is "impaired" and, thus, is not entitled to any accommodation under the ADA. See, e.g., Dogon, slip op. at 4 (performing at average level on achievement tests reflects there is no impairment).

### B. Plaintiff Cannot Prove That Her Alleged Impairments Impact A *Major Life Activity*.

Even if this Court finds that Plaintiff is impaired, she is still not disabled for purposes of the ADA, because Plaintiff has failed to show that her alleged impairments impact a "major life activity." Bailey, 306 F.3d at 1167. Major life activities include "walking, seeing, hearing,

speaking, breathing, learning, and working."  28 C.F.R. § 36.104(2).  This standard includes major life activities of most people's lives, not specialized tasks in any specific endeavor. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 201 (2002) ("[T]asks unique to any particular job are not necessarily an important parts of most people's lives.")  Thus, the inability to pursue a specific academic pursuit or professional career does not impact major life activity.[19]

Although Plaintiff's Brief attempts to characterize the affected major life activity as reading and learning, it is clear from the record that Plaintiff actually claims that her alleged impairments affected the taking of timed standardized tests on medical topics.[20]  Inability to pass timed tests on medical topics does not qualify as a major life activity for most people.  See, e.g., McGuinness v. University of N.M. Sch. Of Med., 170 F.3d 974, 978-79 (10th Cir. 1998); Marlon v. Western New England Coll., No. Civ.A. 01-12199DPW, Civ.A. 01-12199DPW, 2003 WL 22914-304, at *8 (D. Mass. Dec. 9, 2003).

### C.    Plaintiff Cannot Prove A *Substantial Limitation* In A Major Life Activity.

Even if Plaintiff were impaired by ADHD or a learning disability – which she is not – Plaintiff still fails to establish disability under the ADA because she is not substantially limited. Bailey, 306 F.3d at 1167.  The First Circuit has repeatedly held that the mere fact that a plaintiff

---

[19]  See, e.g., McGuinness v. Univ. of N.M. Sch. of Med., 170 F.3d 974, 979 (10th Cir. 1998) (finding that plaintiff must prove disability impeded performance in wide variety of disciplines and concluding that "[f]or the purposes of the ADA, inability to pursue one career, such as medicine, does not constitute a severe impact on an individual's life."); Whitlock, 2002 WL 31432688, at *2 (explaining ADA standard required plaintiff to prove more than that he was precluded from more than a particular job).

[20]  Plaintiff cannot argue that she has a comprehensive disability in reading and learning generally, as she successfully completed a college degree in English without any accommodations.  Indeed, not even her own experts allege that functional day-to-day reading and learning is impacted — her own expert's letter to the NBME in support of her request for accommodations stated that Ms. Baer "clearly does not have a severe or comprehensive problem" with reading or learning but that it is an "obstacle to a real life activity of passing examinations."  See Murphy Aff, ¶ 19 (Connolly Letter, dated Aug. 4, 2003).  Furthermore, Plaintiff's above-average scores on the PSAT and SAT, without any accommodations, refute that she is limited in the activity of timed test-taking generally.  As such, Plaintiff can claim, at most, that her alleged impairments impact the taking of tests on medical topics.

is impaired is insufficient to establish disability under the ADA; rather, it is essential that the plaintiff establish a <u>substantial limitation</u> in a major life activity in <u>comparison to most people</u>.[21]

The First Circuit has repeatedly and specifically found that the appropriate standard for comparison of limitation is the average person.  <u>See</u>, e,g, <u>Bercovitch</u>, 133 F.3d at 155-56 (vacating district court's grant of a preliminary injunction pending arbitration of ADA claims because plaintiff could not show, compared in relation to an average person his age, that a major life activity was substantially limited); <u>Soileau v. Guilford of Me., Inc.</u>, 105 F.3d 12, 15-16 (1st Cir. 1997) ("Impairment is to be measured in relation to normalcy, or, in any event, to what the average person does.").  <u>See also</u> <u>Calef v. Gillette Co.</u>, 322 F.3d 75, 83-84 (1st Cir. 2003) (finding facts belied claim of substantial limitation when plaintiff scored in average range on tests, completed his GED and successfully completed on-the-job-training).[22]  Indeed, Plaintiff's brief acknowledges the First Circuit's average person standard.[23]

Plaintiff has failed to produce evidence demonstrating that she does not learn in a manner comparable to an average person.  When both of the NBME's experts compared Plaintiff's experts' test results to the appropriate benchmark, the conclusion is clear; plaintiff falls within the average range of performance.  See Bernier Aff. Ex. G.

---

[21]  <u>See</u>, <u>e.g.</u>, <u>Wright v. CompUSA, Inc.</u>, 352 F.3d 472, 477 (1st Cir. 2003) (finding that plaintiff was not disabled within the meaning of the ADA because although plaintiff "provided evidence that his ADD affected various activities in his everyday life" he could not show he was substantially limited in those activities); <u>Bercovitch,</u> 133 F.3d at 155-56 (vacating district court's grant of a preliminary injunction pending arbitration of ADA claims because plaintiff could not show, compared in relation to an average person his age, that a major life activity was substantially limited); <u>Soileau v. Guilford of Me., Inc.</u>, 105 F.3d 12, 15-16 (1st Cir. 1997) (finding that plaintiff's dysthemia was not a disability because it did not substantially affect a major life activity).

[22]  Indeed, the very case on which she seeks to predominately rely, <u>Rush v. National Bd. of Med. Exam'rs</u>, 268 F. Supp.2d 673 (N.D. Tex. 2003), applies the average person standard.  The scant findings in that case included a finding that the plaintiff was limited in reading and learning <u>as compared to most people</u>.  Because not even plaintiff's own experts proffer evidence that Ms. Baer is limited as compared to the average person, that case is readily distinguishable.

[23]  <u>See</u> Mov. Br. at 13 (citing the preamble to the Department of Justice's ADA regulations, 28 C.F.R. Pt. 35, App. A. § 35.104, which states that "[a] person is considered an individual with a disability . . . when the individual's important life activities are restricted . . . <u>in comparison to most people</u>") (emphasis added).

Moreover, Plaintiff's past academic record directly contradicts a finding that she is substantially limited in reading and learning in comparison to most people. Her school records from Milton Academy show success without accommodations. See Compl. Ex. M. Plaintiff took both the PSAT and SAT without accommodations scored well within the average range or better. See Bernier Aff. ¶ 31. Plaintiff was accepted by and graduated from Duke University with a degree in English, achieving a 2.95 GPA without accommodations. Based on this unaccommodated successful academic career plaintiff cannot prove that she is "substantially limited" by her alleged disabilities.[25] Her problems with science tests are much more likely related to her noted difficulties with science courses and her admitted dislike of science labs in college, both wholly unrelated to timed testing. Plaintiff cannot show she is substantially limited in a major life activity in comparison to most people.

## III.   THE BALANCE OF HARDSHIPS AND PUBLIC POLICY FAVOR DENIAL OF THE PRELIMINARY INJUNCTION.

Finally, Plaintiff cannot show the third and fourth elements required for issuance of a preliminary injunction: that the balancing of hardships favors the issuance of the injunction and that the issuance of the injunction will not be contrary to public interest. See Bercovitch, 133 F.3d at 151. Despite Plaintiff's attempts to minimize the impact of granting a preliminary injunction, it is clear that granting Plaintiff's motion would be contrary to the public interest and

---

[25] See, e.g., Calef, 322 F.3d at 83-84 (finding facts belied claim of substantial limitation when plaintiff scored in average range on tests, completed his GED, and successfully completed on-the-job-training); Gonzales v. Nat'l Bd. Of Med. Exam'rs, 225 F.3d 620, 630 (6th Cir. 2000) (rejecting plaintiff's claim of disability because of plaintiff's academic success including an average scores on the SAT and 3.15 GPA); Marlon v. Western New England Coll., Civ.A. No. 01-12199DPW, 2003 WL 22914304 (D. Mass. Dec. 9, 2003) (rejecting a plaintiff's claim of learning disability as longstanding when she had been successful in academic in professional career before she started law school).

detrimental to the NBME as well as other test-takers.

The NBME is responsible for ensuring the integrity and meaningfulness of the scores of the examinations used throughout the United States for medical licensure. Thus, the NBME must take care that the examinations are administered under standard conditions and that no examinee or group of examinees receives an unfair advantage. The NBME has developed a extensive, standardized system for evaluating and granting requests for accommodations. See Powell v. National Bd. of Med. Exam'rs, 364 F.3d 79, 88-89 (2d Cir. 2004). If the NBME were to extend accommodations to examinees who have not established by the requisite clinical, psychometric and historical data that they are disabled, the NBME's integrity would be called into question as would the entire testing process. "As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it." Powell, 364 F.3d at 88-89.

The objective of NBME testing is different from the MCAT or medical school tests, which set standards for performance as a medical student, not a physician. The public relies on and expects the Exam to be fair, equal, and rigorous. In addition, other individuals who take the examination would be harmed by the unfair advantage given to the Plaintiff. The accommodation sought here also disadvantages those with real disabilities by creating an uneven playing field again. In addition, depending on her score, it may unfairly give plaintiff an opportunity for a better residency than a similarly situated, unaccommodated student.

Issuing a preliminary injunction in this case potentially endangers the public and thus, is contrary to the public interest. The public has the right to expect that licensed medical doctors are qualified to treat them. Accordingly, the public interest requires the objective, fair and standardized testing of those who seek to become licensed physicians so that those who pass the licensing examinations are qualified to practice medicine.

Refusing to grant injunctive relief will not irreparably injure the Plaintiff, but granting injunctive relief may cause irreparable injury to members of the public and will also cause injury to the NBME and to the other individuals taking the examination. Accordingly, based

on the equities and the public interest, the preliminary injunction should be denied.

## CONCLUSION

For all of the foregoing reasons, NBME requests that the Court deny in all respects Plaintiff's request for a preliminary injunction and other equitable relief.

Respectfully submitted,

NATIONAL BOARD OF MEDICAL EXAMINERS

By its attorneys,

/s/ Joseph F. Savage, Jr.
Joseph F. Savage, Jr. (BBO#443030)
Inez H. Friedman-Boyce (BBO#630910)
Melissa Briggs Hutchens

GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02019
(617) 570-1000

Dated: April 22, 2005

- 20 -

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HEIDI A. BAER,                          )
                                        )
                Plaintiff,              )
                                        )
v.                                      )          Civil Action No.
                                        )          05-CV-10724-GAO
NATIONAL BOARD OF                       )
MEDICAL EXAMINERS,                      )
                                        )
                Defendant.              )
                                        )

## AFFIDAVIT OF CAROL MORRISON FEATHERMAN, Ph.D

Carol Morrison Featherman, having been duly sworn, hereby deposes and states:

1.      I currently reside at 16 Highland Drive, Media Pa.  I am employed by the
National Board of Medical Examiners ("NBME") as Assistant Vice President, Examinee
Support Services.  As Assistant Vice President, Examinee Support Services, my duties at
NBME include, among other things, supervising Examinee Support Services subunits, including
Registration, Examinee Records, Test Administration Services, and Disability Services;
addressing test administration, registration and test accommodation issues; improving processes
and keeping abreast of new developments in testing.  A copy of my curriculum vitae is attached
hereto as Exhibit A.

2.      NBME is a private non-profit corporation which, together with the Federation of
State Medical Boards ("FSMB"), another non-profit corporation, has created and established the
United States Medical Licensing Examination$^{TM}$ ("USMLE").  The USMLE is an examination
used by individual state medical licensing authorities to assess the qualifications of candidates
for medical licenses.  The test is designed to screen out unqualified individuals.  Consequently,

it tests minimum knowledge and skills; a test-taker passes the test by answering correctly only about 60-70% of the questions.

3.    The NBME takes its role as the testing organization for medical licensure seriously. All fifty states have, in essence, made the NBME the gatekeeper for the medical licensing boards, relying on its exams to identify those who are qualified to enter the profession and those who are not qualified to become physicians. Maintaining the integrity of the testing process is a critical part of the NBME's obligation to protect the public safety. The NBME is an integral component of a carefully constructed state-by-state system designed to ensure that only competent and qualified individuals are licensed to practice medicine.

4.    There are three phases of the USMLE exam known as "Steps." Step 1 assesses whether an applicant can understand and apply important concepts of the sciences basic to the practice of medicine, with special emphasis on the principles and mechanisms underlying health, disease, and modes of therapy. Step 1 is generally taken by a medical student enrolled in accredited U.S. medical schools at the end of the student's second year of school, after the basic science curriculum has been completed. Step 2, which consists of separate clinical knowledge ("CK") and clinical skills ("CS") components, is generally taken during the student's fourth year of medical school. Step 3 is often taken after the receipt of the medical degree, usually during or after the first year of residency training. Passage of all three Steps is accepted by all U.S. medical licensing authorities to satisfy the examination requirements for licensure as a physician.

5.    For students and graduates of U.S. and Canadian accredited medical schools, NBME determines whether to grant accommodations for Steps 1 and 2 and scores Steps 1 and 2. NBME reviews and makes recommendations to FSMB and/or state medical licensing boards regarding requests for accommodations for applicants taking the Step 3 examination. NBME does score

-2-

Step 3.

6.    NBME does not offer the Step examinations to all members of the general public.

To the contrary, only certain persons are eligible to sit for these examinations. With respect to

the Step 1 or Step 2 examination, only those persons who fall into one of the following

categories at the time of application and on the day of examination are eligible to sit for these

examinations:

- A medical student officially enrolled in or a graduate of a United States or Canadian medical school accredited by the Liaison Committee on Medical Education;

- A medical student officially enrolled in or a graduate of a United States osteopathic medical school accredited by the American Osteopathic Association; or

- A medical student officially enrolled in or a graduate of a foreign medical school and eligible for examination by the Educational Commission for Foreign Medical Graduates for its certificate.

In addition, an individual physician who is eligible for licensure by a medical licensing authority,

but who is not in one of the above three categories, may take Steps 1 or 2 upon request by that

licensing authority and upon meeting certain requirements for licensing established by that

licensing authority.

7.    To be eligible to sit for the Step 3 examination, the applicant must meet all of the

following requirements prior to submitting his or her application for the examination:

- Meet the requirements for taking Step 3 set by the medical licensing authority to which he or she is applying to sit for the examination, such as the completion of any postgraduate training requirements;

- Obtain the MD degree (or its equivalent) or the DO degree;

- Pass both Steps 1 and 2; and

- If a graduate of a foreign medical school, obtain certification by the Educational Commission for Foreign Medical Graduates or successfully complete a "Fifth Pathway" Program.

8.  Accredited medical schools in the United States and Canada have varying requirements concerning Step 1. According to the Association of American Medical Colleges, a nonprofit association that represents all accredited United States medical schools and many accredited Canadian medical schools: (1) at 11 accredited medical schools in the United States and Canada, Step 1 is optional; (2) at another 11 accredited medical schools in the United States and Canada, students must simply record a score on Step 1 (regardless of whether that score is passing or failing); (3) at 20 accredited medical schools in the United States and Canada, passage of Step 1 is required for graduation, but not for promotion to the third year of study; and (4) 94 accredited medical schools in the United States and Canada require a passing score on Step 1 for promotion to the third year of medical study. As such, passage of Step 1 is a prerequisite to licensure, but not to the completion of medical school, in the United States.

9.  Step 1 is offered year-round at Prometric® Test Centers around the world. Eligible registrants must select a three-month period during which they wish to take the exam. Upon completion of the registration process and a determination of eligibility, NBME sends to registrants a Scheduling Permit, which specifies the three-month eligibility period during which the registrant must complete the examination. It is then the registrant's responsibility to contact Prometric® to schedule a test date at his or her preferred Prometric® center during that three-month period. If a registrant is unable to take Step 1 within his or her eligibility period, extensions are available to take the test during the contiguous three-month eligibility period.

10.  NBME is responsible for ensuring that Steps are administered under standard conditions and that no examinee or group of examinees receives unfair advantage over another

-4-

on the examination in order to ensure the integrity and meaning of the scores and in order to

protect the public's interest in the medical licensure process. With respect to Steps 1 and 2, it is

also NBME's responsibility to ensure that persons with disabilities as defined by the Americans

with Disabilities Act ("ADA") are accommodated. In this regard, NBME recognizes that certain

applicants may have disabilities which require special testing accommodations. To this end,

NBME provides reasonable and appropriate accommodations in accordance with the ADA for

individuals with documented disabilities who demonstrate a need for accommodation. The goal

of these accommodations is to ensure that these applicants have equal, not preferential, access to

the examination process, so that the public will have the benefit of the skills of qualified

physicians who may be disabled, but not be subject to treatment by unqualified physicians.

11.     Applicants for the Steps who believe they are disabled and should be given

reasonable accommodation are required to complete a questionnaire regarding the nature of their

disability, the type of accommodation sought and history of prior accommodation. In addition,

they are required to provide to NBME documentation from qualified experts describing the

disability and the type of accommodation requested.

12.     The Disability Services office of the NBME reviews, among other things,

requests for test accommodations for the USMLE. A staff of 7 employees of the NBME

processes all requests in a timely manner and responds to telephone inquiries. All requests are

tracked by database to ensure follow-through and resolution of each request.

13.     Upon receipt of the required information from the applicant for test

accommodations for Step 1 or Step 2, NBME consults with outside experts with expertise in the

diagnosis and treatment of the disability described by the applicant, to assist it in determining

whether the applicant's submission supports the diagnosis of a disability as defined by the ADA

and the accommodation requested. A request from an applicant claiming multiple disabilities will be forwarded to an expert in each of the appropriate fields. For example, if an applicant requests test accommodations based on both: (i) claimed learning disorders; and (ii) claimed adult Attention Deficit/Hyperactivity Disorder ("ADHD"), the applicant's materials would be referred to an expert in learning disorders and to an expert in ADHD.

14.    The applicable expert reviews each assigned case and writes a detailed report with recommendations to the NBME as to whether diagnostic criteria are met and whether the requested accommodations are appropriate. Based on the review and recommendation of its experts, NBME either grants or denies the request for accommodation.

15.    The NBME has created an open and flexible process whereby an individual may submit additional material for consideration within the established deadlines. As a result, examinees are encouraged to submit their requests for accommodations early so that there is time for submission and review of additional information if needed. Examinees whose requests lack sufficient data are informed that we will accept additional information and will re-review the file for a subsequent test administration.

16.    In the present case, Ms. Heidi Baer submitted to the NBME four applications for special accommodations under the Americans with Disabilities Act ("ADA") while taking the USMLE, Step 1, dated March 11, 2003, September 16, 2003, May 11, 2004, and November 29, 2004.

17.    Ms. Baer's first two applications for test accommodations (dated March 11, 2003 and September 16, 2003), claimed only that she suffered from a learning disability and, as such, were referred to Joseph E. Bernier, Ph.D., an expert specializing in learning disorders. With respect to each of these applications, Dr. Bernier declined to recommend that the NBME extend

the special accommodation under the ADA sought by Ms. Baer, and the NBME rejected Ms.

Baer's application for accommodation. The NBME notified Ms. Baer of its decisions on her first

and second applications for accommodation by letters dated June 11, 2003 and November 17,

2003, respectively.

18.    In her third application for test accommodations (dated May 11, 2004), Ms. Baer

included for the first time a claim that she was disabled by reason of ADHD (in addition to

various other Learning Disorders). In a letter dated May 27, 2004, the NBME notified Ms. Baer

that the documentation submitted in support of her diagnosis of ADHD was insufficient and

requested that Ms. Baer submit additional information for consideration. On June 10, 2004,

Ms. Baer responded, through her attorney, and instructed NBME to proceed with processing

her request solely on the basis of her learning disability. As such, Ms. Baer's file was referred

to Dr. Bernier who declined to recommend that the NBME extend the special accommodation

requested by Ms. Baer. The NBME notified Ms. Baer of its decision by a letter dated July 7,

2004.

19.    Ms. Baer's fourth application for test accommodations dated November 29, 2004,

again claimed that she suffered from both a learning disability and ADHD. Ms. Baer's file was

referred to both Dr. Bernier and to Dr. Kevin R. Murphy, an expert in ADHD. Both Dr. Bernier

and Dr. Murphy declined to recommend that the NBME extend the special accommodation

under the ADA sought by Ms. Baer, and the NBME rejected Ms. Baer's fourth application for

accommodation. The NBME notified Ms. Baer of its decisions on her fourth application for

accommodation by letter dated January 14, 2005.

20.    Ms. Baer is now eligible to take Step 1, without accommodation, from May 1,

2005 through July 31, 2005. Subject to seating availability at the various Prometric® Test

Centers, Ms. Baer can take the exam at any time during that three month period.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 22ND DAY OF

APRIL, 2005.

Carol morrison Featherman
CAROL MORRISON FEATHERMAN

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEIDI A. BAER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 05-CV-10724-GAO |
| NATIONAL BOARD OF | ) |
| MEDICAL EXAMINERS, | ) |
| | ) |
| Defendant. | ) |

## AFFIDAVIT OF JOSEPH E. BERNIER, PH.D.

I, Joseph E. Bernier, Ph.D., having been duly sworn, hereby deposes and says:

1. My name is Joseph E. Bernier, Ph.D.

2. I hold a Doctorate in Philosophy (Ph.D.) in Counseling Psychology from the University of Minnesota.

3. I am currently the Assistant Director for Training & Clinical Evaluation at University Counseling Center of the State University of New York at Albany, where I specialize in the assessment and treatment of adolescents and adults with learning disabilities and other psychiatric conditions.

4. In addition to my practice assessing and treating patients, I am also an expert on learning disabilities and the Americans With Disabilities Act ("ADA"), and I serve as a consultant and consultant examiner to national, state, and local organizations, including the National Board of Medical Examiners ("NBME"), on issues related to learning disability determinations, test accommodations, and other disability-related matters.

5. I am a licensed psychologist in New York State (#005849-1). I am recognized as a qualified Health Service Provider in Psychology by the Counsel for the National Register of Health Service Providers in Psychology.

6. I have published numerous journal articles, book chapters, as well as a book entitled Diagnosis of Learning Disability in Adulthood (Allyn & Bacon, 2003). A copy of my curriculum vitae is attached hereto at Exhibit A.

7. In submitting this report, I rely on documentation submitted by and on behalf of Ms. Heidi A. Baer as part of her application for special accommodations (the "Application") while taking the United States Medical Licensing Exam ("USMLE"), Step 1. The NBME asked me to review this documentation and provide my opinion as to whether Ms. Baer is disabled under the ADA. I also rely on my own personal knowledge of the field of Clinical Psychology Learning Disabilities and my 29 years of clinical and teaching experience at the State University of New York at Albany and other institutions of higher education.

8. I was asked by the NBME to review Ms. Baer's three applications for a special accommodation under the ADA while taking the USMLE, Step 1. I was also asked to re-review Ms. Baer's first application. Attached hereto as Exhibit B, C, D, and E are true copies of my consultant's reports to the NBME respecting Ms. Baer's three applications and one request for a re-review.

9. Specifically, I was asked by the NBME to review Ms. Baer's first application for a special accommodation under the ADA while taking the USMLE, Step 1, which relied on a diagnosis of a Learning Disability (Reading Disorder). This application was dated March 11, 2003 and included, among other things, a personal statement by Ms. Baer and psychological evaluations by Christopher Connolly, Ph.D. and Ms. Danielle Kerns/Evan Forman, Ph.D., as

- 2 -

well as a diagnosis from M. Patricia Boyle, Ph.D. dating back to 1984-85. In a report to the

NBME dated April 17, 2003 (attached as Exhibit B), I concluded that Ms. Baer's learning

disability diagnosis was not supported by the documentation and declined to recommend an

accommodation.

10.    In September of 2003, I was asked to re-review Ms. Baer's first application for a

special accommodation under the ADA while taking the USMLE, Step 1. I reviewed the

documentation submitted by Ms. Baer in connection with her request for a re-review and, in a

report to the NBME dated September 29, 2003 (attached as Exhibit C), I again concluded that

Ms. Baer's learning disability diagnosis was not supported by the documentation and declined to

recommend an accommodation.

11.    I was later asked by the NBME to review Ms. Baer's second application for a

special accommodation under the ADA while taking the USMLE, Step 1, which again relied on

a diagnoses of: (1) Learning Disabilities (Reading Disorder and Learning Disorder, Not

Otherwise Specified); and (2) ADHD, Predominantly Inattentive Type. This application was

dated June 7, 2004 and included, among other things, an updated personal statement and new

psychological evaluations by Penny Prather, Ph.D. and Marilyn F. Engleman, Ph.D. In a report

to the NBME dated June 22, 2004 (attached as Exhibit D), I again concluded that Ms. Baer's

learning disability diagnosis was not supported by the documentation and declined to

recommend an accommodation.

12.    Most recently, I was asked by the NBME to review Ms. Baer's third application

for a special accommodation under the ADA while taking the USMLE, Step 1, which relied on

diagnoses of: (1) Learning Disabilities (Reading Disorder and Learning Disorder, Not Otherwise

Specified); and (2) ADHD, Predominantly Inattentive Type. This application was dated

November 29, 2004 and included among other documents, another updated personal statement and a new psychological evaluation by Cheryl Weinstein, Ph.D. In a report to the NBME dated December 6, 2004 (attached as Exhibit E), which focuses primarily on the issue of Ms. Baer's learning disability diagnosis, I once more concluded that Ms. Baer's learning disability diagnosis was not supported by the documentation and declined to recommend an accommodation.

13.    Because the documentation submitted by Ms. Baer in connection with her successive applications for a special accommodation under the ADA while taking the USMLE, Step 1 was, in large respect, cumulative, I will focus my sworn testimony in this affidavit on the conclusions that I reached in my report dated December 6, 2004, in connection with which I considered all of the psychological evaluations included in Ms. Baer's documentation. My opinion with respect to Ms. Baer's diagnosis, however, has remained the same throughout my review of her three applications. As set forth in my report dated December 6, 2004, it is my professional opinion that the documentation provided by Ms. Baer to the NBME does not adequately support a finding of disability based on reading or learning difficulties and is therefore insufficient to warrant the grant of special accommodations on the USMLE, Step 1.

14.    Ms. Baer has submitted to the NBME reports of five clinicians who diagnosed her as having one or more language-based learning disorders. The testing results that underlie each of these reports, however, do not substantiate the claim that Ms. Baer is functionally impaired in reading or learning when compared to the general population of adults. Using a standard "bell curve" methodology, scores that are between the 16th and 84th percentile fall within the average range. See, e.g., Anastasi and Urbina, Psychological Testing, 7th edition, 1997. In other words, the 68% of the population that are within one standard deviation of the mean score are within the average range for the purpose of analyzing diagnostic tests of ability and achievement in the field

of psychology. Rather than being a disabled reader, Ms. Baer performed at or above the 16th percentile of the general population on all but one of the age-appropriate diagnostic reading tests that were used to evaluate her. These average results, coupled with a history of average or better achievement on the PSAT and SAT and her undergraduate coursework, without benefit of accommodations, demonstrate that Ms. Baer is not a disabled reader or test-taker.

15.    As set forth in my reports, which are incorporated by reference in this affidavit, it is my professional opinion that the documentation provided by Ms. Baer to the NBME does not adequately support a conclusion that Ms. Baer has a reading or learning disorder under the Diagnostic and Statistical Manual of Mental Disorders (4th ed.) ("DSM-IV"). (Copies of the DSM-IV diagnostic criteria for reading and learning disorders are attached hereto as Exhibit F.) Further, in my professional opinion, Ms. Baer is not reading or learning disabled. Finally, in my professional opinion, the documentation provided by Ms. Baer to the NBME is insufficient to warrant the grant of special accommodations on the basis of reading or learning disability.

16.    I will review below in Paragraphs 17 through 27 my analysis of the testing of Ms. Baer that was conducted by the various clinicians on whose diagnosis Ms. Baer's applications rely, broken down by the skills or abilities each test is intended to measure. Consistent with my December 6, 2004 report to the NBME, the analysis focuses on the most recent reading testing of Ms. Baer conducted by Weinstein (11/2003), Engleman (3/2004), and Prather (8/2003). A chart summarizing the test results reviewed is attached as Exhibit G hereto. Those tests reflect that there is only one test of reading on which Ms. Baer scored below average, namely the Woodcock Johnson-III Reading Fluency test administered by Dr. Weinstein, on which Ms. Baer scored in the 13th percentile. However, this test result reflects an unexpected, unexplained, and inexplicable 44 percentile point drop in performance from the Woodcock Johnson-III Reading

Fluency test score obtained by Dr. Engleman only eight months earlier. The test results, when considered together, point towards a non-disabled reader with average, albeit perhaps sub-optimal, reading comprehension skills.

17.    Ms. Baer took 13 reading skills tests in from August 2003 to March 2004, which may be grouped into three categories: (1) reading accuracy; (2) reading fluency; and (3) reading comprehension. Ms. Baer scored within the average range on twelve of these thirteen reading skills tests.

18.    More specifically, Ms. Baer scored within the average range or above on six of six reading accuracy ability tests conducted from August 2003 to March 2004.

| Evaluator | Test | Subtest | Score |
|-----------|------|---------|-------|
| Weinstein | Woodcock Johnson-III | Letter Word Identification | 89th %ile |
| Weinstein | Woodcock Johnson-III | Word Attack | 41st %ile |
| Engleman | Woodcock Johnson-III | Letter Word Identification | 65th %ile |
| Engleman | Woodcock Johnson-III | Word Attack | 52nd %ile |
| Prather | Woodcock Reading Mastery | Word Identification | 64th %ile |
| Prather | Woodcock Reading Mastery | Word Attack | 37th %ile |

19.    Ms. Baer also scored within the average range on three of four reading fluency ability tests conducted from August 2003 to March 2004.

| Evaluator | Test | Subtest | Score |
|-----------|------|---------|-------|
| Weinstein | Woodcock Johnson-III | Reading Fluency | 13th %ile |
| Engleman | Woodcock Johnson-III | Reading Fluency | 57th %ile |
| Engleman | Test of Word Reading Efficiency | Total Word Reading Efficiency | 52nd %ile |
| Engleman | Nelson Denny Reading Test | Words per Minute Reading Rate | 25th %ile |

20. Ms. Baer also scored within the average range on three of three reading comprehension ability tests conducted from August 2003 to March 2004.

| Evaluator | Test | Subtest | Score |
|-----------|------|---------|-------|
| Weinstein | Nelson Denny Reading Test-G | Reading Comprehension (timed) | 25th %ile |
| Engleman | Nelson Denny Reading Test-H | Reading Comprehension (timed) | 37th %ile |
| Engleman | Woodcock Johnson-III | Passage Comprehension | 62nd %ile |

It bears noting that Dr. Weinstein misinterpreted Ms. Baer's score of 185 on the Nelson Denny Reading Test-G by using the percentile scores contained in the test manual, resulting in a 3rd percentile score. However, the percentile scores reported in the test manual judge an examinee in comparison with others of similar education level, rather than in comparison to the general population, which is the standard, as I understand it, for accommodation under the ADA. To obtain a comparison to the general population, I determined that Ms. Baer's score is about two-third standard deviations below the statistical mean for the general population of test takers and is therefore equivalent to the 25th percentile. Further, because this was a timed test, the NDRT-G Comprehension test, like the NDRT-H test, also gives evidence of average reading fluency and test-taking ability.

21. In total, Ms. Baer scored within the average range or better in twelve of thirteen reading tests conducted between August 2003 and March 2004. The only such test in which she scored below average was the Woodcock Johnson III Reading Fluency test conducted by Dr. Weinstein. This result, however, reflects a substantial, unexpected, and inexplicable 44 percentile point drop in performance from the Woodcock Johnson-III Reading Fluency test score obtained by Dr. Engleman only eight months earlier. These test results, when read together, demonstrate a non-disabled reader with average reading comprehension skills.

22.    Ms. Baer took fourteen interpretable reading-related cognitive ability tests from August 2003 to March 2004, which may be grouped into four categories: (1) phonological awareness; (2) word knowledge; (3) word (domain) knowledge; and (4) oral fluency. These tests measure cognitive skills that are closely related to reading but do not measure reading. Ms. Baer scored within the average range or above on all fourteen of these interpretable reading-related cognitive ability tests

23.    More specifically, Ms. Baer scored within the average range or above average range on four of four phonological awareness testability tests conducted from August 2003 to March 2004.

| Evaluator | Test | Subtest | Score |
| --- | --- | --- | --- |
| Weinstein | Woodcock Johnson Diagnostic Reading Battery | Sound Blending | 22nd %ile |
| Weinstein | Woodcock Johnson Diagnostic Reading Battery | Incomplete Words | 47th %ile |
| Engleman | Woodcock Johnson-III | Sound Blending | 90th %ile |
| Engleman | Woodcock Johnson-III | Auditory Attention | 53rd %ile |

Thus, notwithstanding Dr. Weinstein's characterization of her as having a "poor knowledge of sounds," Ms. Baer's test scores actually show her to be a person of at least average phonological processing skills.

24.    Ms. Baer also scored within the average range or above average range on eight of eight word knowledge and domain knowledge (knowledge of a subject) tests conducted from August 2003 to March 2004.

| Evaluator | Test | Subtest | Score |
| --- | --- | --- | --- |
| Weinstein | Woodcock Johnson Diagnostic Reading Battery | Oral Vocabulary | 32nd %ile |

| Weinstein | Woodcock Johnson Diagnostic Reading Battery | Listening Comprehension | 18th %ile |
| Weinstein | Wechsler Adult Intelligence Scale-III | Vocabulary | 79th %ile |
| Weinstein | Wechsler Adult Intelligence Scale-III | Similarities | 95th %ile |
| Weinstein | Wechsler Adult Intelligence Scale-III | Information | 65th %ile |
| Weinstein | Shipley Scale | Vocabulary | 67th %ile |
| Engleman | Woodcock Johnson-III | Verbal Comprehension Index | 53rd %ile |
| Engleman | Woodcock Johnson-III | General Information | 58th %ile |

25.    Ms. Baer also scored within the average range on two of two interpretable oral fluency tests (tests of the ability to rapidly retrieve words) conducted from August 2003 to March 2004.

| **Evaluator** | **Test** | **Subtest** | **Score** |
| --- | --- | --- | --- |
| Weinstein | Boston Naming Test | | Raw score 14/15 |
| Weinstein | Associative Fluency | FAS | Raw score 35 |
| Weinstein | Naming Fluency | Animal Generation | Raw score 19 |
| Engleman | Woodcock Johnson-III | Rapid Picture Naming | 17th %ile |
| Engleman | Woodcock Johnson-III | Retrieval Fluency | 45th %ile |

Notwithstanding Dr. Weinstein's characterization of Ms. Baer as having a "reduced retrieval of language," the raw scores reported by Dr. Weinstein for these oral fluency tests are essentially meaningless and tell us nothing about Ms. Baer relative to the general population. As such, the only recent tests of oral fluency with interpretable results are those conducted by Dr. Engleman, and Ms. Baer obtained scores on those tests within the average range.

26.    In summary, Ms. Baer scored within the average range in fourteen of fourteen interpretable tests of reading-related cognitive skills conducted in from August 2003 to March 2004.

27.    In total, of the 27 interpretable reading and reading-related cognitive ability tests given to Ms. Baer from August 2003 to March 2004 described above, Ms. Baer performed at or above the average range in all but one. The single test score that falls below the average range – the Woodcock Johnson-III Reading Fluency test conducted by Dr. Weinstein in November 2004 – reflects an unexpected, unexplained, and inexplicable loss of 44 percentile points from the administration of the same or parallel test eight months earlier. This data does not permit the conclusion that Ms. Baer is a disabled reader when viewed in comparison to the general population.

28.    Ms. Baer's performance on the SAT also indicates at least average performance on timed, multiple-choice, high-stakes examinations. Ms. Baer took the PSAT once and the SAT three times – in January, March, and November 1991 – all under standard conditions without any accommodation for disability. On each occasion, she scored just under or above the national average for female test-takers that year. Specifically, Ms. Baer's scores for the PSAT and SAT were as follows:

| Date | Verbal | Math | Combined |
|------|--------|------|----------|
| 1990 PSAT | 43 (60th %ile) | 49 (66th %ile) | 92 |
| January 1991 SAT | 470 | 500 | 970 |
| March 1991 SAT | 490 | 560 | 1050 |
| November 1991 SAT | 530 | 560 | 1090 |
| Mean Female 1991 Score | 495 | 482 | 977 |

- 10 -

According to the College Board, the mean female SAT score in 1991 was 495 verbal and 482 Math, for a total or combined score of 977. Ms. Baer missed this combined mean by 7 points in January 1991, and she exceeded it by 73 and 113 points in March and November 1991, respectively. These test scores are all within the average range and undercut any suggestion that Ms. Baer is disabled with respect to taking timed, multiple-choice tests under standard conditions that require reading.

29.    The PSAT and SAT are timed, written multiple-choice examinations that do not differ significantly in format from the MCAT or the USMLE, Step 1. The principle differences between the SAT, the MCAT, and the USMLE, Step 1 is that they test progressively more difficult areas of knowledge, and the MCAT and USMLE, Step 1 are scored based on people with higher levels of education than the SAT (i.e., college graduates and individuals with at least two years of medical education, respectively). As such, Ms. Baer has demonstrated her ability to obtain no less than average scores on timed, multiple-choice tests that involve reading.

30.    Furthermore, Ms. Baer's Step 1 test results do not simply or primarily reflect test-taking ability, as she has proven that she can successfully take similarly formatted, timed tests, such as the PSAT and SAT. Indeed, the history of Ms. Baer's timed test taking reflects only increasing difficulty, as the subject matter being tested becomes more difficult. These results are not probative of any disability.

31.    Likewise, Ms. Baer obtained average scores on six SAT Achievement tests between June 1898 and December 1991. These test scores similarly undercut any suggestion that Ms. Baer is disabled with respect to taking timed, written multiple-choice tests under standard conditions.

32.     Similarly, Ms. Baer earned a 2.95 GPA at Duke University, with a major in English, without any sort of treatment or accommodations for reading or learning disability.

33.     Based on Ms. Baer's clinical evaluation test results, her history of success in academic settings, and her history of average or better scores on timed, written multiple-choice tests under standard conditions, I conclude that she does not suffer from any reading-related disorder or disability, in comparison to the general population. As such, the evidence does not indicate that she is a disabled reader who is thereby substantially impaired in her ability to complete timed, multiple choice tests under standard conditions. The evidence is also inconsistent with any diagnosis of language-based learning disability. In support of this diagnosis, Dr. Weinstein pointed to deficits in sound blending skills, listening comprehension, and writing fluency. However, Ms. Baer scored in the 22nd percentile on the Woodcock Johnson Diagnostic Reading Battery test of Sound Blending, in the 18th percentile on the Woodcock Johnson Diagnostic Reading Battery test of Listening Comprehension, and in the 25th percentile on the Woodcock Johnson-III test of Writing Fluency. Ms. Baer's Wechsler Adult Intelligence Scale-III Verbal IQ and Verbal Comprehension Index scores are all well above average (94th percentile and 86th percentile, respectively). Ms. Baer also achieved no less than average scores on the SAT and SAT-Achievement tests. All of this evidence argues against the diagnosis of language-based learning disorder or disability.

34.     Although some weaknesses did emerge in Ms. Baer's record possibly suggestive of difficulties in executive or meta-cognitive functions, in my opinion the testing indicates that Dr. Weinstein has overstated the case for diagnosis with an executive dysfunction disorder (i.e., impairments in planning and decision making, organization, mental flexibility). For example, Ms. Baer's scores on the Wechsler Adult Intelligence Scale-III Similarities and Matrix

Reasoning tests (95th and 99th percentile, respectively) are incompatible with finding pervasive

difficulties in the executive functions of planning, decision-making, and mental flexibility. The

Wechsler Symbol Search test is yet another test of planning. Dr. Weinstein reported a score for

Ms. Baer that is at the 25th percentile, which is an average score. Dr. Weinstein also noted that

Ms. Baer earned scores on the Trail Making test, a measure of mental flexibility, that fall

between the 80th and 90th percentiles. Finally, Ms. Baer displayed a Working Memory Index

score of the Wechsler scale, often regarded as another marker of executive functioning, that is at

the 96th percentile (above average), thereby contributing to the evidence against a confident

conclusion that executive disorder is present.

35.     In sum, in my professional opinion, the documentation provided by Ms. Baer to

the NBME is insufficient to warrant the grant of special accommodations on the basis of either

reading or learning disability.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 22TH DAY OF

APRIL, 2005.

Joseph E. Bernier, Ph.D.

EXHIBIT 2(a)

JOSEPH E. BERNIER, Ph.D.
University Counseling Center
University at Albany
State University of New York
Albany, New York 12222
(518) 442-5800
E-MAIL: jbernier@uamail.albany.edu

VITA

## EDUCATION

Ph.D. (1976)    University of Minnesota, Minneapolis, Minnesota Program: Counseling
Psychology, APA Approved (Supporting Area: School Psychology)
B.A. (1973)     Westfield State College, Westfield, Massachusetts Major: Psychology
Minor: Special Education

## PSYCHOLOGY LICENSURE

New York (awarded 1978)

## CERTIFICATION

Health Service Provider in Psychology
Council for the National Register of Health Service Providers in Psychology
(awarded 1983)
New York State Office of Vocational & Educational Services for Individuals with
Disabilities -Approved Neuropsychological Examiner

## PRESENT POSITION

Psychologist and Assistant Director for Training and Evaluation Services
University Counseling Center
University at Albany
State University of New York
Albany, NY 12222 (1991-present)

Provide clinical and developmental psychological services to university students and consult with
staff and student groups as appropriate.  Coordinate, supervise and personally provide clinical /
psychological and psychoeducational assessment services provided through the University
Counseling Center, including the evaluation of learning disorders and other neurodevelopmental
conditions compromising academic performance.  Function as a consultant / liaison to the
University's Disabled Students Services Office.   Coordinate and manage all facets of advanced
practicum, post practicum, and pre-doctoral internship training programs at UCC.  Direct the
development of an APA approved pre-doctoral internship at the University Counseling Center.
Participate in University related committee work.  Tenure awarded 1997.

Joseph E. Bernier, Ph.D.                                                                                    2

## CONSULTANTSHIPS

Office of Test Accommodations, <u>National Board of Medical Examiners</u>, Market Street
Philadelphia, PA   (1998-present)

Critically review psychological documentation provided by medical students who seek
disability status and testing accommodations on the national medical licensing under
the ADA.

<u>Northeastern Association for the Blind at Albany</u> Washington Avenue, Albany, NY
(1978-present)

Conduct comprehensive psychological and neuro-psychological evaluations of blind and
multi-handicapped rehabilitation clients and consult with staff on case management/
programming.

Consultative Examiner, <u>NYS Office of Temporary and Disability Assistance</u>/<u>Division of
Disability Determinations</u> (2000 - Present).  Conduct psychological and neuro-
psychological examinations on children and adults who seek disability benefits.

Independent Medical Examiner, <u>Forest Hills IPA</u>, Forest Hills, New York. (2003-present)
Perform consultative psychological and neuropsychological examinations for FHIPA
client groups.

## INDEPENDENT PRACTICE

Psychologist, independent practice specializing in psychodiagnostic services and
psychoeducational / neuropsychological evaluations of children, adolescents, and adults
(1978-present)

Office Location:
5 Pine West Plaza, Suite 508
Washington Avenue Extension
Albany, New York 12205
(518) 452-4232

## PAST POSITIONS

Psychologist, Four Winds Hospital, Saratoga Springs, New York (1 988-1991)

Joseph E. Bernier, Ph.D.

Psychologist on the College Service inpatient unit doing intensive, individual psychotherapy, group therapy, family treatment, psychological testing (College Unit and adult units), admissions, and case management. Performed psychodiagnostic and neuropsychological evaluations for all in-patient units as part of the Psychological Testing Service.

Psychologist & Director, Psychological Counseling Center, Siena College, Loudonville, New York (1987-1988).

Administered a college psychology and counseling service that offered a range of clinical services to students, faculty, and college employees. Provided clinical supervision to professional staff-. 6 clinicians, including psychology interns, counselors, and psychiatry residents. Personally performed psychodiagnostic evaluations, learning disability assessments, short and long-term psychotherapy, career counseling, clinical consultation with Student Affairs and Health Services Staff.

Psychologist & Director, Psychological Counseling Service, The College of St. Rose, Albany, New York (1980-1987)

Developed a college psychology service. Personally provided a variety of clinical psychological services to students and members of the college community, including psychodiagnostic services, learning disability evaluations, individual and group psychotherapy, crisis intervention, career counseling, outreach programs, consultation to Student Affairs staff and clinical supervision of psychology interns and medical residents.

Assistant Professor, Department of Counseling Psychology and Student Development State University of New York at Albany, Albany, New York (1 976-1980)

Teaching and clinical supervision of doctoral and masters psychology students, advising graduate students and conducting/supervising research.

Faculty Clinical Associate, University Counseling Service, State University of New York at Albany, Albany, New York 12222 (1976-1980)

Provided individual psychotherapy to college students.

Visiting Assistant Professor, Faculty of Education, University of Western Ontario London, Ontario, Canada (Summer 1976)

Taught graduate level counseling course.

Psychology Intern, ("Captive Internship") Deliberate Psychological Education Program
Department of Psychoeducational Studies, University of Minnesota and Freemont
Community Health Center / Freemont Connection, Minneapolis, Minnesota
(1974-1976)

> Psychotherapist for adults, children, and families; outreach and training for inservice
> counselors and teachers to implement developmental models of primary prevention and
> psychological growth, conducting psychological and psychoeducational evaluations with
> children and adolescents.

Psychotherapist, Walk-in Counseling Center, Minneapolis, Minnesota (1975-1976)

> Individual short-term psychotherapy with adults in a community walk-in clinic..

Psychology Clerkship, Marcy Open School and Tuttle School Minneapolis, Minnesota (9/73-
6/75)

> Provided psychological / psychoeducational evaluations, psychological counseling with
> elementary-aged children and parents; consultation with teachers; implemented programs
> with children aimed at primary prevention.

## PUBLICATIONS

Flanagan, D., Keiser, S. Bernier, J., and Ortiz, S. Diagnosis of Learning Disability in Adulthood,
Boston, Allyn and Bacon (2003).

Sue, D. W., Bernier, J. E., Durran, A. Feinberg, L., Pederson, P., Smith, E. J., and Vasquez,
Nuttal, E. (1982) Position Paper: Cross Cultural Counseling Competencies. The Counseling
Psychologist, 45-52.

Grand, S. A., Bernier, J. E., and Strohmer, D. C. (1982).  Attitudes Towards Disabled Persons as
a Function of Social Context and Specific Disability.  Rehabilitation Psychology, 27 (3), 1965-
1974.

Bernier, J. E. (1981).  Families, Children, and Change: An application of Ecological Psychology.
Counseling and Values, 25 (2), 85-100.

Bernier, J. E. (1980).  Training and supervising counselors:  Lessons Learned from Deliberate
Psychological Education.  Personnel and Guidance Journal, 59 (1).

Sprinthall, N. A., and Bernier, J.E. (1970). Ego and Cognitive Development for Teachers: A Neglected Arena. Chapter for T. Hennessey (Ed.). Values/Moral Education, Paulist Press, New York.

Bernier, J. E. (1978). Developmentally based teacher education: A pilot project. Texas Tech Journal of Education, 5 (2).

Sprinthall, N.A., and Bernier, J. E. (1978). Moral and Cognitive Development of Teachers. New Catholic World, (1 324), 179-184.

Bernier, J. E. (1977). Psychology of Counseling Curriculum: A follow-up study. The Counseling Psychologist, 6 (4), 18-21. (Co-author: Kenneth Rustad; Reprinted in Whitely, J. (Ed.), Developmental Counseling and Teaching, Monterey, California: Brooks/Cole).

Bernier, J. E. (1977). The new contraception program: A psychological perspective, Chapter for C. Garfink and H. Pizer, The New Birth Control Program. New York-Bolder.

Bernier, J. E. (1976). Active-listening Skills for Staff Development - A Workbook. St. Paul, Minnesota: Minnesota Department of Education.

Bernier, J. E. (1976). A psychological education intervention for teacher development. Unpublished doctoral dissertation, University of Minnesota.

## SELECTED POSTGRADUATE TRAINING

*Highlights of continuing education in neuropsychology, clinical and personality assessment, and brief psychological interventions. A comprehensive list is available upon request.*

Rorschach Workshops "Annual Rorschach Workshop", Presenter: John E. Exner, et. al., Asheville, NC, 4 days, 21 credit hours, September 2003

"Neuropsychology of the Civilized Mind", Presenter: Elkhonon Goldberg, Ph.D., Cape Cod Institute, 5 days, 15 credit hours, July 2002

"Rorschach Comprehensive System: Update and Advanced Interpretation", Presenter: Barry Ritzler, Ph.D., Rorschach Workshops, three days each, May 2001 and May 2004, Albany, NY

"Violence Risk and Threat Assessment", Presenter: J. Reid Meloy, Ph.D., Specialized Training Services, Inc., (San Diego, CA), two days, June 2000, Albany, NY

"Advanced Interpretation of the Comprehensive System Rorschach", Presenter: Barry Ritzler, Ph.D. LIU/Rorschach Workshops, three days, June 2000, Albany, NY

Joseph E. Bernier, Ph.D.

"The Comprehensive System Rorschach: Advanced Interpretation", Presenter: Barry Ritzler, Ph.D., LIU/Rorschach Workshops, three days, May 1999, Albany, NY

"Rorschach Alumni Workshop", Presenters: John E. Exner, Ph.D., & Irving Weiner, Ph.D., Rorschach Workshops, Asheville, NC, three days, September 25-28, 1997, 21 CE Credits

"Integrating Rorschach and Neuropsychological Assessment", Presenters: Anthony Sciara, Ph.D., & Jeffrey Barth, Ph.D., Rorschach Workshops, Asheville, NC, three days, May 1996, 21 CE credits

"Two's Company, Three's Allowed: Psychopharmacology for Therapists", Presenter: J. Hullett, MD, Value Behavioral Health, Inc., April 1996, Scotia, NY

"Forensic Issues for the Practicing Clinician", Presenter: Alan M. Goldstein, Ph.D., PANNY, March 1996, Albany, NY, 3 CE credits

"Neurodevelopmental Assessment", Presenter: Janet Holmes-Bernstein, Ph.D., Einstein Institute, Einstein College of Medicine, five days, July 1995, 15 CE credits

"Training Models for Brief Psychodynamic and Solution-Oriented Therapy", Presenter: Elenor Bossie, Ph.D., ACCTA, Truckee, CA, October 1994, 1.5 CE credits

"Developmental Psychopathology", Presenter: Sir Michael Rutter, MD, Einstein Institute, Einstein College of Medicine, July 1993, five days, 15 CE credits

"The Comprehensive System Rorschach: Advanced Interpretation", Presenter: John E. Exner, Ph.D., Einstein Institute, Einstein College of Medicine, July 1992, five days, 15 CE credits

"Short-term Anxiety Provoking Psychotherapy", Presenter: Peter Sifneos, MD, Stratton VA, April 1992, Albany, NY

"Time-Effective Psychotherapy", Presenter: Simon Budman, Ph.D., Value Behavioral Health, Winter 1992, Albany, NY

"Short-Term Dynamic Psychotherapy", Presenter: Habib Davenloo, MD, two days, May 1991, Syracuse, NY, 14.5 CE credits

"Brief & Emergency Psychotherapy", Presenter: Leopold Bellak, MD, December 1987, New York, NY

"Myers Briggs Type Indicator Workshop for Career Professionals", Adirondack Community College, two days, December 1987, Glens Falls, NY

"Adolescent Treatment", Presenter: Derek Miller, MD, Einstein Institute, Einstein College of Medicine, five days, 15 CE credits

Joseph E. Bernier, Ph.D.

"Adult Neuropsychology", Presenter: Arthur Benton, Ph.D., Einstein Institute, Einstein College of Medicine, five days, 15 CE credits

"Disorders of Personality", Presenter: Theodore Millon, Ph.D., one day, May 1985, 6 CE credits

"The Neuropsychological Evaluation of School-aged Children", Presenter: Lawrence C. Hartlage, Ph.D., one day, November 1984, Albany, NY, 6 CE credits


PROFESSIONAL AFFILIATIONS

Member, American Psychological Association (APA)
Member, Association of Counseling Center Training Agents
Member, Society for Personality Assessment



REFERENCES
Furnished upon request.                                              4/20/2005

# EXHIBIT 2(b)

USMLE Baer #5-099-376-5

# Joseph E. Bernier, Ph.D.

Licensed Psychologist

(518) 452-4232

5 Pine West Plaza, Suite 508
Washington Avenue Extension
Albany, New York 12205

April 17, 2003

CONFIDENTIAL

Carol Morrison Featherman, Ph.D.
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Re: BAER, HEIDI A.
ID: 5-099-376-5

Dear Dr. Featherman:

Ms. Heidi Baer is a medical student at Drexel University who has applied for time and one-half on Step 1 of the medical licensing examination. According to Ms. Baer, and to others who have examined and worked with her, these accommodations are needed in order to mitigate the impact of slow reading speed, a manifestation of alleged dyslexia or reading disorder. Ms. Baer indicated that she is allowed time and one-half for her examinations in medical school and provided the proper documentation of her accommodation. She also reported that she was allowed similar accommodation when she took the MCAT in August 1999 but I see no documentation of this is in her file. Ms. Baer has provided documentation to indicate she was first professionally identified as "learning disabled" as a fifth grade student and was subsequently provided with tutoring and remedial instruction thereafter. However, it appears that formal academic accommodations were not put into place until after she repeatedly performed poorly on the MCAT (1999). Evidently, she did not receive programmatic accommodations during high school or college.

I am unable to support Ms. Baer's request for testing accommodation in light of the evidence that is presently contained in her file. Even though Ms. Baer may have been an underachiever for much of her academic career, her records include compelling evidence to suggest that when compared to the general population of adults, she is not severely limited in her ability to "pass" standardized multiple-choice examinations that entail reading. Also, there are numerous problems and inconsistencies in her documentation that lead me to question the accuracy of her reading disorder diagnosis.

To begin with, Ms. Danielle Kerns and Evan Forman, Ph.D., practitioners with the Student Counseling Center at Drexel who recently examined this medical student (January and February 2003), reported that Ms. Baer had been in honors classes and had

1

USMLE Baer #5-099-376-5

achieved a 1250 on the SAT during high school. She took the SAT under standardized circumstances. This score reflects above average performance on a timed, multiple-choice national examination and would argue against the idea that she is a disabled test-taker. More recently, Christopher Connolly, Ph.D. evaluated Ms. Baer (October 1998). His write-up is contained in her case file. Dr. Connolly reported that he administered the Nelson Denny Reading Test and provided her percentile scores for the timed Reading Comprehension and words-per-minute Reading Rate components of the test. Both show Ms. Baer to be an average reader when compared to the general population of test-takers and to others with a college education. Ms. Baer's percentile scores (grade-based) and their conversation to scaled scores (general population-based) are displayed below.

| Test | Scaled Score | Percentile Score |
|---|---|---|
| Reading Comprehension (timed) | 216 | 23rd |
| Reading Rate (word/minute) | 201 | 36th |

In my opinion, the NDRT provides a fairly good work-sample of academic reading and taking multiple-choice tests. Because the words-per-minute rate score is based upon an unreliable one-minute sample of behavior, the Reading Comprehension test, which is performed under timed conditions, is perhaps more informative. The scaled scores compare Ms. Baer to the general population and the percentile scores make a comparison with college-educated individuals. Clearly, this data argues against the notion that Ms. Baer is a handicapped test-taker when the frame-of-reference is the general population of teenagers and young adults.

Dr. Connolly also reported that Ms. Baer had characterized her un-accommodated MCAT scores as falling within the 19-21 point range. This Examinee's MCAT scores cannot be used as a measure of her alleged functional disability because of the highly selective nature of the subject pool upon which this test is normed. MCAT scores reflect one's standing relative to others who have applied to medical school and to those who have matriculated. This is far from the "general population" standard used when determining disability.

I am also unable to recommend that the Board provide Ms. Baer with accommodations because I am not convinced that her reading problems rise to the threshold required for diagnosis as dyslexia or reading disorder. First, Ms. Kerns identified herself as a "counselor" at Drexel, indicated that she had a bachelor's degree, and stated that she was the examiner in the recent assessment (January and February 2003). Although Dr. Forman countersigned the report, it is unclear what part he actually played in the evaluation. Generally, I would not regard an evaluation that is performed and reported by someone who has a bachelor's degree as an evaluation from a professionally qualified person.

Second, Ms. Kerns used the WJ-III in their evaluation and reported an array of individual achievement test scores. Grade norms were used in the analysis (rather than the more appropriate and required age norms). Of the 11 individual achievement tests reported,

2

Ms. Baer achieved a below average score on <u>only one</u> measure, namely Reading Fluency (grade-based standard score = 67). Using the raw score data that Ms. Kerns provided, I calculated the age-based standard scores for the reading-related tests. Ms. Baer scored as follows.

| Individual WJ-III Test | Age-Based Standard Score | SEM |
|---|---|---|
| Letter Word Identification | 118 | 8 |
| Passage Comprehension | 105 | 5 |
| Reading Fluency | 81 | 1 |
| Spelling | 108 | @ 4 |

Also of interest,

| | | |
|---|---|---|
| Writing Fluency | 101 | @ 5 |
| Math Fluency | 97 | 2 |
| Broad Reading Cluster | 94 | @ 2 |
| Academic Fluency Cluster | 84 | 1 |

These data indicate that Ms. Baer performed below average in reading fluency when compared to others at her age. It is important to note that a finding of "impaired reading fluency" on the basis of this WJ-III information contrasts with the Nelson Denny data from 1998 that Dr. Connolly reported (see above). As noted, she earned average words-per-minute and timed reading comprehension test scores on the NDRT.

Further, there is no information here or from the other test scores reported by Ms. Kerns that would help us understand or be clear about the manifest difficulties in fluent reading. The conventional view is that individuals who achieve low reading fluency test scores do so because they have failed to master the fundamentals of reading and therefore cannot automatically decode words. For them, identifying words is not an automatic process freeing them to direct or focus their energies towards comprehending words and paragraphs. In this case, we have <u>no real evidence</u> that might suggest that Ms. Baer decodes words poorly. Her Letter Word Identification and Spelling scores are at or above the 70th percentile and do not appear to hint at any major problems in decoding or phonological processing. Evidently the WJ-III Word Attack test or the various other WJ-III tests that are used to measure phonological skills were not employed in Ms. Kern's test battery. In my view, this is a significant omission that renders the evaluation incomplete and non-comprehensive. Also, when Dr. Connolly examined her in 1998, Ms. Baer achieved a word identification score on the WRAT-3 that is above average (84th percentile) and a spelling score that is solidly average (61st percentile). The WRAT-3

3

information, obtained nearly 5 years ago, is consistent with the WJ-III findings in these same areas and do not indicate impaired basic reading skills.

Ms. Kerns reported that the Examinee achieved a WAIS-III Processing Speed Index score of 69, which is a below average score. She suggested that Ms. Baer displayed a general deficit in the reading-related ability of "processing speed". This is a curious finding in light of the fact Ms. Baer achieved average scores on three other timed tests from the WAIS-III, namely Block Design, Picture Arrangement, and Object Assembly. Object Assembly in particular is a time-sensitive test and Ms. Baer earned a scaled score of 9, an average score, on this measure. She also obtained an above average score on Arithmetic, a timed verbal test. Both Object Assembly and Symbol Search tap mental speediness while Digit Symbol focuses more on psychomotor speed. The fact that Ms. Baer produced an average performance on one test of mental processing speed (Object Assembly — 9) and a below average score on the other test of the same function (Symbol Search — 2) makes it difficult to come to a confident conclusion about mental processing speed.

Perhaps more important is the contrast between the scores Ms. Baer achieved on Digit Symbol when administered the WAIS-III in January 2003 (Kerns) and in October 1998 (Connolly). Mr. Kerns reported the Digit Symbol scaled score as 6 (a below average score) and Dr. Connolly reported a scaled score of 15 (above average) for the same test. This degree of discrepancy (along with the average scores on the other timed performance tasks from the WAIS-III) certainly raises a serious question about the reliability of Ms. Baer's performance on speeded tests and the validity of concluding that there is general impairment in processing speed.

I would also like to point out that Ms. Baer performed more poorly on the WAIS-III the "second time around". She dropped 26 points in VIQ, 18 points in PIQ, and 20 points in FSIQ between 1998 and 2003. It is unusual for individuals to drop IQ points of this magnitude upon re-testing. Assuming that an examinee has put forth their honest, best effort, a clinician must consider the possibility that substantial decreases in IQ scores may be the product of "recently emerged" neurological or severe psychiatric conditions.

To her credit, Ms. Kerns was puzzled by the low processing speed scores and presented the possibility that Ms. Baer's poor showing on several speeded tasks may have been the product of an unusual psychological or test-taking "set". She reported on "...[the Examinee's] demonstrated need to be extremely careful when responding to questions". Ms. Kerns also reported "she appeared unusually absorbed with understanding instructions and providing correct responses to tasks" and that "Ms. Baer seemed unusually concerned with providing not only the correct answer, but also the most thorough answer possible, particularly during these two [WAIS-III] untimed tasks". The Examiner stated, "During the Arithmetic subtest, Ms. Baer more than once commented on a previous problem while calculating the answer to a subsequent problem." Further, "Upon arriving at the second testing session, she reported that she had used the internet to find correct answers to questions from the Information subtest of the WAIS-III that she had answered incorrectly". The Examiner also made reference to Ms. Baer's "checking

4

habits". Ms. Kerns recommended follow-up testing to try to further tease out the contribution of "Brain" and the part played by "Psychology" in the manifest processing speed problem. Clearly Ms. Kerns was not confident that she had ruled out a so-called "non-intellective" factor as being responsible for the low scores on speeded tests. I would like to add that both Digit Symbol and Symbol Search, which are the Examinee's two lowest WAIS-III scores, are particularly vulnerable to obsessive concern with detail and accuracy among examinees who are so inclined.

The psychological testing that was performed with Ms. Baer prior to her most recent evaluation also contributes to confusion about the accuracy of the LD label. First, the data presented by Dr. Connolly from his 1998 examination identified reading and spelling test scores from the NDRT and the WRAT-3 that are within the average or higher range (see above). This data is inconsistent with the idea that she is reading handicapped. Further, the index evaluation that was performed by psychologist M. Patricia Boyle, Ph.D. when the Examinee was in the fifth grade apparently did not include any nationally standardized achievement tests. Rather, she compared Ms. Baer's superior IQ test scores with her pattern of underachievement in the classroom. In her letter to the Board, Dr. Boyle wrote, "While a diagnosis of the presence of a learning problem was indicated, the specific nature of the problem was to be determined with remediation".

In summary, I cannot recommend that the Board permit Ms. Baer extra time on Step 1. First, in my view, the evidence shows that this medical student is not severely limited in her ability to take standardized multiple-choice examinations when the frame-of-reference, as is customary in disability determination cases, is the average person in the general population. Second, the psychological evaluations that she submitted as evidence fail to show that her slow reading fluency test score is the product of impaired basic reading skills or phonological processing deficits. Further, there are numerous cross-sectional and longitudinal inconsistencies among her various test scores that make it impossible to diagnose Ms. Baer with a reading disorder or a general processing speed deficit. Finally, each of the three psychological examinations noted in her file are, in my opinion, not comprehensive and lacking in one or another important respect. This also interferes with one's ability to arrive at a reasonably confident diagnosis.

JOSEPH E. BERNIER, PH.D.

---

Examinee: BAER, HEIDI A.        ID: 5-099-376-5        Exam: STEP 1

Diagnosis is not supported by the documentation and need for accommodation is not supported or justified.

Case review Hours: 5.0        Case Conference Hours: 0.0

EXHIBIT 2(c)

Baer #5-099-376-5

# Joseph E. Bernier, Ph.D.

Licensed Psychologist

(518) 452-4232

5 Pine West Plaza, Suite 508
Washington Avenue Extension
Albany, New York 12205

September 29, 2003

### CONFIDENTIAL

J. Abram Doane, Ph.D.
Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Re: Baer, Heidi
ID: 5-099-376-5

Dear Dr. Doane:

I have reviewed the documentation that was provided by and on behalf of Ms. Heidi Baer. Ms. Baer is a medical student who is appealing the Board's decision to not provide her with accommodations on the Step 1 examination. According to Ms. Baer, and to those who have provided documentation on her behalf, she is an individual who is said to have a reading disorder that significantly interferes with her ability to perform on examinations that are strictly timed. She has requested one and one-half to twice the usual time on Step 1. She is allowed time and one-half on her examinations in medical school and has been allowed to take a reduced course-load.

In a letter to Ms. Baer, dated June 11, 2003, Dr. Carol Morrison Featherman informed this medical student of the Board's decision to not grant her with accommodations. Dr. Featherman raised issues concerning the inappropriate use of discrepancies between measures of intelligence and achievement as the primary basis for diagnosing LD. The letter also noted the lack of objective childhood evidence of reading impairment and the evidence that argued against the conclusion of severe functional impairment in reading or test taking as critical factors in the Board's decision.

In response, Ms. Baer submitted the results of a recent psychological evaluation that was performed by Penny Prather, Ph.D. in August 2003. She also submitted rebuttal letters from previous examiners whose reports are already on file with the Board (Drs. Christopher Connolly, who examined her in 1998, and M. Patricia Boyle who performed an assessment when the Examinee was in the fifth grade). Ms. Baer also submitted the results of a recent EEG study that was conducted in August 2003 and a letter from a fifth grade teacher. Also among the new materials is a letter from the Dean of her medical

1

Baer #5-099-376-5

school. Finally, she provided the results from USMLE practice examinations as evidence of functional impairment.

I evaluated Ms. Baer's file in April 2003 and was unable to recommend that she be allowed accommodations on Step 1. First, in my view, the evidence failed to support the contention that Ms. Baer was severely limited in her ability to take standardized multiple-choice examinations under normal circumstances. Further, the alleged reading problems were not tied into underlying impairments in phonological processing. Finally, numerous cross-sectional and longitudinal inconsistencies that appeared among her test scores rendered the LD diagnosis or explanation of her difficulties quite unconvincing.

After reviewing all of the old and new information that has been provided by and on behalf of this medical student, I remain unable to support her request for additional time on Step 1. Perhaps the most salient issue here is whether or not Ms. Baer is a disabled reader. I believe that the weight of the evidence argues that she is not, that is, that she is not severely limited in her ability to pass timed multiple-choice examinations because of reading problems or, more precisely, because of problems in reading efficiency.

Ms. Baer seems to have used her "low" scores on the USMLE practice tests as evidence of functional impairment with respect to test taking. It is readily apparent that failure on such tests can be the result of numerous factors that are unrelated to reading fluency. In short, this (i.e., a USMLE practice exam) is a "dirty" or confounded test of disability or functional impairment.

Dr. Prather did not employ a test of reading efficiency in her evaluation that was standardized for use with individuals who are at Ms. Baer's age. She did administer the GORT-3, and used norms for 16 year-olds as her interpretative frame-of-reference. As an aside, Ms. Baer scored at the 95th percentile and above on all of the GORT-3 tests, ...but this is in reference to the performance of 16 year-old individuals.

Actually, the best test of reading efficiency may have been the timed Reading Comprehension Test from the Nelson Denny Reading Test that Dr. Connolly administered in 1998 (October). At that time Ms. Baer achieved a NDRT Reading Comprehension scaled score of 216, which is an average score when she is compared to the general population of the standardization sample. In my opinion, this is the single best marker test of her ability to take multiple-choice examinations that depend upon reading skills under timed circumstances that has been used in the various evaluations that she submitted for review. Ultimately, our concern is whether or not Ms. Baer is impaired in her ability to perform on timed multiple-choice examinations as a result of reading problems. The functional issue is primary and the clinical diagnosis is secondary. The timed NDRT Comprehension Test is perhaps as close to the behavior under investigation as one gets in the evaluations under review.

It is important to note that Ms. Baer did take the WJ-III Reading Fluency test when she was evaluated at Drexel University earlier this year (January and February 2003). She achieved a below average score on this measure at that time (standard score = 81).

Baer #5-099-376-5

Certainly one might argue that this too is a good marker of reading efficiency. However, I suspect that there would be little argument that the NDRT measure is the more difficult test of the two and more representative of the complex skills, including inferential reading, that is involved in academic reading and test taking circumstances. I cannot account for the discrepancy, for the fact that she performed within the average range on the more challenging reading task than she did on the less challenging measure. Dr. Prather speculated that the differences in test scores between the Drexel evaluation and Ms. Baer's other evaluations may be due to the inexperience of the Drexel examiner. Perhaps she is correct. The fact is however, that Ms. Baer displayed average reading efficiency on a relatively demanding test that required her to read and understand passages that presumably contained unfamiliar information and answer multiple-choice questions based on that information in a timed format (NDRT). Also, as I pointed out in my previous review, the fact that Ms. Baer had earned a 1250 on the SAT without the benefit of additional time would also argue against the idea that she is severely restricted in her ability to perform due to reading problems.

To take this analysis a little further, let me point out that reading efficiency is believed to be a function or product of reading accuracy and simple reading speed. Dr. Prather provided test data that simply corroborated information provided by the Drexel examiners earlier this year, namely that Ms. Baer is average or better in reading accuracy. Dr. Prather reported that Ms. Baer scored at the 64th percentile in Letter Word Identification on the WRMT, which is an average score. Using the WJ-III earlier this year, the Drexel examiners reported a Letter Word Identification score of 118 (above average) and a Passage Comprehension score of 105 (average). Dr. Connolly noted that Ms. Baer had achieved a reading accuracy score on the WRAT-3 that was at the 84th percentile (above average) when he tested her in 1998. I see no impairment in reading accuracy in these test performances.

With respect to simple reading speed: Dr. Prather did not administer a measure of this particular function. Dr. Connolly (1998) used a measure, albeit a flawed measure, of simple reading speed, namely the Words Per Minute Reading Rate of the NDRT. Ms. Baer achieved an average score, when compared to the standardization sample or general pool of test takers, on this one-minute sample of reading (scaled score = 201).

In short, I see no objective evidence of deficient reading accuracy or of deficient simple reading speed in these evaluations.

To take this investigation one step further (and, by the way, further removed from the functional behavior of concern), let's look at the data pertaining to pronunciation knowledge and oral word fluency or naming ability. The first is empirically related to both reading accuracy and to speed and the last is related primarily to reading speed. Dr. Prather reported that Ms. Baer achieved a WRMT Word Attack score at the 37th percentile, which provides evidence of normal phonological processing or pronunciation knowledge. Dr. Prather also used the Boston Naming Test in her assessment. She reported that Ms. Baer achieved a 54 (raw score) on this test. Since the normal range for scores on the BNT for 28 year-old individuals is between 53 and 59, then it is obvious

3

Baer #5-099-376-5

that she scored within normal limits in her ability to retrieve words. In short, I see no evidence of impaired decoding or deficient naming in these data.

I would like to draw attention to the fact that Ms. Baer was using the stimulant medication Dexedrine when Dr. Prather administered the WRMT and other academic skill measures. Note however, that a picture of normal reading skills emerged regardless of whether or not she used medication. All of her prior evaluations were performed without stimulants and essentially obtained fundamentally similar results.

Referring to the difference between Ms. Baer's WRMT Word Attack (37th percentile) and Word Identification (64th percentile) scores and arguing the need for accommodation, Dr. Prather wrote the following. "If asked to read scientific or technical material that included unfamiliar terms, for example, or if asked to read a foreign language, strengths in sight words would be of no help. Current findings would predict to decline in reading rate as well as accuracy when reading material places increased demands on decoding, particularly information that is unfamiliar so that context is also less helpful as a compensatory mechanism". I would like to point out that regardless of the difference in scores, Ms. Baer displayed normal ability to decode unfamiliar words (Word Attack, 37th percentile). In addition, the USMLE Step 1 tests acquired knowledge and use of that knowledge. The language used in the test questions should be familiar to a well-prepared examinee.

Seeming to be responding to concerns regarding insubstantial childhood evidence of LD, Ms. Baer included a letter from Mr. Scott Ford, her fifth grade teacher at Milton Academy, among the documents for review. Mr. Ford noted that Ms. Baer was a student who displayed processing speed difficulties and, as is customary at Milton, was allowed as much time as was needed to complete tasks. He also noted that the faculty had recommended that she be evaluated for LD. Apparently that evaluation did occur and was conducted by M. Patricia Boyle, Ph.D. However, that evaluation did not employ any standardized achievement tests to investigate and document deficient academic skills. The file contains a letter and a report from Dr. Boyle. Nevertheless, Ms. Baer took honors classes in high school and graduated from college without benefit of formal accommodations.

Presumably making a case for the presence of underlying neurological dysfunction, Dr. Prather reported on the findings from an EEG study that was performed on Ms. Baer in August 2003. The Examinee included a report from Dr. B. A. Dworetzky, dated August 8th, 2003, who interpreted the study. The report indicates that this was essentially a normal study.

In an August 4th (2003) letter to the Board, Dr. Connolly defended his use of discrepancies on some measures of academic achievement and intelligence in diagnosing LD in this case. His argument fails to note that the DSM-IV Criterion A for Reading Disorder entails three "tests", namely reading test scores that are discrepant from age-expectations (i.e., are below average using age-norms), discrepant from IQ test scores, and discrepant from expectations given the person's educational background. Ms. Baer

4

SEP-30-2003 TUE 10:54 AM UNIVCOUNCENTER      FAX NO.        442 3096

Baer #5-099-376-5

consistently falls short of meeting the first standard or first test. This was well illustrated earlier in the report when discussing reading achievement test results. Dr. Connolly also advocated for use of his 1998 evaluation as the basis for making a decision regarding Step 1. He noted that the testing occurred within the past five years and therefore should be considered current. However, in my opinion, the data that Dr. Connolly provided argues against diagnosing Ms. Baer as LD. This is also detailed above and in my previous report to the Board.

To conclude, the new documents added to Ms. Baer's file, in my opinion, do little to persuade me that she needs accommodations. Without getting into the issue of whether or not she has a reading disorder, the evidence demonstrates that she is not severely restricted in her ability to perform on timed written multiple-choice tests because of problems in reading efficiency. In other words, Ms. Baer does not appear to be functionally impaired in reading when compared to the general population. I also question the accuracy of the Reading Disorder diagnosis given the test data in particular. I cannot recommend that the Board provide Ms. Baer with accommodation.

JOSEPH E. BERNIER, Ph.D.

Diagnosis and need for accommodation NOT SUPPORTED by the documentation

Case Review Hours: 5.0                Case Conference Hours: 0.0

5

# EXHIBIT 2(d)

Step 1: Baer #5-099-376-5 (June 2004)

## Joseph E. Bernier, Ph.D.

Licensed Psychologist
(518) 452-4232

5 Pine West Plaza, Suite 508
Washington Avenue Extension
Albany, New York 12205

June 22, 2004

CONFIDENTIAL

J. Abram Doane, MA, JD
Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Re: Baer, Heidi A.
ID: 5-099-376-5

Dear Mr. Doane:

I have completed my review of the documents that have been provided by and on behalf of Ms. Heidi Baer, a Drexel University medical student, and used to support her request for time and one-half on Step 1 of the medical licensing examination. The Boston law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. represent Ms. Baer's interests in her application for disability assistance and argue that she is a handicapped reader who needs time and one-half on the licensing examination.

A little over a year ago I reviewed the materials pertaining to Ms. Baer's earlier request for time and one-half. I was unable to support her request at that time because, simply stated, the evidence failed to demonstrate presently _impaired_ functioning in reading. Since then an updated personal statement, two new psychological evaluations, and legal documents have been added to her file. Having reviewed these additional materials, I remain unable to support her request for accommodations.

Ms. Baer described longstanding problems in reading and spelling, in concentration, with retrieving names and dates, and orienting herself in matters of direction. Timed examinations reportedly have been the bane of her academic life. She is said to have employed tutors and improved her organizational skills but continues to struggle with timed tests.

Previously Ms. Baer provided documentation to indicate that she was first professionally identified as "learning disabled" in the fifth grade and received tutoring and remedial instruction thereafter. The psychologist who performed this examination did not administer a standardized achievement test, as is customary practice. Evidently Ms. Baer

1

Step 1: Baer #5-099-376-5 (June 2004)

attended a private school that provided flexibility with respect to the time allowed for examinations. However, as a high school senior, she completed the SAT under standardized conditions and achieved a high score of 1250. In college, Ms. Baer majored in English partly to take advantage of the emphasis on class participation and writing in determining her grades. It wasn't until she encountered difficulties obtaining competitive MCAT scores that Ms. Baer sought further testing and formal academic accommodations. One evaluator diagnosed a reading disorder even though Ms. Baer earned average scores on reading achievement tests. A subsequent evaluation provided limited test evidence that supported the LD diagnosis.

Presently, Ms. Baer's attorneys claim (2004) that she continues to struggle with "a learning disability that seriously impairs her ability to read and comprehend at the same rate as most people" (page 1). They contend, "her disability hampers her ability to communicate her knowledge in standard test environments" (page 1). Ms. Baer's attorneys repeatedly refer to the results from two recent psychological evaluations to support their conclusions. Dr. Marilyn Engelman (March 2004) and Dr. Penny Prather (August 2003) conducted the referenced examinations.

Ms. Baer's attorneys state Dr. Engleman's March 2004 assessment demonstrated that "she has a reading disorder and learning disorder that causes her to read slowly and to re-read sentences over and over before she is able to fully comprehend their meaning" (2004, page 3). Referring to Dr. Engleman's evaluation they state "the results of the tests demonstrated that Ms. Baer's reading and comprehension abilities fall below average when she is compared with other adults in her age group and substantially below average when compared with her peers" (2004, page 4).

Citing DSM-IV, Ms. Baer's examiners and attorneys offer the diagnosis of Reading Disorder (RD). In fact, the recent test evidence argues against a diagnosis of RD. The DSM-IV requires test evidence of reading skills that are "substantially below that expected given the person's chronological age…". Stated differently, the DSM-IV requires reading test scores that fall outside and below normal limits using norms that are based upon the person's chronological age. (Of course, the DSM-IV articulates additional criteria for establishing the diagnosis.) In actuality Ms. Baer earned average scores, compared to others her age, on every single age-appropriate reading test Drs. Engelman and Prather administered. See below. Note that the average range on the Woodcock and TOWRE tests reflects standard scores that fall between 85 (16th percentile) and 115 (84th percentile). The average range for scaled scores (based on pooled norms) on the Nelson Denny is between 175 and 225.

### Woodcock Johnson-III (2004)

|  | Standard Score | Percentile score |
|---|---|---|
| Letter-Word Identification | 106 | 65 |
| Word Attack | 101 | 52 |
| Reading Fluency | 103 | 57 |
| Passage Comprehension | 105 | 62 |

2

Step 1: Baer #5-099-376-5 (June 2004)

Woodcock Reading Mastery Test (2003)

|  | Standard Score | Percentile Score |
|---|---|---|
| Word Identification | not provided | 64 |
| Word Attack | not provided | 37 |

Test of Word Reading Efficiency (2004)

Total Word Reading Efficiency (standard score)    101    52nd percentile

Nelson Denny Reading Test – H (2004)

Scaled Score

| Vocabulary (timed) | 243 |
|---|---|
| Comprehension (timed) | 190 |
| Reading Rate (wpm) | 184 |

While it might be fair to characterize Ms. Baer as a "sub-optimal reader" based on these reading achievement test scores and on her IQ test scores, one cannot accurately describe her as being "impaired" in reading. Further, the standard scores do not indicate reading skills that are "substantially below" what is expected for someone at her age.

The particulars of DSM-IV aside, RD is typically characterized as being a fundamental impairment in word recognition. This impairment may become manifested as inaccurately "sounding out" words or, as being able to correctly do so, but in a labored, non-automatic way, thereby impacting reading speed and comprehension. Impairment in word recognition is not evident in the recent reading test data. Ms. Baer achieved average scores on the WJ-III tests of Letter-Word Identification, Word Attack, and Reading Fluency and also on the WRMT versions of these. The results from the TOWRE, a test that specifically measures the "accuracy and speed with which one executes word reading processes", powerfully demonstrates that Ms. Baer has mastered the fundamentals of reading or word recognition. She reportedly achieved an average score (52nd percentile).

The WJ-III Reading Fluency and Passage Comprehension scores argue against the conclusion that Ms. Baer's current comprehension abilities are below average compared to others at her age. The strictly timed NDRT Comprehension test results, like the WJ-III Reading Fluency test results, is also contrary to the allegation that her ability to comprehend falls below average under timed conditions. These data are contrary to her

Step 1: Baer #5-099-376-5 (June 2004)

attorneys' statement (2004, page 6) that Ms. Baer "is substantially limited in her ability to read quickly and comprehend the material" and also that "the *functional limitation* of Ms. Baer's learning disability is that she cannot comprehend written words as quickly as others" (page 8, *italics* added).

Dr. Prather mentioned in her report (August 2003) that she consulted a reading specialist regarding the test findings. Dr. Prather reported (2003, page 5) that her consultant's opinion in reviewing the data was that Ms. Baer manifested "well compensated" dyslexia, meaning that she relies upon her memory for familiar words and struggles to identify or sound out words that she has not previously encountered or often encountered. Dr. Prather wrote, or reported, that "if asked to read scientific or technical material that included unfamiliar terms, for example, or if asked to read a foreign language, [Ms. Baer's] strengths in sight words would be of no help". The WRMT and WJ-III Word Attack scores, average scores on a test concerned with reading nonsense words, do not permit these assertions. On the WRMT Word Attack test (2003), Ms. Baer clearly demonstrated average ability to decode unfamiliar words (37th percentile). She performed even better on the 2004 WJ-III Word Attack test (52nd percentile). Further, by virtue of her medical education, Ms Baer should be well acquainted with the words, phrases, and concepts in NBME test questions. The scientific and technical terms on the test should not be "a foreign language" to a medical student. In fact, the examination is designed to measure one's familiarity and knowledge of science and medicine.

In the "summary" section of her report (page 13), Dr. Engelman (2004) stated that Ms. Baer "needs to re-read material several times before understanding the material". She explained that Ms. Baer "has difficulty discerning essential from nonessential material" and that "she needs to learn strategies to help her more efficiently understand the 'gist' of the material". What Dr. Engelman is actually describing is someone who falls short at the higher levels of reading comprehension. This is a description of "sub-optimal" reading rather than disabled reading. It is certainly possible that Ms. Baer lacks higher-order reading comprehension strategies, but she does not display Reading Disorder given the testing results.

In a statement to the Board, Ms. Baer's attorneys indicate that "several experts have concluded that Ms. Baer's difficulties with reading comprehension are the result of a specific learning disability and have excluded the possibility of other factors, such as low intelligence or emotional or other problems are instead the cause of her difficulties" (May 10, 2004, page 6). However, one of their experts, Dr. Prather, made the following observations in her August 2003 report. Specifically, "this tendency to ruminate contributed to inefficient performance, bust also was a marker of increased uncertainty and anxiety" (page 7). Dr. Prather further described that "at one point during testing (after about an hour or so of working together), Ms. Baer was having such difficulty both focusing and deciding how to respond that we stopped the test process to discuss her concerns and worries" (page 7). Also that "based on the above qualitative features of Ms. Baer's performance, the examiner raised the possibility that attention as well as anxiety may be factors in her inefficient performance" (page 7). It is unclear if Dr. Prather's intervention resolved Ms. Baer's anxieties "once and for all". Nonetheless, anxiety

Step 1: Baer #5-099-376-5 (June 2004)

played a part in determining her performance according to Dr. Prather's reported observations.

On page 13 of her report, Dr. Engelman noted that Ms. Baer's "profile indicates slow reading efficiency and speed, which is caused by weak reading processing, decision speed, and cognitive efficiency". Dr. Prather noted that the "current [test] findings in general, but the finding of reduced phonological processing particularly, support the prior diagnosis of a language based reading disability" (2003, page 7). Dr. Prather opined that the previous testing had failed to fully investigate the deficit in this important reading-related specific mental ability (2003, page 8). However, these assertions or conclusions do not fit with the test results. For example, Dr. Engelman reported that Ms. Baer achieved the following WJ-III scores relative to cognitive efficiency. See below.

|  | Standard Score | Percentile Score |
|---|---|---|
| Retrieval Fluency | 98 | 45 (average) |
| Decision Speed | 97 | 42 (average) |
| Rapid Picture Naming | 87 | 17 (low average) |
| Pair Cancellation | 109 | 72 (average) |
| Visual Matching | 93 | 32 (average) |
| Numbers Reversed | 111 | 76 (high average) |
| Memory for Words | 106 | 67 (average) |
| Cognitive Fluency Cluster | 89 | 23 (low average) |
| Processing Speed Cluster | 94 | 35 (average) |

None of these scores is outside and below normal limits and therefore do not reflect normative deficits in cognitive fluency, decision speed, cognitive efficiency, or processing speed. The WJ-III tests that are related to phonological processing are indicated below.

|  | Standard Score | Percentile Score |
|---|---|---|
| Sound Blending | 119 | 90 (above average) |
| Word Attack | 101 | 52 (average) |
| Spelling | 113 | 80 (high average) |

Again, none of these scores is outside and below normal limits. These data would argue against the conclusions of Drs. Prather and Engelman referenced above.

Dr. Prather used the discrepancy in grade-equivalent scores between Word Identification (11th grade level) and Word Attack (6th grade level) on the WRMT to argue the existence of phonological processing deficits. However, Ms. Baer's age-based standard scores on each of these tests is within the average or normal range. Ms. Baer's score on Word Attack at the 37th percentile falls within normal limits when compared to others at her age and does not reflect a normative deficit. Dr. Prather's use of grade-equivalent scores is an

5

Step 1: Baer #5-099-376-5 (June 2004)

unorthodox way to evaluate this data. Comparisons are generally made using standard scores. When standard score comparisons are made, she displays average word recognition or basic reading skills as measured by the WRMT.

Ms. Baer's attorneys argue that her "disability has the effect of limiting the speed with which she can answer questions so that the time limitation of the test becomes an insurmountable barrier to completing the test" (2004, page 8). They added that "as a result, the exam tests her comprehension speed, not her knowledge of the substantive material" (page 8). Her attorneys credit (page 8) Dr. Engelman as pointing out that under standard time conditions, Ms. Baer's licensing examination test scores would "not reflect her knowledge of the topics being tested; rather, her test scores would reflect speed and accuracy". The basis for this argument is unfounded. Tests such as the WJ-III Reading Fluency test and the NDRT timed test of reading comprehension are designed to remove the confound imparted by specialized or prior subject matter knowledge in measuring reading efficiency. Performance on the two tests does not require prior academic knowledge. Ms. Baer earned average scores on both of these measures.

The materials that I reviewed appeared to emphasize the importance of completing a test, answering all the questions, and Ms. Baer's handicap in doing so without extra time. However, accommodations are not designed for the purpose of ensuring that a candidate answers all the test questions. Rather, accommodations are used to mitigate the impact of normative deficits in functioning. The test results presented by Drs. Engelman and Prather do not indicate the presence of a present functional limitation in reading when the average person from the general population is the yardstick in this analysis.

In summary, I remain unable to recommend that the Board provide Ms. Baer with time and one-half on Step 1. Simply stated, the data do not indicate that she is functionally impaired in reading. While she may very well be a "sub-optimal reader", in my opinion Ms. Baer does not meet the standard required for identification as a disabled reader.

Joseph E. Bernier, Ph.D.
Licensed Psychologist

# EXHIBIT 2(e)

Baer 5-099-376-5

# Joseph E. Bernier, Ph.D.

Psychology

5 Pine West Plaza, Suite 508<br>
Washington Avenue Extension<br>
Albany, New York 12205<br>
(518) 452-4232

December 6, 2004

Confidential

Abram Doane, Manager
Office of Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190

Re: Heidi A. Baer
ID: 5-099-376-5

Dear Mr. Doane:

I have completed my review of the documents provided by and on behalf of Heidi Baer to support her request for time and one-half on Step 1 of the medial licensing examination. Ms. Baer has made previous requests for accommodation; all have been denied. According to Ms. Baer, to her attorney, and to those who have examined her, she is a disabled reader and entitled by law to accommodation. In her own words, Ms. Baer explained "I have always had problems reading and comprehending material as quickly as others" and "...this problem has manifested itself most obviously in my substantial difficulty taking tests within the time frame allotted".

I have reviewed Ms. Baer's file twice before and, on both occasions, I have been unable to support her request for non-standardized testing conditions. My last review was in June 2004. Since then Ms. Baer has updated her file with a recent neuropsychological evaluation (Weinstein, November 3rd 2004), letter from her attorney, and new application for accommodative relief. While the Examinee reported numerous impairments (including RD, writing disability, listening problems, ADHD and executive dysfunction) the primary, though not exclusive, focus of my review is on her purported reading difficulties and the impact of the reading problems on her ability to take multiple-choice tests under standardized conditions.

1

Baer 5-099-376-5

To summarize my prior opinion, the testing results (to that point) did not substantiate the claim that Ms. Baer was functionally impaired in reading when compared to the general population of adults. While she may be a sub-optimal reader, the evidence argued against a diagnosis of Reading Disorder and the conclusion of disabled reading. In fact, Ms. Baer achieved average scores, compared to others at her age, on just about every single age-appropriate reading test that Drs. Engleman and Prather administered to her in 2003 and 2004. Further, she has a history of average or better achievement on the SAT, a nationally standardized multiple-choice examination that was taken without accommodation, when compared to other college-bound students.

In his recent letter to the Board (November 24, 2004) Bret A. Cohen, Ms. Baer's attorney, again asserted that the Examinee is a disabled reader. Referencing Dr. Weinstein's report, Mr. Cohen noted that his client is reading and learning disordered and manifest as difficulties in reading fluency, her ability to organize information, and in oral language fluency. On page 2 of his letter, Mr. Cohen emphasized that the ADA does not require one to qualify for diagnosis under DSM-IV but rather that the individual substantiates that they suffer from a mental impairment that substantially limits a major life activity (reading and test-taking in this case). Absent from Mr. Cohen's reminder regarding the ADA is notation that the standard for evaluation is the average person from the general population and not some special or select group such as, for example, highly educated college or graduate students. Of course, it is generally recognized that "substantially limited" means "below average". In statistical terms, following the "bell curve", this means below the 16th percentile on properly standardized measures.

After reviewing the testing evidence contained in the up-dated file and also considering Mr. Cohen's argument, I still cannot recommend that the Board provide Ms. Baer with time and one-half on Step I. For the most part, the data do not indicate that she is a disabled reader; she is performing at or above the 16th percentile (when general population norms are used) on most of the age-appropriate diagnostic reading tests used to evaluate her in 2004 and 2003. I am not suggesting that Ms. Baer is a "great reader"; in light of the test evidence, she is not. She may be characterized as a relatively weak reader and she may have some cognitive problems. Nevertheless, the evidence that she is a functionally disabled reader is far from compelling. I will explain my reasoning below. To a large extent, the analysis will focus upon the reading and reading-related ability test scores obtained within the last two years (Weinstein 2004, Engleman 2004, and Prather 2003). These scores provide the most contemporary assessment of Ms. Baer's functional reading skills. Age-based percentiles will be used herein to promote comparison between the tests. To reiterate, scores that are between the 16th and 84th percentile fall within the average range.

## Reading Skills

### Reading Accuracy

Woodcock Johnson-3 (Weinstein)
Letter Word Identification                        89th percentile

2

Baer 5-099-376-5

| | |
|---|---|
| Word Attack | 41st percentile |

Woodcock Johnson-3 (Engleman)
    Letter Word Identification        65th percentile
    Word Attack                52nd percentile

Woodcock Reading Mastery Test (Prather 2003)
    Word Identification          64th percentile
    Word Attack                37th percentile

These scores uniformly indicate that Ms. Baer is at least average in her ability to accurately decode, recognize, or read words. While Dr. Engleman used Form B of the WJ-3, we are not told which form Dr. Weinstein used. This makes it a little difficult to appreciate or interpret the significantly different word identification score obtained by Dr. Weinstein in November 2004 compared to the score obtained by Dr. Engleman in March 2004. Regardless, all indications here are of average or better word reading.

Reading Fluency

Woodcock Johnson-3 (Weinstein)
    Reading Fluency           13th percentile

Woodcock Johnson-3 (Engleman)
    Reading Fluency           57th percentile

Test of Word Reading Efficiency (Engleman)
    Total Word Reading Efficiency    52nd percentile

Nelson Denny Reading Test-Form H (Engleman)
    Words Per Minute Reading Rate    25th percentile

Three of the four "reading fluency" scores fall within the average range. The only outlier score is the most recent WJ-3 Reading Fluency score, a below average score (13th percentile). What is interesting about this score in particular is that it reflects a substantial, unexpected, and inexplicable 44 percentile point drop in performance from the average Reading Fluency score obtained in March 2004, only eight months earlier. Of the four tests reported here, the only "clean" test of word reading or decoding fluency is the TOWRE. Ms. Baer achieved an average score on this test (52nd percentile). The WJ-3 Reading Fluency Test places demands upon text comprehension skills in addition to word decoding skills and as much as anything else it is a timed reading comprehension test (see below).

3

Baer 5-099-376-5

## Reading Comprehension

| | |
|---|---|
| Nelson Denny Reading Test-Form G (Weinstein)<br>Reading Comprehension (timed) | 25th percentile (- 2/3 SD) |
| Nelson Denny Reading Test-Form H (Engleman)<br>Reading Comprehension (timed) | 37th percentile |
| Woodcock Johnson-3 (Engleman)<br>Passage Comprehension | 62nd percentile |

These data uniformly reflect average reading comprehension skills, even when tested under timed conditions (i.e., NDRT). Combining these data with the WJ-3 Reading Fluency data indicated above, Ms. Baer scored within average limits on four of the five timed reading comprehension tests administered in 2004. Again, her poor showing on the second administration of the WJ-3 Reading Fluency test this year is unexpected and inexplicable. One should note that Dr. Weinstein interpreted the Examinee's timed NDRT Reading Comprehension using the percentile scores contained in the test manual and concluded "markedly slowed reading fluency". However, the percentile scores that are reported in the manual are based on grade-norms and therefore judge an examinee in comparison to others with a similar level of education instead of by comparison to the general population. My use of percentile scores on the NDRT above was calculated on the basis of general population norms using the scaled scores and standard deviation. A scaled score of 185 (Ms. Baer's score) is about two-thirds standard deviations below the statistical mean for the general population of NDRT test-takers and is therefore equivalent to the 25th percentile. This therefore is an average score.

Summarizing the March 2004 data by itself, one would conclude that Ms. Baer is an accurate, fluent reader with average, albeit sub-optimal, reading comprehension skills. While she may be seen as underachieving with regards to reading, the March 2004 data would argue that she is not so underachieving as to be identified as a disabled reader. Summarizing the November 2004 data in isolation, one might be tempted to characterize Ms. Baer as an accurate but not automatic reader with average reading comprehension skills. Typically people who are non-fluent word readers encounter difficulties with reading comprehension; and so, the average comprehension score does not fit the pattern. Ms. Baer's low scores in reading fluency ("automatic" reading) are also unexpected and inexplicable considering her performance eight months earlier and are therefore "suspect". In November 2004 she earned a timed reading comprehension score on the NDRT-G (which required her to read connected text in contrast to single sentences) that is about two-thirds standard deviation below the mean for the entire NDRT standardization sample, regardless of level of education, and therefore is within the average range. This would argue against a finding of "disability". The contrast in her performance on timed reading measures (WJ-3 Reading Fluency 13th percentile and NDRT-G Reading Comprehension 25th percentile) in November 2004 would not permit confident conclusion of impaired reading fluency. Of course, interpreting the reading test

4

Baer 5-099-376-5

scores "in isolation" of one another is ill-advised. Considered together, the 2004 data points towards <u>non-disabled,</u> if imperfect and sub-optimal, reading skills.

## Reading-Related Cognitive Abilities

### Phonological Awareness

Woodcock Johnson Diagnostic Reading Battery (Weinstein)
    Sound Blending              22nd percentile
    Incomplete Words        47th percentile

Woodcock Johnson-3 (Engleman)
    Sound Blending              90th percentile
    Auditory Attention        53rd percentile

The picture here, again, is of at least average phonological processing skills, Dr. Weinstein's characterization or conclusion of "poor knowledge of sounds" notwithstanding. Once again, Ms. Baer displayed a substantial, unexpected, and inexplicable drop in Sound Blending scores between the first and second administration of the WJ-3 this year (March and November, respectively). Still, she performed in the average range on this test in November 2004 (22nd percentile).

We know that word knowledge and domain knowledge (knowledge of a subject) are very important in reading, including reading fluency. Vocabulary, or word knowledge, speeds up word recognition, while domain knowledge facilitates comprehension by providing a foundation for making inferences. For the most part, Ms. Baer scored within the average and above average range on marker tests of these reading-related cognitive abilities (see below).

### Word Knowledge

Woodcock Johnson Diagnostic Reading Battery (Weinstein)
    Oral Vocabulary            32nd percentile
    Listening Comprehension    18th percentile

WAIS-III (Weinstein)
    Vocabulary                 79th percentile
    Similarities                95th percentile

Shipley Scale (Weinstein)
    Vocabulary                 79th percentile

Woodcock Johnson-3 (Engleman)
    Verbal Comprehension Index   67th percentile

5

Baer 5-099-376-5

Admittedly there is a good bit of variability among these scores. However, none fall outside and below normal limits on age-norms. Dr. Weinstein's characterization of Listening Comprehension (18th percentile) as a "deficit" is inaccurate in that the average range includes scores that fall between the 16th and 84th percentile.

### World (Domain) Knowledge

| | |
|---|---|
| WAIS-III (Weinstein) | |
|     Information | 65th percentile |
| Woodcock Johnson-3 (Engleman) | |
|     General Information | 58th percentile |

These two scores are average scores.

### Oral Fluency

There is substantial research evidence to suggest that one's ability to rapidly retrieve words, names, etc. contributes to reading success. This is yet another critical reading-related mental ability.

| | |
|---|---|
| Boston Naming Test (Weinstein) | raw score 14/15 correct* |
| Associative Fluency (Weinstein) | |
|     FAS | raw score 35* |
| Naming Fluency (Weinstein) | |
|     Animal Generation | raw score 19* |

(*It is important to note that Dr. Weinstein reported only the raw scores for these tests and noted "reduced retrieval of language..." next to the Animal Generation test score. However, raw scores alone are essentially meaningless and tell us nothing about Ms. Baer relative to the general population. It is unclear how Dr. Weinstein could conclude "reduced retrieval" on the basis of raw scores alone. Further, in my experience, the FAS and AN tests are typically scored on the basis of age and level of education and therefore do not permit conclusions about one's standing relative to the average person from the general population.)

| | |
|---|---|
| Woodcock Johnson-3 (Engleman) | |
|     Rapid Picture Naming | 17th percentile |
|     Retrieval Fluency | 45th percentile |

6

Baer 5-099-376-5

The November 2004 data pertaining to oral fluency is not comparable to the March 2004 data. The March data reveals average oral fluency relative to others from the general population using age-based norms. The November 2004 scores actually contribute nothing to this assessment of disability. While the Rapid Picture Naming score is a low score, it still is within normal or average limits.

In summary, of the 25 interpretable reading and reading-related cognitive tests given to Ms. Baer in 2004 reported on above, every test but one is within the average and above range of functioning. The single test that falls outside and below average limits is the WJ-3 Reading Fluency test from November 2004, a test that reflects an unexpected and inexplicable loss of 44 percentile points from a previous administration of the same or parallel test in March 2004. It also contrasts with average timed reading comprehension scores using connected text (NDRT) rather than single sentences (WJ-3 Reading Fluency).

Regardless of whether any of these reading or reading-related scores document a DSM-IV defined reading disorder or not, they do not document disabled reading when the customary average person from the general population standard is used to make this determination. Indeed there is substantial variability among these test scores and many reveal underachievement in reading when determined by contrast with Ms. Baer's measured general mental abilities (e.g., WAIS-III IQ scores). Nonetheless, the underachievement reflected here falls short of the threshold required for identification as "severely limited" or "disabled" reading. Regardless of the idiosyncrasies noted in her testing behavior, as described by Dr. Weinstein and other examiners, Ms. Baer performed within normal limits on every reading test with only one exception. These performance data together prohibit the conclusion that Ms. Baer is a "disabled" reader.

As we know, the "general population" standard is the frame-of-reference or marker used to determine disability. With this in mind, use of an examinee's performance on tests such as the MCAT, the GRE, or the USMLE fail as a measure of disability simply because they are standardized or normed on a select group of highly educated individuals rather than on the average person in the general population. Non-competitive or failing scores on these tests is not proof of disabled functioning. The PSAT and SAT are perhaps somewhat closer to the average person standard because they are standardized and make comparisons with high school students who aspire or intend to go onto college. The format for these is similar to the USMLE Step 1. Ms. Baer's record on the PSAT and SAT indicates at least average performance on timed multiple-choice "high stakes" examinations. See below.

| PSAT (1990) | Verbal 60th percentile | Math 66th percentile |
|---|---|---|
| | | |
| SAT | Verbal Score | Math Score |
| JAN 91 | 470 | 500 |

7

Baer 5-099-376-5

| | | |
|---|---|---|
| MAR 91 | 490 | 560 |
| NOV 91 | 530 | 560 |

SAT-Achievement Tests

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JUN 89 | BY | 550 | | | M1 | 560 | |
| MAY 91 | FR | 530 | EN | 520 | M1 | 600 | (67th percentile) |
| DEC 91 | ES | 590 (71st percentile) | | | | | |

These tests are all timed and all were completed under ordinary or standardized conditions. Ms. Baer's PSAT and SAT scores are all within the average or better range and argue against disability with respect to taking timed multiple-choice tests under standardized conditions.

In her report (November 2004), Dr. Weinstein diagnosed Ms. Baer with a "language-based learning disorder", secondary ADHD, "slowed reading", and "executive dysfunction". In support of Ms. Baer, Dr. Weinstein, explained that "Extended time on timed tests is in order given Ms. Baer's longstanding history of slowed reading and her history of accommodations at Milton Academy". Further, "Extended time on timed tests is also in order given Ms. Baer's difficulty rapidly retrieving language". Much of my discussion has focused upon the allegation that she is a disabled reader. This is Ms. Baer's chief complaint. The impact of problems in oral fluency (language retrieval) on reading was also addressed in my discussion. To reiterate, regardless of whether or not Ms. Baer is impaired in the ways that Dr. Weinstein described, the evidence does not indicate that she is a disabled reader who is thereby severely limited or precluded in her ability to complete timed multiple-choice written tests under standardized conditions. Further, I question the basis for Dr. Weinstein's diagnosis of a language-based learning disorder.

Dr. Weinstein seems to have based her language-based LD diagnosis on what she regarded as evidence of (1) "poor knowledge of sounds" and (2) "reduced listening comprehension". She identified (page 7 of her report) specific deficits in sound blending skills, listening comprehension, and in writing fluency. However, the Examinee's performance on specific diagnostic tests of these functions falls within the normal or average range (i.e., WJDRD Sound Blending 22nd percentile, WJDRB Listening Comprehension 18th percentile, WJ-3 Writing Fluency 25th percentile). Expressed only in raw score terms, the results from the oral fluency tests used by Dr. Weinstein are not interpretable and are meaningless or non-contributory. In addition, Ms. Baer displayed Verbal IQ and Verbal Comprehension Index scores that are above average on the WAIS-III (94th percentile and 86th percentile respectively). Her ability to hold verbal information "in mind" while performing a mental task is also above average when measured by the WAIS-III (Working Memory Index 96th percentile). Again, Ms. Baer achieved at least average scores on the timed verbal, English, and French tests of the SAT. In my opinion, this is a compelling body of evidence that argues against the diagnosis of language-based

8

Baer 5-099-376-5

disorder or disability. Ms. Baer's Picture Completion and Similarities (both 95th percentile) and Matrix Reasoning (99th percentile) scores on the WAIS-III argue against the idea of pervasive difficulties processing complex information or solving complex problems. In short, although some weaknesses do emerge in the test record relative to executive or metacognitive functions (e.g., Rey-Osterrieth, CVLT-2), I believe that Dr. Weinstein has overstated the case for diagnosis with language-based learning disorder and executive dysfunction disorder.

The more important question however is whether or not Heidi Baer is disabled in her ability to take written timed tests in reference to the performance of the general population. I submit that she is not disabled in this way considering the data. Her history of performance upon the PSAT and SAT would support "my" conclusion. Her performance on all but one of the reading tests would also support this conclusion. Her performance upon the Nelson Denny Reading Test is of special interest because on this test examinees are given twenty minutes in which to read passages and answer literal and inferential multiple-choice questions based on the content of the passage. The information needed to answer the questions is contained within the written passages. This test comes quite close to the "behavior-of-interest" that forms the basis for Ms. Baer's complaint. When compared to the general population of NDRT test-takers, Ms. Baer achieved average scores on both administrations of the NDRT in 2004. Again, the evidence fails to indicate that she is disabled relative to the average person in so far as taking timed written multiple-choice tests is concerned. I cannot recommend that the Board extend Ms. Baer the time and one-half accommodation that she has requested.

Sincerely,

Joseph E. Berthier, Ph.D.

9

# EXHIBIT 2(f)

Learning Disorders (formerly Academic Skills Disorders)

## Diagnostic criteria for Mental Retardation

A. Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).

B. Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

C. The onset is before age 18 years.

*Code* based on degree of severity reflecting level of intellectual impairment:

| | | |
|---|---|---|
| 317 | **Mild Mental Retardation:** | IQ level 50–55 to approximately 70 |
| 318.0 | **Moderate Mental Retardation:** | IQ level 35–40 to 50–55 |
| 318.1 | **Severe Mental Retardation:** | IQ level 20–25 to 35–40 |
| 318.2 | **Profound Mental Retardation:** | IQ level below 20 or 25 |
| 319 | **Mental Retardation, Severity Unspecified:** | when there is strong presumption of Mental Retardation but the person's intelligence is untestable by standard tests |

# Learning Disorders
# (*formerly* Academic Skills Disorders)

The section on Learning Disorders includes Reading Disorder, Mathematics Disorder, Disorder of Written Expression, and Learning Disorder Not Otherwise Specified.

## Diagnostic Features

Learning Disorders are diagnosed when the individual's achievement on individually administered, standardized tests in reading, mathematics, or written expression is substantially below that expected for age, schooling, and level of intelligence. The learning problems significantly interfere with academic achievement or activities of daily living that require reading, mathematical, or writing skills. A variety of statistical approaches can be used to establish that a discrepancy is significant. *Substantially below* is usually defined as a discrepancy of more than 2 standard deviations between achievement and IQ. A smaller discrepancy between achievement and IQ (i.e., between 1 and 2 standard deviations) is sometimes used, especially in cases where an individual's performance on an IQ test may have been compromised by an associated disorder in cognitive processing, a comorbid mental disorder or general medical condition, or the individual's ethnic or cultural background. If a sensory deficit is

present, the learning difficulties must be in excess of those usually associated with the deficit. Learning Disorders may persist into adulthood.

## Associated Features and Disorders

Demoralization, low self-esteem, and deficits in social skills may be associated with Learning Disorders. The school drop-out rate for children or adolescents with Learning Disorders is reported at nearly 40% (or approximately 1.5 times the average). Adults with Learning Disorders may have significant difficulties in employment or social adjustment. Many individuals (10%–25%) with Conduct Disorder, Oppositional Defiant Disorder, Attention-Deficit/Hyperactivity Disorder, Major Depressive Disorder, or Dysthymic Disorder also have Learning Disorders. There is evidence that developmental delays in language may occur in association with Learning Disorders (particularly Reading Disorder), although these delays may not be sufficiently severe to warrant the separate diagnosis of a Communication Disorder. Learning Disorders may also be associated with a higher rate of Developmental Coordination Disorder.

There may be underlying abnormalities in cognitive processing (e.g., deficits in visual perception, linguistic processes, attention, or memory, or a combination of these) that often precede or are associated with Learning Disorders. Standardized tests to measure these processes are generally less reliable and valid than other psychoeducational tests. Although genetic predisposition, perinatal injury, and various neurological or other general medical conditions may be associated with the development of Learning Disorders, the presence of such conditions does not invariably predict an eventual Learning Disorder, and there are many individuals with Learning Disorders who have no such history. Learning Disorders are, however, frequently found in association with a variety of general medical conditions (e.g., lead poisoning, fetal alcohol syndrome, or fragile X syndrome).

## Specific Culture Features

Care should be taken to ensure that intelligence testing procedures reflect adequate attention to the individual's ethnic or cultural background. This is usually accomplished by using tests in which the individual's relevant characteristics are represented in the standardization sample of the test or by employing an examiner who is familiar with aspects of the individual's ethnic or cultural background. Individualized testing is always required to make the diagnosis of a Learning Disorder.

## Prevalence

Estimates of the prevalence of Learning Disorders range from 2% to 10% depending on the nature of ascertainment and the definitions applied. Approximately 5% of students in public schools in the United States are identified as having a Learning Disorder.

## Differential Diagnosis

Learning Disorders must be differentiated from **normal variations in academic attainment** and from scholastic difficulties due to **lack of opportunity, poor teaching,** or **cultural factors.** Inadequate schooling can result in poor performance on standardized achievement tests. Children from ethnic or cultural backgrounds different from the prevailing school culture or in which English is not the primary language and children who have attended class in schools where teaching has been inadequate may score poorly on achievement tests. Children from these same backgrounds may also be at greater risk for absenteeism due to more frequent illnesses or impoverished or chaotic living environments.

**Impaired vision or hearing** may affect learning ability and should be investigated through audiometric or visual screening tests. A Learning Disorder may be diagnosed in the presence of such sensory deficits only if the learning difficulties are in excess of those usually associated with these deficits. Accompanying neurological or other general medical conditions should be coded on Axis III.

In **Mental Retardation,** learning difficulties are commensurate with general impairment in intellectual functioning. However, in some cases of Mild Mental Retardation, the level of achievement in reading, mathematics, or written expression is gnificantly below expected levels given the person's schooling and severity of Mental Retardation. In such cases, the additional diagnosis of the appropriate Learning Disorder should be made.

An additional Learning Disorder diagnosis should be made in the context of a **Pervasive Developmental Disorder** only when academic impairment is significantly below expected levels given the individual's intellectual functioning and schooling. In individuals with **Communication Disorders,** intellectual functioning may have to be assessed using standardized measures of nonverbal intellectual capacity. In cases in which academic achievement is significantly below this measured capacity, the appropriate Learning Disorder should be diagnosed.

**Mathematics Disorder** and **Disorder of Written Expression** most commonly occur in combination with **Reading Disorder.** When criteria are met for more than one Learning Disorder, all should be diagnosed.

## 315.00   Reading Disorder

### Diagnostic Features

The essential feature of Reading Disorder is reading achievement (i.e., reading accuracy, speed, or comprehension as measured by individually administered standardized tests) that falls substantially below that expected given the individual's chronological age, measured intelligence, and age-appropriate education (Criterion A). The disturbance in reading significantly interferes with academic achievement or ·ith activities of daily living that require reading skills (Criterion B). If a sensory deficit is present, the reading difficulties are in excess of those usually associated with it (Criterion C). If a neurological or other general medical condition or sensory deficit is present, it should be coded on Axis III. In individuals with Reading Disorder (which

has also been called "dyslexia"), oral reading is characterized by distortions, substitutions, or omissions; both oral and silent reading are characterized by slowness and errors in comprehension.

## Associated Features and Disorders

See the "Associated Features and Disorders" section for Learning Disorders (p. 50). Mathematics Disorder and Disorder of Written Expression are commonly associated with Reading Disorder, and it is relatively rare for either of these disorders to be found in the absence of Reading Disorder.

## Specific Gender Features

From 60% to 80% of individuals diagnosed with Reading Disorder are males. Referral procedures may often be biased toward identifying males, because they more frequently display disruptive behaviors in association with Learning Disorders. The disorder has been found to occur at more equal rates in males and females when careful diagnostic ascertainment and stringent criteria are used rather than traditional school-based referral and diagnostic procedures.

## Prevalence

The prevalence of Reading Disorder is difficult to establish because many studies focus on the prevalence of Learning Disorders without careful separation into specific disorders of Reading, Mathematics, or Written Expression. Reading Disorder, alone or in combination with Mathematics Disorder or Disorder of Written Expression, accounts for approximately four of every five cases of Learning Disorder. The prevalence of Reading Disorder in the United States is estimated at 4% of school-age children. Lower incidence and prevalence figures for Reading Disorder may be found in other countries in which stricter criteria are used.

## Course

Although symptoms of reading difficulty (e.g., inability to distinguish among common letters or to associate common phonemes with letter symbols) may occur as early as kindergarten, Reading Disorder is seldom diagnosed before the end of kindergarten or the beginning of first grade because formal reading instruction usually does not begin until this point in most school settings. Particularly when Reading Disorder is associated with high IQ, the child may function at or near grade level in the early grades, and the Reading Disorder may not be fully apparent until the fourth grade or later. With early identification and intervention, the prognosis is good in a significant percentage of cases. Reading Disorder may persist into adult life.

## Familial Pattern

Reading Disorder aggregates familially and is more prevalent among first-degree biological relatives of individuals with Learning Disorders.

## Differential Diagnosis

See the "Differential Diagnosis" section for Learning Disorders (p. 51).

---

### Diagnostic criteria for 315.00 Reading Disorder

A. Reading achievement, as measured by individually administered standardized tests of reading accuracy or comprehension, is substantially below that expected given the person's chronological age, measured intelligence, and age-appropriate education.

B. The disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills.

C. If a sensory deficit is present, the reading difficulties are in excess of those usually associated with it.

**Coding note:** If a general medical (e.g., neurological) condition or sensory deficit is present, code the condition on Axis III.

---

# 315.1   Mathematics Disorder

## Diagnostic Features

The essential feature of Mathematics Disorder is mathematical ability (as measured by individually administered standardized tests of mathematical calculation or reasoning) that falls substantially below that expected for the individual's chronological age, measured intelligence, and age-appropriate education (Criterion A). The disturbance in mathematics significantly interferes with academic achievement or with activities of daily living that require mathematical skills (Criterion B). If a sensory deficit is present, the difficulties in mathematical ability are in excess of those usually associated with it (Criterion C). If a neurological or other general medical condition or sensory deficit is present, it should be coded on Axis III. A number of different skills may be impaired in Mathematics Disorder, including "linguistic" skills (e.g., understanding or naming mathematical terms, operations, or concepts, and decoding written problems into mathematical symbols), "perceptual" skills (e.g., recognizing or reading numerical symbols or arithmetic signs, and clustering objects into groups), "attention" skills (e.g., copying numbers or figures correctly, remembering to add in "carried" numbers, and observing operational signs), and "mathematical" skills (e.g., following sequences of mathematical steps, counting objects, and learning multiplication tables).

## Associated Features and Disorders

See the "Associated Features and Disorders" section for Learning Disorders (p. 50). Mathematics Disorder is commonly found in combination with Reading Disorder or Disorder of Written Expression.

# EXHIBIT 2(g)

# EXHIBIT G

## SUMMARY OF HEIDI A. BAER TESTING RESULTS

| Test and Date | Below Average | Average | Above Average |
|---|:---:|:---:|:---:|
| PSAT 1990 | | X | |
| SAT 1/1991 | | X | |
| SAT 3/1991 | | X | |
| SAT 11/1991 | | X | |
| WJ -III Letter Word Identification 11/2003 | | | X |
| WJ-III Word Attack 11/2003 | | X | |
| WJ-III Letter Word Identification 3/2004 | | X | |
| WJ-III Word Attack 3/2004 | | X | |
| WJ Reading Mastery Letter Word Identification 8/2003 | | X | |
| WJ Reading Mastery Word Attack 8/2003 | | X | |
| WJ-III Reading Fluency 11/2003 | X | | |
| WJ-III Reading Fluency 3/2004 | | X | |
| Test of Word Reading Efficiency 3/2004 | | X | |
| N-D Reading Test Words Per Minute 3/2004 | | X | |
| N-D Reading Test G: Comprehension (Timed) 11/2003 | | X | |
| N-D Reading Test H: Comprehension (Timed) 3/2004 | | X | |
| WJ-III Passage Comprehension 3/2004 | | X | |
| WJ Reading Battery Sound Blending 11/2003 | | X | |
| WJ Reading Battery Incomplete Words 11/2003 | | X | |
| WJ-III Sound Blending 3/2004 | | | X |
| WJ-III Auditory Attention 3/2004 | | X | |
| WJ Reading Battery: Oral Vocabulary 11/2003 | | X | |
| WJ Reading Battery: Listening Comprehension 11/2003 | | X | |
| WAIS -III Vocabulary 11/2003 | | X | |
| WAIS-III Similarities 11/2003 | | | X |
| WAIS-III Information 11/2003 | | X | |
| Shipley Scale Vocabulary 11/2003 | | X | |
| WJ-III Verbal Comprehension Index 3/2004 | | X | |
| WJ-III General Information 3/2004 | | X | |
| WJ-III Rapid Picture Naming 3/2004 | | X | |
| WJ-III Retrieval Fluency 3/2004 | | X | |

# EXHIBIT 2(h)

# EXHIBIT H

## SUMMARY OF HEIDI A. BAER TESTING RESULTS

| Test and Date | Below Average | Average | Above Average |
|---|:---:|:---:|:---:|
| PSAT 1990 | | X | |
| SAT 1/1991 | | X | |
| SAT 3/1991 | | X | |
| SAT 11/1991 | | X | |
| WJ -III Letter Word Identification 11/2003 | | | X |
| WJ-III Word Attack 11/2003 | | X | |
| WJ-III Letter Word Identification 3/2004 | | X | |
| WJ-III Word Attack 3/2004 | | X | |
| WJ Reading Mastery Letter Word Identification 8/2003 | | X | |
| WJ Reading Mastery Word Attack 8/2003 | | X | |
| WJ-III Reading Fluency 11/2003 | X | | |
| WJ-III Reading Fluency 3/2004 | | X | |
| Test of Word Reading Efficiency 3/2004 | | X | |
| N-D Reading Test Words Per Minute 3/2004 | | X | |
| N-D Reading Test G: Comprehension (Timed) 11/2003 | | X | |
| N-D Reading Test H: Comprehension (Timed) 3/2004 | | X | |
| WJ-III Passage Comprehension 3/2004 | | X | |
| WJ Reading Battery Sound Blending 11/2003 | | X | |
| WJ Reading Battery Incomplete Words 11/2003 | | X | |
| WJ-III Sound Blending 3/2004 | | | X |
| WJ-III Auditory Attention 3/2004 | | X | |
| WJ Reading Battery: Oral Vocabulary 11/2003 | | X | |
| WJ Reading Battery: Listening Comprehension 11/2003 | | X | |
| WAIS -III Vocabulary 11/2003 | | X | |
| WAIS-III Similarities 11/2003 | | | X |
| WAIS-III Information 11/2003 | | X | |
| Shipley Scale Vocabulary 11/2003 | | X | |
| WJ-III Verbal Comprehension Index 3/2004 | | X | |
| WJ-III General Information 3/2004 | | X | |
| WJ-III Rapid Picture Naming 3/2004 | | X | |
| WJ-III Retrieval Fluency 3/2004 | | X | |

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEIDI A. BAER,<br><br>          Plaintiff,<br><br>v.<br><br>NATIONAL BOARD OF<br>MEDICAL EXAMINERS,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No.<br>)    05-CV-10724-GAO |

## AFFIDAVIT OF KEVIN R. MURPHY, PH.D.

Kevin Murphy, Ph.D., having been duly sworn, hereby deposes and says:

1.     My name is Kevin R. Murphy, Ph.D.

2.     I hold a Doctorate in Counseling Psychology from the University of Connecticut in Storrs, Connecticut, which I received in 1990. I also obtained a Master's Degree in Counseling Psychology from Florida State University in Tallahassee, Florida in 1981 and a Bachelor's Degree in Psychology from Boston College in Chestnut Hill, Massachusetts in 1979.

3.     I am currently the Chief of The Adult ADHD Clinic of Central Massachusetts, located in Northboro, Massachusetts, where I specialize in the assessment and treatment of adolescents and adults with Attention Deficit Disorder ("ADD") and Attention Deficit/Hyperactivity Disorder ("ADHD"). I am also an Associate Adjunct Professor in the Graduate Program in Counseling Psychology at Assumption College in Worcester, Massachusetts. From 1992 to 2003, I was an Assistant and later Associate Professor of Psychiatry and Chief of the Adult Attention Deficit Hyperactivity Disorder Clinic at University of Massachusetts Medical School in Worcester, Massachusetts.

- 1 -

4.      In addition to my practice assessing and treating patients, I am also an expert on

ADD/ADHD and the Americans With Disabilities Act ("ADA"), and I serve as a consultant on

issues related to ADD/ADHD disability determinations and test accommodations to numerous

national and state licensing boards, including the National Board of Medical Examiners

("NBME"), the Educational Commission for Foreign Medical Graduates, and the boards of bar

examiners for California, Connecticut, Delaware, Florida, Louisiana, Massachusetts, Missouri,

New York, Oklahoma, and Washington, D.C.

5.      I am a licensed Psychologist and Health Service Provider in Massachusetts

6.      I have published widely on the subject of ADD/ADHD, including several book

chapters and numerous journal articles. I co-authored a book entitled <u>Out of the Fog: Treatment</u>

<u>Options and Coping Strategies for Adult Attention Deficit Disorder</u> (Hyperion, 1995). I also co-

authored a clinical assessment workbook with Dr. Russell Barkley on ADD/ADHD entitled

<u>Attention Deficit Hyperactivity Disorder:  A Clinical Workbook</u> (Guilford, 1998).

7.      I have presented more than 100 invited lectures, grand rounds, seminars, and full-

day workshops to various professional groups throughout North America.  The topics have

included assessment and treatment of ADHD, academic and workplace accommodations, and the

ADA. I have appeared on several local and regional radio shows and appeared on Good

Morning America in June of 1994.  I have also appeared in two of Dr. Russell Barkley's

educational video tapes on ADHD and a video entitled "Accommodating Invisible Disabilities:

An Expert Briefing."  I have assisted the following magazines and newspapers with stories on

ADHD:  Newsweek, The Wall Street Journal, The New York Times, The Boston Globe, The

Worcester Telegram, Men's Health, Reader's Digest, Dr. Phil's Newsletter, and Entrepreneur.

8.      A copy of my curriculum vitae is attached hereto as Exhibit A.

9.     In submitting this report, I rely on documentation submitted by Ms. Heidi A. Baer as part of her application for special accommodations (the "Application") while taking the United States Medical Licensing Exam ("USMLE"), Step 1. The NBME asked me to review this documentation and provide my opinion as to whether Ms. Baer is disabled under the ADA. I also rely on my own personal knowledge of the field of Counseling Psychology and more than two decades of clinical experience and teaching.

10.     Attached hereto as Exhibit B is a true copy of my consultant's report to the NBME respecting Ms. Baer's application for a special accommodation under the ADA while taking the USMLE, Step 1, based on diagnoses of: (1) ADHD, Predominantly Inattentive Type; and (2) Learning Disabilities (Reading Disorder and Learning Disorder, Not Otherwise Specified). My report focuses primarily on the issue of Ms. Baer's ADHD diagnosis.

11.     As set forth in my report, which is incorporated by reference in this affidavit, it is my professional opinion that the documentation provided by Ms. Baer to the NBME does not adequately support an ADHD diagnosis or a conclusion that, by virtue of ADHD, Ms. Baer is substantially limited in a major life activity. As such, in my professional opinion, the documentation provided by Ms. Baer to the NBME is insufficient to warrant the granting of special accommodations on the basis of ADHD.

12.     ADHD is a developmental disability with a childhood onset that typically results in a chronic and pervasive pattern of functional impairment in academic, social, or vocations areas, and often in daily adaptive functioning. By definition, ADHD first exhibits in early childhood and manifests itself in more than one setting.

13.    The records submitted by Ms. Baer in support of her Application do not reflect a frequency, intensity, or magnitude of symptomology or impairment sufficient to support a clinical diagnosis of ADHD, either currently or during childhood.

14.    With respect to Ms. Baer's childhood, her early functioning appeared to be quite satisfactory and did not reflect any significant or developmentally deviant ADHD-like impairment that would rise to the level of a clinical diagnosis. Based on her academic records of Milton Academy, which Ms. Baer attended from kindergarten through high school, the overwhelming majority of her teachers viewed her as an intelligent, hard-working, dedicated student who was a pleasure to have in class. Ms. Baer was never referred for any formal treatment or accommodations related to ADHD-like impairment during her childhood. A psychoeducational evaluation conducted by M. Patricia Boyle, Ph.D. when Ms. Baer was in fifth grade concluded that she was "extremely intelligent" and "her reading aloud skills were excellent." Although there were a few comments from various Milton Academy teachers indicating that Ms. Baer missed details, made careless mistakes, and needed to be more consistently attentive and less social, such comments were relatively few and far between and did not represent a developmentally deviant pattern of impairment that would justify a clinical diagnosis of ADHD. In short, Ms. Baer's childhood records do not present a picture consistent with ADHD, and she has not shown that she meets the childhood onset criterion that is required for an ADHD diagnosis.

15.    Further, Ms. Baer was evaluated by numerous diagnosticians over a period of nearly two decades who did not conclude that ADHD was a valid diagnosis for her. Specifically, Ms. Baer was evaluated by: (1) M. Patricia Boyle, Ph.D., when she was a fifth grader at Milton Academy (1984-85); (2) Christopher Connolly, Ph.D., on October 26, 1998; (3) Ms. Danielle

Kerns/Evan Forman, Ph.D., on January 27 and February 3, 2003; and (4) Penny Prather, Ph.D., on August 21 and 22, 2003. Not one of these professionals described a history of symptoms or functional impairment consistent with ADHD, and none of them diagnosed Ms. Baer as having ADHD.

16.    It was not until 2004, when Ms. Baer was evaluated by Marilyn F. Engleman, Ph.D., that she was diagnosed for the first time with "mild AD/HD, Inattentive Type." In making this ADHD diagnosis, however, Dr. Engleman did not apply the full diagnostic criteria set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed.) ("DSM-IV"). A copy of the DSM-IV's Diagnostic Criteria for Attention Deficit/Hyperactivity Disorder is attached as Exhibit C.

17.    For example, a DSM-IV ADHD diagnosis requires the presence of six or more itemized symptoms of inattention or hyperactivity-impulsivity that have persisted for at least six months to a degree that is maladaptive and inconsistent with developmental level. However, Dr. Engleman did not specify which or how many of these symptoms Ms. Baer manifested currently or during childhood to determine if she met the symptom threshold required for a DSM-IV diagnosis of ADHD. By failing to review and document the formal criteria of ADHD with Ms. Baer to see if the criteria were satisfied, Dr. Engleman was in no position to either rule in or rule out ADHD as the correct diagnosis under the DSM-IV.

18.    In addition, the DSM-IV requires "clinically significant impairment" in at least two life domains. ADHD affects people over time and across situations in multiple life domains (e.g., at home as well as at school and/or work). However, Dr. Engleman described impairment in only one area – academics – and even there the described impairment was limited to the setting of timed testing.

19.    The lack of ADHD-like impairment in any other life domains, such as work, social, or daily adaptive areas, is evident from the records and personal statement that Ms. Baer submitted in support of her Application. Even individuals who have pointed out difficulties that Ms. Baer may have had in isolated situations have taken pains to comment that her issues were not significant or pervasive. For example, in her Advisor's Report from October 1986, Ms. Nancy Lee of Milton Academy raised some concerns regarding Ms. Baer's "distracting behavior" and "full social agenda" in science class, but then stated that "[n]one of these problems is of very serious concern, I assure you." Similarly, in a letter to the NBME dated August 4, 2003, Dr. Connolly stated that Ms. Baer "clearly does not have a severe or comprehensive problem." Subtle or minor symptoms that cause only occasional or mild interference are not disabilities.

20.    Additionally, there is no indication that Ms. Baer has experienced ADHD-like impairment in any work setting. Prior to entering medical school, Ms. Baer worked very successfully as a biotechnology analyst for an investment bank, where, by her own report, she "did very well, did not feel as though she was slow to finish projects, handled all the responsibilities that were asked of her, and had excellent performance evaluations." Ms. Baer has also done well in her medical school clerkships, which she described in her personal statement as "uniformly positive."

21.    Likewise, there is no indication that she experienced ADHD-like impairment in academic settings other than timed medical exams. For example, Ms. Baer twice obtained above-average scores on the SAT without any sort of treatment or accommodations for ADHD. (Ms. Baer obtained scores of 1050 and 1090 on the SAT in March 1991 and November 1991, respectively; both of these scores exceed the mean female SAT score of 977 in 1991.) Similarly,

she earned a 2.95 GPA at Duke University, with a major in English, without any sort of formal treatment or accommodations for ADHD. These accomplishments are inconsistent with ADHD-like impairment in those life domains, are not indicative of impaired functioning, and belie substantial impairment in a major life activity.

22.    Because Dr. Engleman did not find that Ms. Baer met the symptom thresholds for inattention or hyperactivity-impulsivity or find and illuminate "clinically significant impairment" in at least two life domains, her ADHD diagnosis of Ms. Baer fails to satisfy the DSM-IV criteria.

23.    Rather than apply the DSM-IV criteria, Dr. Engleman instead used the self-reported Brown ADD Rating Scale and the results of several tests that are not diagnostic of ADHD, including the Nelson Denny Reading Test and the Woodcock-Johnson Psycho-Educational Battery, as her rationale for the ADHD diagnosis. The Brown Rating Scale does not represent the official DSM-IV criteria for ADHD, which are considered the "gold standard" and the most scientifically valid criteria. Further, no test or battery of tests can reliably diagnose ADHD. In addition, Dr. Engleman did not adequately illuminate the persistent functional impairment in real world functioning that would support a clinical diagnosis of ADHD. As such, Dr. Engleman's diagnosis of ADHD is poorly substantiated.

24.    In November, 2004, Cheryl Weinstein, Ph.D. also diagnosed Ms. Baer as having "attention deficit disorder secondary to language based learning disorder." Dr. Weinstein appears to have based her ADD diagnosis on a selective reading of historical documentation provided by Ms. Baer and on Dr. Engleman's earlier diagnosis. Dr. Weinstein also did not employ the official DSM-IV criteria for ADHD, and her diagnosis of ADD is also poorly substantiated.

25.    The fact that Ms. Baer may have scored low average on select portions of the Nelson Denny Reading Test and the Woodcock-Johnson Psycho-Educational Battery is not diagnostic of ADHD.  There is no test or battery of tests that can reliably diagnose ADHD; the impact of the disability needs to be evident in real world functioning and result in developmentally deviant impairment in at least two life domains.  Weaknesses in selected portions of the Nelson Denny Reading Test and the Woodcock-Johnson Psycho-Educational Battery are not diagnostic of ADHD, especially where, as in Ms. Baer's case, the overwhelming majority of the subject's test results fall in the average range or better.  Without a documented history of functional impairment that can be reliably tied to ADHD and concurrent validation of significant impairment from other non-testing sources, selected test results (most of which are at least average) are not sufficient to establish an ADHD diagnosis.

26.    The fact that Ms. Baer may have difficulty performing on timed tests is also not diagnostic of ADHD.  There are many possible reasons for slow test taking besides ADHD.  One possibility that emerges from the documentation that Ms. Baer submitted in support of her Application is that her difficulty with timed tests may be the result of her slow, deliberate, perseverative, careful test taking style/strategy.  More specifically, Ms. Baer's documentation describes her as being a perfectionist, obsessively checking her answers, having a tendency to ruminate and get bogged down in details, and being overly concerned with accuracy and completeness, all of which contribute to a slow and inefficient test-taking strategy.  Furthermore, it appears from the documentation that Ms. Baer's tendencies in the timed test context are exacerbated when she becomes anxious.  As such, it is possible that Ms. Baer's difficulty performing on timed tests is the product of a combination of stylistic/strategic issues and anxiety, rather than ADHD.  In any event, absent an adequately substantiated history consistent with

ADHD, it is inappropriate to conclude that Ms. Baer's testing difficulties are a function of ADHD.

27.    In summary, ADHD is, by definition, a disorder that pervades an individual's functioning over time and across life situations; it does not affect people in only one circumscribed slice of life, such as test-taking. A diagnosis of ADHD cannot be based merely on results on select portions of certain psychoeducational tests or underperformance on high stakes, timed exams. Because it does not illuminate any functional impairment beyond the context of timed tests, and indeed demonstrates an individual who has been highly successful in many other contexts, the documentation submitted in support of Ms. Baer's application fails to support a DSM-IV diagnosis of ADHD or a conclusion that, by virtue of ADHD, Ms. Baer is substantially limited in a major life activity. As such, in my professional opinion, the documentation provided by Ms. Baer to the NBME is insufficient to warrant the granting of special accommodations on the basis of ADHD.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 20TH DAY OF

APRIL, 2005.

_Kevin R. Murphy Ph.D._
Kevin R. Murphy, Ph.D.

# EXHIBIT 3(a)

KEVIN RICHARD MURPHY, Ph.D.

Current Business Address:
The Adult ADHD Clinic of Central Massachusetts
Fox Meadow Executive Center
300 West Main Street, Bldg B
Northboro, MA 01532
Phone:(508) 393-8388 or cell:(508) 769-6218
Fax: (508) 393-8360
Email: drmurphy@adultadhdclinic.com

Home Address:

 161 Gulf Street
Shrewsbury,MA 01545

Personal Data :
Date of Birth: February 27, 1957
Social Security Number: 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
Married, three stepchildren, Wife: Bonnie Murphy

## EDUCATION

Ph.D. Counseling Psychology.  University of Connecticut, Storrs, CT, 1990
Doctoral Dissertation: Biological Parents of ADHD Children: Degree of
Attention Deficits Relative to the Biological Parents of Normal Children.

Pre-Doctoral Internship Training: Worcester State Hospital & UMass Medical
Center, Department of Psychiatry, Worcester, MA, 1987 - 1988

M.S.  Counseling Psychology.  Florida State University, Tallahassee, FL, 1981

B.A.  Psychology.  Boston College, Chestnut Hill, MA, 1979, Magna Cum Laude.

## PROFESSIONAL EXPERIENCE AND POSITIONS

The Adult ADHD Clinic of Central Massachusetts, 300 West Main Street, Bldg B,
Northboro, MA 01532. Private Practice. January 2003 - Present.

Associate Professor of Psychiatry & Chief: Adult Attention Deficit
Hyperactivity Disorder Clinic, UMass Medical Center, Worcester, MA.
Ran a specialty clinic devoted to research, assessment, and treatment of
adults with ADHD.  January 1992 - January 2003.

Associate Professor, Adjunct Faculty position, Assumption College Graduate
Program in Counseling Psychology, Worcester, MA  2002 - Present.

Part Time Research Program Manager in the Bipolar and Psychotic Disorders
Program, UMass Memorial Health Care, Worcester, MA.
Coordinated all phases of a long-term study on treatment of patients with
Bipolar Disorder.  January 2000 - January 2002.

Consultant:  Oklahoma and Missouri Boards of Bar Examiners, 2004 - present.

Consultant:  Florida Board of Bar Examiners, Tallahassee, FL. 2002 - present.

Consultant: National Board of Medical Examiners, Philadelphia, PA. 1994 -
Present.

Consultant: Educational Commission for Foreign Medical Graduates,
Philadelphia, PA.  1994 - Present.

Consultant: Louisiana Board of Law Examiners, New Orleans, LA. 2001 - Present.

Consultant: California Board of Law Examiners, San Francisco, CA. 1999-
present.

2

Consultant: New York State Board of Law Examiners, Albany, NY. 1994 - Present.

Consultant: Connecticut, Massachusetts, Delaware, and Washington D.C. Boards of Law Examiners. 1995 - Present.

Employee Assistance Program Manager, ETP, Inc. Windsor, CT. Responsible for developing, implementing and managing local and national EAP contracts. Duties included clinical assessment and counseling, supervisory training, educational seminars, and management consultation. January 1991 - January 1992.

SENIOR RESEARCH ASSISTANT to Dr. Russell Barkley, Department of Psychiatry, University of Massachusetts Medical Center. Managed a large federally funded NIMH grant studying Attention Deficit Disorder in adolescents, family conflicts, and their treatment. September 1998 - July 1990.

CLINICAL PSYCHOLOGY INTERN, Worcester State Hospital and University of Massachusetts Medical Center, Worcester, MA. APA approved pre-doctoral internship. Duties included inpatient and outpatient counseling, psychological testing, working with the acutely and chronically mentally ill, and outpatient rotations in neuropsychology, behavioral medicine, and outpatient psychiatry. September 1987 - September 1988.

EMPLOYEE ASSISTANCE PROGRAM COUNSELOR, Massachusetts Employee Assistance Program, Fitchburg, MA. Assessment and counseling for Massachusetts State employees. February 1988 - August 1989.

EMPLOYEE ASSISTANCE PROGRAM CONSULTANT, Puzzo Associates, Waterbury, CT. Performed counseling, training, assessment, and program evaluation for Sikorsky Aircraft, Norden Defense Systems, and Diesel Systems divisions of United Technologies Corporation. Conducted training for local EAP contractors servicing United Technologies operating units in locations throughout the United States. February 1984 - September 1987.

EMPLOYEE SERVICES COORDINATOR, Omega Engineering, Stamford, CT. Counseled employees and supervisors on personnel problems, employee relations and benefits, developed an employee assistance program. November 1981 - February 1984.

Clinical Psychology Clerkships and Practicums during Graduate and Undergraduate Training: Massachusetts Mental Health Center State Hospital, Butler Hospital, Fall River Center for Alcohol Problems (Detoxification Unit), Counseling Center at Florida State University. 1978 - 1981.

## GRANT AWARDED

"An Examination of ADHD Symptomatology in an Adult Community Sample". Basic Research Science Grant through UMASS Medical Center to develop adult norms for the DSM-IV ADHD criteria ($10,000). 1994.

## LICENSES/CERTIFICATIONS/PROFESSIONAL MEMBERSHIPS:

Licensed Psychologist and Health Service Provider, Commonwealth of Massachusetts (# 6529).
Certified Employee Assistance Professional in past (CEAP).
Certified Alcoholism Counselor.
Former Member of CHADD National Advisory Board.
American Psychological Association.
Massachusetts Psychological Association.

3

## HONORS AND AWARDS

Inducted into the ADHD Hall of Fame, Annual National Meeting of CHADD (Children and Adults with Attention Deficit Hyperactivity Disorder).   October 2001.

University of Connecticut – Nominated to the Phi Delta Kappa Honor Society.
Boston College – Academic Scholarship.
Nominated to the Cross and Crown Honor Society of Boston College.
Somerset Teacher's Association Scholarship.
Lion's Club Scholarship.

## UNIVERSITY COMMITTEES

Academic Accommodations Committee for UMASS Medical School, 1997 – 2003.
Medical School Admissions Committee Interviewer, 1999 – 2003.
Compensation Committee, 1995 – 1996.

## TEACHING EXPERIENCE

Assumption College Graduate School of Counseling Psychology. Taught "Psychological Measurement" and "Special Topics Seminar on Assessment and Treatment of Adult ADHD", 2002 – 2005.

Supervisor of several psychology interns and psychiatry residents in the Department of Psychiatry at UMMC on Adult ADHD assessment and treatment. 1994 – present

Teacher for Dr. Sheldon Benjamin's Biological Psychiatry Seminar on assessment of Adult ADHD. 1999 – Present.

Presenter for Law and Psychiatry Seminar Series at UMMC on ADHD as it relates to the Americans with Disabilities Act.  1999.

Presented two Grand Rounds presentations for the Department of Psychiatry at UMMC. 1993 and 2000.

Teacher for Office of Medical Education ADHD/Learning Disabilities Seminar on accommodations/eligibility issues for residents and medical students, Hoagland Pinkus Conference Center.  2000.

Taught psychiatry residents a seminar on Social Phobia.  2001.

Invited to teach a week-long seminar on assessment and treatment of Adult ADHD for the United States Army mental health professionals in Willingen, Germany. 1996.

Supervisor of Doctoral Dissertation of Anne Marie Samar at UMass Medical Center.  2000.

Teacher/Consultant to University of Massachusetts Undergraduate Counseling Center on issues related to ADHD and Academic Accommodations. Have provided two on site training workshops and provide ongoing telephone consultation to counseling center psychiatrist and other service personnel. 1993 – present.

Presenter for the Division of Forensic Mental Health on ADHD and legal issues. 1994.

Invited speaker to teach on Attention Deficit Disorders in Adults and Adolescents at the Menninger Clinic in Topeka, KS.  1994.

4

Individualized training and supervision of psychiatry resident Craig Surman for his adult ADHD elective. 1999.

Teacher for the Clinical Training series for Western Massachusetts Department of Mental Health. 1994 – 1995.

Panel member on a live national teleconference entitled "Emerging Disabilities on Campus: What You Need to Know." 2000.

Taught two ADHD seminars and one case conference For Dr. Ken Appelbaum's Forensic Program at Bridgewater Correctional Facility. 1999.

Occasional lectures to Psychiatry residents on ADHD. 1992 – Present

Teaching Assistant in Undergraduate and Graduate School. 1979 – 1981.

## SCIENTIFIC CONTRIBUTIONS

Associate Editor of the ADHD Report. 1993 – Present (New York, Guilford Publications)

Consulting reference and book reviewer for Journal of Attention Disorders. 2000 – present.

Consultant on "Project Access", a grant from The United States Department of Education aimed at reducing barriers to successful completion of postsecondary education for students with disabilities. 1997-1999.

## PUBLICATIONS

### Books

Barkley, R.A. & Murphy, K.R., (1998). <u>Attention Deficit Hyperactivity Disorder: A clinical workbook</u> (Second edition). New York: Guilford. A Spanish translation has also been published with assistance of Jose J. Bauermeister, Ph.D. and associates.

Murphy, Kevin R., & Levert, Suzanne. <u>"Out of the Fog: Treatment Options and Coping Strategies for Adult Attention Deficit Disorder"</u>. Hyperion, 1995.

### Book Chapters

Murphy, K.R., (2005) In Press. <u>Assessment of Adults with ADHD.</u> Chapter in Attention Deficit Hyperactivity Disorder: A Handbook for Diagnosis and Treatment, Revised edition, edited by Russell A. Barkley, New York: Guilford Press.

Murphy, K. R., (2005) In Press. <u>Psychological counseling of adults with ADHD.</u> Chapter in Attention Deficit Hyperactivity Disorder: A Handbook for Diagnosis and Treatment, Revised Edition, edited by Russell A. Barkley, New York: Guilford Press.

Murphy, K., (2002). Clinical case studies. In S. Goldstein and A. Teeter-Ellison (Eds.). *Clinical Interventions for Adult ADHD: A Comprehensive Approach*. New York, NY: Academic Press.

Murphy, K.R., & Gordon, M., (1998). <u>Assessment of Adults with ADHD</u>. Chapter in Attention Deficit Hyperactivity Disorder: A Handbook for Diagnosis and

5

Treatment, Revised Edition, edited by Russell A. Barkley, New York: Guilford Press, 345-369.

Murphy, K.R., (1998). Psychological counseling of adults with ADHD. Chapter in Attention Deficit Hyperactivity Disorder: A Handbook for Diagnosis and Treatment, Revised Edition, edited by Russell A. Barkley, New York: Guilford Press, 582-591.

Gordon, M., & Murphy, K.R., (1998). Attention Deficit/ Hyperactivity Disorder (ADHD). Chapter in Accommodations in Higher Education under the Americans with Disabilities Act (ADA): A No-Nonsense Guide for Clinicians, Educators, Administrators, and Lawyers. Edited by Michael Gordon, Ph.D. & Shelby Keiser, M.S., Dewitt, New York, GSI Publications and New York: Guilford Press, 98-129.

Murphy, Kevin R., "Empowering the Adult with ADD". Chapter in A Comprehensive Guide to Attention Deficit Disorder in Adults: Research, Diagnosis, Treatment. Edited by Kathleen G. Nadeau, Brunner/Mazel, 1995.

### Journal Articles

Murphy, K.R., (2005).  Psychosocial treatments for ADHD in teens and adults: A practice-friendly review.  Journal of Clinical Psychology/In Session, Vol. 61, (5), 1-13.

Murphy, K.R., & Adler, L.A. (2004).  Assessing attention deficit hyperactivity disorder in adults: focus on rating scales.  The Journal of Clinical Psychiatry, Supplement 3, 65, 12-17.

Murphy, K., (2004).  ADHD documentation for test accommodations under the ADA: Clarifying the confusion. The ADHD Report, Vol. 12, No. 5, October 2004, 1-5.

Gordon, M., Lewandowski, L., Murphy, K., & Dempsey, K. (2002). ADA-Based accommodations in higher education: A survey of clinicians about documentation requirements and diagnostic standards. Journal of Learning Disabilities, 35, No.4, 357-363.

Barkley, R. A., Murphy, K. R., & Bush, T. (2001). Time perception and reproduction in young adults with attention deficit hyperactivity disorder. Neuropsychology, 15, 351-360.

Murphy, K. R., Barkley, R. A., & Bush, T. (2001). Executive functioning and olfactory identification in young adults with attention deficit-hyperactivity disorder, Neuropsychology, 15, 211-220.

Barkley, R.A., Licho, R., McGough, J., Tuite, P., Feifel, D., Mishkin, F., Sullivan, M., Kawamoto, B., Murphy, K., McCracken, J., Corbett, B., Williams, B., Hoh, C., Fischman, A., Trout, J.R., Lanser, M., & Spencer, T. (in press). Excessive Dopamine Transporter Density in Adults with Attention Deficit Hyperactivity Disorder Assessed by SPECT with Altropane.  Journal of Nervous and Mental Disease.

Barkley, R. A., Murphy, K. R., DuPaul, G. R., & Bush, T. (in press). Driving in young adults with attention deficit hyperactivity disorder: Knowledge, performance, adverse outcomes, and the role of executive functioning. Journal of the International Neuropsychological Society.

Murphy, K. R., Barkley, R. A., & Bush, T. (2002). Young adults with ADHD: Subtype differences in comorbidity, educational, and clinical history. The Journal of Nervous and Mental Disease.  Vol. 190, No. 3, 147-157.

6

Gordon, M., & Murphy, K., (2001). Judging the impact of time limits and distractions on past test performance: A survey of ADHD, clinic-referred, and normal adults. The ADHD Report, Vol. 9, No. 3, June, 2001, 1-5.

Murphy, K., Gordon, M., & Barkley, R.A. (2000). To what extent are ADHD symptoms common? A reanalysis of standardization data from a DSM-IV checklist. The ADHD Report, Vol. 8, No. 3, June, 2000, 1-5.

Murphy, K., (1999). CH.A.D.D. fact sheet on adult ADHD. Children and Adults with Attention Deficit Disorder, Landover, MD.

Gordon, M., Murphy, K.R., & Keiser, S. "Attention Deficit Hyperactivity Disorder (ADHD) and Test Accommodations". The Bar Examiner, Vol. 67, No.4, 26-36, 1998.

Gordon, M., Barkley, R.A., & Murphy, K. "ADHD on Trial". The ADHD Report, Vol.5, No.4, August, 1997.

Murphy, K., & Barkley, R.A. (1996). ADHD in Adults: Comorbidities and adaptive impairments. Comprehensive Psychiatry, Vol. 37, No. 6, Nov/Dec 1996: 393-401.

Barkley, R.A., Murphy, K.R., & Kwasnik, D., (1996). Psychological functioning and adaptive impairments in young adults with ADHD. Journal of Attention Disorders, Vol. 1, No. 1, 41-54.

Murphy, K.R., Barkley, R. (1996). Prevalence of DSM-IV Symptoms of ADHD in Adult Licensed Drivers: Implications for clinical diagnosis. Journal of Attention Disorders, Vol. 1, No. 3, 147-161.

Murphy, K.R., (1996). Adults with attention-deficit hyperactivity disorder: Assessment and treatment considerations. Seminars in Speech and Language (Special Issue), Vol. 17, No 3, 245-254.

Murphy, K., & Gordon, M. "ADHD as a basis for test accommodations: a primer for clinicians". The ADHD Report, Vol. 4, No. 6, December, 1996.

Murphy, K.R., & Barkley, R.A.,(1996). Biological parents of ADHD children: Psychological impairment and attentional performance. American Journal of Orthopsychiatry, 66, 93-102.

Barkley, R.A, Murphy, K.R. & Kwasnik, D., (1996). Motor vehicle driving performance and risks in young adults with ADHD. Pediatrics, 98, 1089 - 1095.

Murphy, Kevin R., & Latham, Patricia, "Disclosure of ADHD in the Workplace: Practical and Legal Issues to Consider". The ADHD Report, Vol. 3, No. 4, August, 1995.

Murphy, Kevin R., "Guarding Against Overdiagnosis of ADHD in Adults", The ADHD Report, Vol. 2, No. 6, December, 1994.

Murphy, Kevin R., "Interpersonal and Social Problems in Adults with ADD". Attention Magazine, October/November, 1994.

Barkley, Russell A. & Murphy, Kevin R., "Guidelines for a Written Clinical Report Concerning ADHD Adults". The ADHD Report, Vol. 1, No. 5, October, 1993.

Barkley, Russell A. & Murphy, Kevin R., "Differential Diagnosis of Adult ADHD: Some Controversial Issues". THE ADHD REPORT, Vol. 1, No. 4, August, 1993.

Murphy, Kevin R., "Effectively Communicating Adult ADHD Diagnosis". THE ADHD REPORT, Vol. 1, No. 3, June 1993, p. 6-7.

Murphy, Kevin, R., "Issues in the Assessment of ADHD Adults". THE ADHD

7

REPORT, Vol. 1, No. 1, February, 1993, p. 5-6.

Murphy, Kevin, R., "Coping Strategies for ADHD Adults". CH.A.D.D.ER, Vol. 6, No. 2, Fall/Winter 1992, p. 10-11.

### PRESENTATIONS

"ADHD and the ADA: Myths, Realities, and Documentation Requirements", North Carolina AHEAD Conference, Wilmington, NC, October 8, 2004.

"The Evaluation and Management of ADHD in Adulthood", Pre-conference Institute at the American Psychological Association annual convention, Honolulu, Hawaii, July 29, 2004.

"Demystifying Mental Health Issues in the Workplace", UNUM Provident, Worcester, MA, October 16, 2003.

"The Evaluation and Management of ADHD in Adulthood", Pre-conference Institute at the American Psychological Association annual convention, Toronto, Canada, August 9, 2003.

"The Evaluation and Management of Attention Deficit Hyperactivity Disorder in Adulthood", Rhode Island Psychological Association, Warwick, RI, April 25, 2003.

"Diagnosing and Treating ADHD in Adults", Roundtable Presentation as Contribution to Special Supplement to The Journal of Clinical Psychiatry, Ritz-Carlton Hotel, Boston, MA, January 17, 2003.

"Succeeding in a Competitive World: Success Strategies for Adolescents and Adults with ADHD/LD", 2003 Proctor Special Education Symposium, Greensboro College, Greensboro, NC, March 3, 2003.

"Succeeding in a Competitive World: Success Strategies and Transitional Issues for Adolescents and Adults with ADHD/LD". Fletcher Forum on Learning Disabilities, Charlotte, NC, February 3, 2003.

"The Evaluation and Management of ADHD in Adulthood", Pre-conference Institute at the American Psychological Association annual convention, Chicago, Ill., August, 2002.

"Assessment and Treatment of Adult ADHD", Massachusetts Rehabilitation Commission, Hoagland-Pincus Conference Center, Shrewsbury, MA, April 2, 2002.

"Assessment and Treatment of ADHD in College Students", Holy Cross College, Office of Students with Disabilities, Worcester, MA, November 30, 2001.

"ADHD, Test Accommodations, and the American's With Disabilities Act: Myths and Realities", Visiting Scholar Invited Address at James Madison University, Harrisonburg, VA, November 12, 2001.

"ADHD in Young Adults: Assessment and Treatment Issues", Assumption College, Worcester, MA, November 9, 2001.

"Psychosocial Treatment in Bipolar Disorder", Manic Depression Disorder Association, Worcester, MA, October 1, 2001.

8

"Accurately Assessing ADHD and Common Co-Morbidities in High School and College Students: Implications for Diagnosticians, Educators, and Students", Keynote address at the 4th Annual Timothy B. Burnett Seminar for Academic Achievement, University of North Carolina, Chapel Hill, NC, September 25, 2001.

"ADHD, Academic Accommodations, and the ADA: Myths and Realities", University of Connecticut Post-Secondary Learning Disability Training Institute, Portland, ME, June 5 – 8, 2001.

"ADHD: Transition to College, Passport for Success", UMass Medical Center, Worcester, MA, May 19, 2001.

"Assessment, Differential Diagnosis, and Treatment of Adult ADHD", Brattleboro Retreat, Brattleboro, VT, May 4, 2001.

"Assessment, Treatment, and Advocacy for Adults with ADHD", University of Alabama, Tuscaloosa, AL, April 27, 2001.

"Assessment, Differential Diagnosis, and Treatment of Adult ADHD", Georgia Southern University, Savannah, GA, April 19, 2001.

"Assessment and Treatment of Adult ADHD", Pre-conference Institute at CH.A.D.D National Convention, Chicago, IL. November 2, 2000.

"Adult ADHD: Current Issues in Assessment", Baystate Medical Center Grand Rounds presentation, Springfield, MA. October 11, 2000.

"Psychotherapy as an Integral Part of Bipolar Treatment", Symposia entitled "An Integrated Approach to the Long-term Management of Bipolar Disorder ", Seattle, WA. September 23, 2000.

"Adult ADHD: Assessment and Treatment", Atlantic Counseling and Consultation Workshop, Newton MA, September 14, 2000.

"Assessment and Treatment of Adult ADHD", Pre-conference Institute at American Psychological Association's annual convention, Washington, D.C. August 4, 2000.

"Psychotherapy as an Integral Part of Bipolar Treatment", Symposia entitled "An Integrated Approach to the Long-term Management of Bipolar Disorder", Westchester, NY.  August 3, 2000.

"Psychotherapy as an Integral Part of Bipolar Treatment", Symposia entitled "An Integrated Approach to the Long-term Management of Bipolar Disorder", Short Hills, NJ.  July 20, 2000.

"ADHD and the ADA: Test Accommodations on the Bar Exam, California Board of Bar Examiners, San Francisco, CA. May 5, 2000.

"Psychotherapy as an Integral Part of Bipolar Treatment", Symposia entitled "An Integrated Approach to the Long-term Management of Bipolar Disorder", Atlanta, GA. April 28, 2000.

"Adult ADHD: Assessment and Treatment", Juvenile Justice Department Personnel, Plainville, CT. June 26, 2000.

"Differentiating ADHD from Bipolar Disorder, OCD, and Substance Dependence via Case Presentations," Education and Training Programs, East Hartford, CT. April 14, 2000.

"ADHD and Test Accommodations on the USMLE", Northeast Regional Conference of Medical School Administrators, Baltimore, MD. March 30, 2000.

9

"Assessment and Treatment of Adult ADHD", University of North Carolina at Greensboro Third Annual Conference on ADHD; Strategies for Identification and Treatment Across the Life Span. Greensboro, NC, March 20, 2000.

"Emerging Disabilities on Campus: What You Need to Know". National Teleconference panel member, University of Vermont, Burlington, VT. March 13, 2000.

"Assessment and Treatment of Adult ADHD". Grand Rounds for University of Maine Medical Center, Portland, ME, March 1, 2000.

"Assessment and Treatment of ADHD in Adults". Education and Training Programs, East Hartford, CT. November 19, 1999.

"Case Conference". Bridgewater State Hospital Corrections Facility, Bridgewater, MA. November 16, 1999.

"Case Studies of Adults with ADHD". Bridgewater State Hospital Corrections Facility, Bridgewater, MA. October 26, 1999.

"Accomodations in Higher Education under The ADA". Panel presentation at CH.A.D.D. Annual Convention, Washington, D.C. October 8, 1999.

"Identification of ADHD and Classroom Interventions". Navajo Reservation Leupp Elementary School, Navajo Nation, AZ. July 27, 1999.

"Comorbidity of ADHD and Substance Abuse". Education and Training Programs, East Hartford, CT. July 22, 1999.

"Treatment of Adult ADHD in the Prison Population". Bridgewater State Hospital Corrections Facility, Bridgewater, MA. July 20, 1999.

"Assessment of Adult ADHD in the Prison Population". Bridgewater State Hospital Corrections Facility, Bridgewater, MA. May 11, 1999.

"Assessment and Differential Diagnosis of Adult ADHD". Education Associates Inc., Myrtle Beach, SC. April 23, 1999.

"Contemporary Issues in Adult ADHD". CH.A.D.D. Meeting, Baystate Medical Center, Springfield, MA. April 20, 1999.

"ADHD and Test Accommodations on the Bar Exam". National Conference of Bar Examiners, Norfolk, VA. April 16, 1999.

"Adults with ADHD". University of North Carolina at Greensboro Second Annual Conference on ADHD: Strategies for Identification and Treatment Across the Life Span, Greensboro, NC. February 22, 1999.

"Assessment and Treatment of Adult ADHD". Maine Psychological Association, Portland, ME. November 20, 1998.

"Assessment and Treatment of ADHD in Adults". Preconference Institute for CH.A.D.D.'s Annual Convention, New York, NY. October 15, 1998.

"Americans with Disabilities Act-The Basics and Beyond". Counsel on Licensure, Enforcement and Regulation Annual Conference, Denver, CO. September 17-19, 1998.

"Empirically Validating Assessment and Service Delivery for ADHD in College Students". Annual convention of the American Psychological Association, San Francisco, CA. August, 1998.

"Assessment, Differential Diagnosis, and Treatment of Adult ADHD". Education and Training Programs, Inc., East Hartford, CT. May 1, 1998.

10

"Treatment of Adult ADHD". Women's Wellness Seminar, St. Vincent's Hospital, Worcester, MA. April 15, 1998.

"Motor Vehicle Driving Risks and ADHD". Attention Deficit Disorder Association's Annual Conference, Washington, DC. March 27, 1998.

"Assessment and Psychosocial Approaches to the Treatment of Adults with ADHD". CH.A.D.D. Eighth Annual International Conference, Chicago, IL. November 14, 1996.

"Controversy Regarding Special Accommodations for High Achieving Adults with ADHD: Legitimate or Not?" CH.A.D.D. Eighth Annual International Conference, Chicago, IL, November 15, 1996.

"Assessment and Treatment of Adult Attention Deficit Disorder". Ohio Psychological Association Fall 1996 Convention, Columbus, OH. November 7, 1996.

"ADHD in Adults: Assessment and Treatment". Oklahoma Department of Mental Health and Substance Abuse Services. Oklahoma City, OK. July 12, 1996.

"Treatment Issues in Adult ADHD". Grand Rounds presentation at Norwood Hospital, Norwood, MA. May 21, 1996.

"Assessment and Treatment of ADHD in Adults". Atlantic Counseling and Consultation Inc., Dedham, MA. May 10, 1996.

"Preliminary Data on the Driving Behavior of Young Adults with ADHD". Second Annual National ADDA Adult ADD Conference, Pittsburgh, PA. May 3, 1996.

"Adult ADHD": Current Approaches to Diagnosis and Management", Group Health Cooperative of Puget Sound, Seattle, WA. April 12, 1996.

"Identification and Treatment of ADHD in Adolescence". Special Conference on Learning Disabilities in Adolescence, San Juan, Puerto Rico. March 29, 1996.

"Assessment and Coping Strategies for Adults with ADHD". Jewish Social Service Agency of Metropolitan Washington. March 21, 1996.

"ADHD: Fad or Reality?" Grand Rounds presentation, Baystate Medical Center, Springfield, MA, January 11, 1996.

"Assessment and Treatment of ADHD in College Students". University of Massachusetts Boston. November 17, 1995.

"Current Issues in Adult ADHD". Grand Rounds presentation at Norwood Hospital, Norwood, MA. November 21, 1995.

"The Nature of Adult ADHD: Clinical Assessment and Differential Diagnosis". Presented at CH.A.D.D. Seventh Annual Conference, Washington, DC. November 9, 1995.

"Driving Behavior of Adults with ADHD: Preliminary Data". CH.A.D.D. Seventh Annual Conference, Washington, DC. November 10, 1995.

"Clinical Assessment and Psychosocial Treatment of Adult ADHD". Atlantic Counseling Services, Randolph, MA. May 19, 1995.

"Assessment, Diagnosis, and Cognitive Strategies for College Students with ADHD". Presented at first annual Learning Disabilities Conference at University of Massachusetts, Lowell, MA. April 7, 1995.

"Treatment Issues in Adult ADHD". Continuing education workshop for Primary

11

and Family Care Physicians at Burbank Hospital, Fitchburg, MA. April 6, 1995.

"Current Issues in Adult ADHD". Presented at CH.A.D.D. meeting of Pioneer Valley, Springfield, MA. March 21, 1995.

"Identification of ADHD in Adults". Continuing education workshop for Primary and Family Care Physicians at Burbank Hospital, Fitchburg, MA. March 9, 1995.

"Adult ADHD: Assessment and Treatment". Grand Rounds presentation at Marlborough Hospital, Marlboro, MA. January 18, 1995.

"Clinical Management and Treatment of Adults With ADHD". Grand Rounds presentation at St. Vincent's Hospital, Worcester, MA. December 6, 1994.

"Teaching Clinicians How to Help ADHD Adults Cope: Skill Building Techniques and Instilling Hope". Presented at Cambridge Hospital's ADHD Conference, Boston, MA. December 3, 1994.

"ADHD In Adults". Presented at Bedford CH.A.D.D. meeting, Bedford, MA. October 19, 1994.

"Psychosocial Treatment of Adults with ADHD". Presented at CH.A.D.D. National Convention, New York, NY. October 13, 1994.

"Assessment, Treatment, and Differential Diagnosis of ADHD In Adults". Presented For Army Psychologists/Psychiatrists, Fort Sam Houston, San Antonio, TX. August 3, 1994.

"Assessment and Treatment of Adult ADHD". Grand Rounds presentation at Syracuse University, Syracuse, NY. June 8, 1994.

"ADHD in Adolescents and Adults". Presented at CH.A.D.D. of Windham County Meeting, Storrs, CT. May 3, 1994.

"Adult ADHD: Issues for College Students". Presented at Clark University, Worcester, MA. April 27, 1994.

"Assessment and Diagnosis of Adult ADHD". Presented at Menninger Clinic Continuing Education Conference, Topeka, KS. April 22, 1994.

"ADHD in Adults". Presented at CH.A.D.D. of Greenfield Meeting, Greenfield, MA. April 13, 1994.

"Differential Diagnosis of Disruptive Behavioral Disorders in Adolescence". Presented at Law and Psychiatry Program on Court-Ordered Assessments of Adolescents' Clinical Needs, Worcester, MA. March 24, 1994.

"ADHD in Adolescence and Adults". Presented at CH.A.D.D. of East Aurora Conference, Buffalo, NY. March 18, 1994.

"Social Conversation Skills of ADHD, ADHD/ODD, and Normal Adolescents". Presented at Association for Advancement of Behavior Therapy Annual Convention, Atlanta, GA. November 21, 1993.

"Assessment and Treatment Issues for ADHD Adults". Presented at the Center for Children and Youth, Westfield, MA. November 19, 1993.

"Assessment, Diagnosis, and Treatment of Adult ADHD". Grand Rounds presentation at Wing Memorial Hospital, Palmer, MA. November 3, 1993.

"Assessment and Diagnosis of Adult ADHD". Presented at Canadian Academy of Child Psychiatry Symposium, Banff, Canada. October 4, 1993.

"Overview of Adult ADHD and Treatment Issues". Presented at CH.A.D.D. of

12

Pioneer Valley Meeting, Springfield, MA.  June 15, 1993.

"Assessment and Treatment of Adult ADHD".  Presented to University Health and Counseling Center Staff of the University of Massachusetts, Amherst, MA.  May 26, 1993.

"Taking Care of the Caregiver" and Chaired a Panel of ADHD Adults.  Presented at AD-IN's annual conference held at Bentley College, Waltham, MA.  May 22, 1993.

"Assessment of Adult ADHD" and "Treatment of Adult ADHD".  Presented at CH.A.D.D. conference held at Brockton High School, Brockton, MA.  May 1, 1993.

"Assessment of Adult ADHD and DSM-IV Criteria: Implications for School Psychologists".  Presented at the National Association of School Psychologists Annual Conference, Washington, DC.  April 16, 1993.

"The Nature and Assessment of Adult ADHD" and "Clinical Management and Treatment Considerations in Adult ADHD".  Keynote presentations at Attention Disorders Conference held at the Institute of Living, Hartford, CT.  April 2, 1993.

"Behavioral Issues, Assessment and Management of ADHD Patients".  Presented at Saint Vincent's Hospital, Worcester, MA.  November, 1992.

"Assessment and Treatment of ADHD Adults".  Presented at CH.A.D.D.'s Fourth Annual Conference on Attention Deficit Disorders, Chicago, IL.  October, 1992.

"Attention Deficit Hyperactivity Disorder in Adults".  Presented at Wayne State University School of Medicine, Detroit, MI.  February, 1992.

"Biological Parents of ADHD Children:  Degree of Attention Deficits Relative to the Biological Parents of Normal Children."  Presented at the American Psychological Association Annual Convention, Boston, MA.  August, 1990.

"The Effects of Employee Assistance Program Intervention on the Job Performance of a Sample of Substance Abusers."  Presented at United Technologies Annual EAP Meeting, Orlando, FL.  October, 1986.

"Evaluation Study of Treatment Outcomes and Job Performance Outcomes of a Sample of Substance Abusers."  Presented at United Technologies Annual EAP Meeting, Boston, MA.  November, 1985.

13

I have presented more than 100 invited lectures, grand rounds, seminars, and full day workshops to various professional groups throughout North America. The topics have included assessment and treatment of Attention Deficit Hyperactivity Disorder, academic and workplace accommodations, and the Americans with Disabilities Act. I have appeared on several local and regional radio shows and appeared on Good Morning America in June of 1994. I have also appeared in two of Dr. Russell Barkley's educational video tapes on ADHD and a video entitled "Accomodating Invisible Disabilities: An Expert Briefing". I have assisted the following magazines and newspapers with stories on ADHD: Newsweek, The Wall Street Journal, The New York Times, The Boston Globe, The Worcester Telegram, Men's Health, Reader's Digest, Dr. Phil's Newsletter, and Entrepeneur.

# EXHIBIT 3(b)



**The Adult
ADHD Clinic
of Central
Massachusetts**

Fox Meadow Executive Center
300 West Main St. • Building B
Northboro, MA 01532
Tel: 508-393-8388 • Fax: 508-393-8360
Cell: 508-769-6218
Email: drmurphy@adultadhdclinic.com
www.adultadhdclinic.com

RECEIVED
DEC 0 9 2004
Disability Services

December 9, 2004

Abram Doane, MA, JD
Manager, Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

RE: Application of Heidi Baer for STEP 1 exam accommodations.

Dear Mr. Doane:

Thank you for forwarding the material on Ms Baer for review. She is requesting the accommodation of
extended time (time and one-half) based on diagnoses of ADHD, Predominantly Inattentive Type and
Learning Disabilities (Reading Disorder, and Learning Disorder NOS). She was denied accommodations
on three previous applications that were based on Learning Disabilities. Her current request includes a
recently diagnosed Attention Deficit Disorder. I will focus my comments mostly on the issue of ADHD
and suggest that an LD consultant also review this application.

In my opinion, the documentation provided does not adequately support an ADHD diagnosis and is
therefore insufficient to warrant granting special accommodations on the basis of ADHD. My reasons
for this opinion are as follows:

1.   ADHD is a developmental disability with a childhood onset that typically results in a chronic and
     pervasive pattern of functional impairment in academic, social, or vocational areas, and often in
     daily adaptive functioning. Ms Baer's records were not reflective of a frequency, intensity, or
     magnitude of symptomatology/impairment to support a clinical diagnosis of ADHD currently or
     during childhood. Although there were a few comments from her Milton Academy teachers
     stating she missed details, made some careless mistakes, and needed to be more consistently
     attentive and less social, these were relatively few and far between and did not represent a
     developmentally deviant *pattern* of impairment that would justify a clinical diagnosis of ADHD,
     in my opinion. The overwhelming majority of her teachers viewed her as an intelligent, hard
     working, dedicated student who was a pleasure to have in class. In addition, she was never
     referred for any formal treatment or accommodations relating to ADHD-like impairment during
     her earlier childhood. Her early functioning appeared to be quite satisfactory and did not reflect
     any significant ADHD-like impairment. Her earliest evaluation by Dr. Boyle concluded she was
     "extremely intelligent" and her "reading aloud skills were excellent". The letter from her 5th
     grade teacher, Scott Ford, mentioned concerns about her working slowly and needing extra time
     for quizzes and tests but also stated she compensated well and achieved good results. In short,
     the childhood descriptions of her difficulties and the objective records do not paint a compelling

Baer, Heidi                                                                                   2

picture consistent with ADHD. Hence, it is not clear she meets the childhood onset criterion that is required for an ADHD diagnosis.

2.   The ADHD diagnosis is not adequately substantiated. First, only one of the many professionals Ms Baer saw in the past diagnosed ADHD and this was not until 2004. Prior diagnosticians who evaluated Ms Baer (Dr.'s Connolly, Boyle, Prather, and Forman) did not describe a history of symptoms or functional impairment consistent with ADHD and none concluded ADHD was a valid diagnosis for her. Her difficulties were consistently viewed in terms of Learning and Reading problems and not ADHD. Second, Dr. Engelman did not adequately apply full DSM – IV criteria to make the ADHD diagnosis. For example, she did not specify which or how many of the DSM-IV criteria Ms Baer endorsed currently or during childhood to determine if she met the symptom threshold required for a diagnosis. Without reviewing the formal criteria of the disorder with the patient to see if the criteria are met, there is no way to rule in or rule out the disorder. Although she did use the Brown Rating scale, this does not represent the official criteria for the disorder. It is always preferable to employ the DSM-IV criteria which are the most empirically valid. Third, the DSM – IV requires "clinically significant impairment" in at least 2 life domains and Ms. Baer's documentation describes impairment only in only one area – academics – or more specifically to timed testing. ADHD tends to affect people over time and across situations in multiple life domains; not in one circumscribed area such as testing. She provided no compelling evidence to indicate her ADHD - like symptoms caused any persistent functional impairment in any other life domain such as work, social, or daily adaptive areas. In fact, just prior to entering medical school she worked very successfully as a biotechnology analyst for an investment bank and stated she "did very well, did not feel as though she was slow to finish projects, handled all the responsibilities that were asked of her, and had excellent performance evaluations". Her medical school clerkships have also apparently been consistently positive. Moreover, she earned a 2.95 GPA at Duke without receiving any treatment or accommodations for ADHD and was "surprised to learn she had dyslexia". In this sense, her problems appear to be contiguous with her decision to enter the medical school environment which may have not been the most optimal vocational match for her profile of strengths and weaknesses. It appears the ADHD diagnosis was made merely on the basis of her responses to a self administered ADHD rating scale (Brown Scale) and some test results that are not diagnostic of ADHD. For all these reasons, her ADHD diagnosis fails to meet DSM – IV criteria.

3.   There is no test or battery of tests that can reliably diagnose ADHD. Dr. Engelman's report tended to over emphasize test scores as the major rationale for the ADHD diagnosis as if they were somehow diagnostic of ADHD. They are not. Weaknesses on selected tests such as the Nelson Denny reading Test, WJ Reading Fluency, and Sound Blending are not diagnostic of ADHD. The overwhelming majority of her test scores fall in at least the average range or better suggesting she is not substantially impaired relative to the average person. The fact that some of her test scores are "only average" and are not commensurate with her "superior" IQ is not necessarily indicative of impaired functioning nor is it evidence of a disability. Without a documented history of functional impairment that can be reliably tied to ADHD and concurrent validation of impairment from other non-testing sources, selected test results (most of which are at least average) are not sufficient to establish an ADHD diagnosis. The impact of the disability needs to be evident in real world functioning and result in developmentally deviant impairment in at least 2 domains, which is not evident here.

4.   The fact that Ms. Baer has a particular weakness in performing on timed tests does not necessarily mean she has ADHD. There are many possible reasons for slow test taking besides

Baer, Heidi                                                                                    3

ADHD or a Learning Disability. It is possible her difficulties on tests may be related more to her particular profile of strengths and weaknesses (or to other factors) rather than ADHD. For example, a slow, deliberate, perseverative, careful test taking style/strategy could be an alternative explanation for her difficulties. Her documentation is describes her are being perfectionistic, obsessively checking her answers, having a tendency to ruminate, gets into too many details, being overly concerned with accuracy, and having a slow and inefficient testing strategy. These tendencies are exacerbated when she becomes anxious. It is also apparent from her documentation that her problems with slow reading and processing do not affect her functioning outside of testing/academics. Hence, her problems could be due to stylistic and strategic issues and anxiety rather than a disability such as ADHD. At any rate, since she has not adequately substantiated a history consistent with ADHD, it is difficult to conclude that ADHD is responsible for her testing difficulties.

5.  In summary, Ms Baer's documentation fails to build a compelling case for the existence of ADHD and fails to illuminate the functional impairment arising from it beyond problems taking tests. ADHD by definition is a disorder that pervades an individual's functioning over time and across situations; not just performance on high stakes exams. The purpose of her requested accommodations appears to be to accommodate her deliberate test taking style and to reduce her anxiety, not to compensate for a disability stemming from ADHD. Moreover, the fact that she may perform better when given extra time is not the issue. For her to be granted accommodations she must first qualify as a person with a disability by meeting the ADA's definition of disability. Because there is insufficient evidence of an ADHD diagnosis or a disability stemming from ADHD, I do not believe extending accommodations on the basis of ADHD is warranted.

Sincerely,

Kevin Murphy, Ph.D.

# EXHIBIT 3(c)

## Diagnostic criteria for
## Attention-Deficit/Hyperactivity Disorder

A.  Either (1) or (2):

    (1)  six (or more) of the following symptoms of **inattention** have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level:

      *Inattention*
      (a)  often fails to give close attention to details or makes careless mistakes in schoolwork, work, or other activities
      (b)  often has difficulty sustaining attention in tasks or play activities
      (c)  often does not seem to listen when spoken to directly
      (d)  often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions)
      (e)  often has difficulty organizing tasks and activities
      (f)  often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (such as schoolwork or homework)
      (g)  often loses things necessary for tasks or activities (e.g., toys, school assignments, pencils, books, or tools)
      (h)  is often easily distracted by extraneous stimuli
      (i)  is often forgetful in daily activities

    (2)  six (or more) of the following symptoms of **hyperactivity-impulsivity** have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level:

      *Hyperactivity*
      (a)  often fidgets with hands or feet or squirms in seat
      (b)  often leaves seat in classroom or in other situations in which remaining seated is expected
      (c)  often runs about or climbs excessively in situations in which it is inappropriate (in adolescents or adults, may be limited to subjective feelings of restlessness)
      (d)  often has difficulty playing or engaging in leisure activities quietly
      (e)  is often "on the go" or often acts as if "driven by a motor"
      (f)  often talks excessively

      *Impulsivity*
      (g)  often blurts out answers before questions have been completed
      (h)  often has difficulty awaiting turn
      (i)  often interrupts or intrudes on others (e.g., butts into conversations or games)

B.  Some hyperactive-impulsive or inattentive symptoms that caused impairment were present before age 7 years.

C.  Some impairment from the symptoms is present in two or more settings (e.g., at school [or work] and at home).

## Diagnostic criteria for
## Attention-Deficit/Hyperactivity Disorder (continued)

D. There must be clear evidence of clinically significant impairment in social, academic, or occupational functioning.

E. The symptoms do not occur exclusively during the course of a Pervasive Developmental Disorder, Schizophrenia, or other Psychotic Disorder and are not better accounted for by another mental disorder (e.g., Mood Disorder, Anxiety Disorder, Dissociative Disorder, or a Personality Disorder).

Code based on type:

**314.01 Attention-Deficit/Hyperactivity Disorder, Combined Type:** if both Criteria A1 and A2 are met for the past 6 months

**314.00 Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type:** if Criterion A1 is met but Criterion A2 is not met for the past 6 months

**314.01 Attention-Deficit/Hyperactivity Disorder, Predominantly Hyperactive-Impulsive Type:** if Criterion A2 is met but Criterion A1 is not met for the past 6 months

**Coding note:** For individuals (especially adolescents and adults) who currently have symptoms that no longer meet full criteria, "In Partial Remission" should be specified.

---

## 314.9 Attention-Deficit/Hyperactivity Disorder
## Not Otherwise Specified

This category is for disorders with prominent symptoms of inattention or hyperactivity-impulsivity that do not meet criteria for Attention-Deficit/Hyperactivity Disorder. Examples include

1. Individuals whose symptoms and impairment meet the criteria for Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type but whose age at onset is 7 years or after

2. Individuals with clinically significant impairment who present with inattention and whose symptom pattern does not meet the full criteria for the disorder but have a behavioral pattern marked by sluggishness, daydreaming, and hypoactivity

## Conduct Disorder

### Diagnostic Features

The essential feature of Conduct Disorder is a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated (Criterion A). These behaviors fall into four main groupings:

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALEXANDER L. DOGON and JORDAN F. SCOTT, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL BOARD OF MEDICAL EXAMINERS, <br> Defendant. | CIVIL ACTION NO. 98-10967-PBS |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

### June 10, 1998

Saris, U.S.D.J.

After a three hour evidentiary hearing, plaintiff Alexander Dogon's motion for a preliminary injunction under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12189, to require Defendant National Board of Medical Examiners ("NBME") to allot Dogon double the normal test-taking time during the June 9-10, 1998 administration of Step 1 of the United States Medical Licensing Examination ("USMLE") on the basis of an alleged learning disability is <u>DENIED</u>.

First, Dogon has not demonstrated that he will suffer irreparable harm should the Court deny his last-minute motion requiring this accommodation. Dogon could take this first portion of the USMLE in October 1998, or retake it then, if he is successful in this litigation. Mere inconvenience of rescheduling Dogon's clinical rotations in his third year of medical school or the rigor of taking the test at that time do not amount to irreparable harm. This is especially true given

DOCKETED

that third-year students at BU Medical School have taken that administration of the test in the past and that BU does not require its medical students to pass or even to take Step 1 of the USMLE to advance to third year. (Landau Aff. Ex. A.) Even the possibility of delayed graduation from medical school is not a basis for _irreparable_ harm necessary to satisfy the standard for preliminary injunction. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996).

Second, on the current record, Dogon has no substantial likelihood of showing that, under the ADA, he suffers from a "mental impairment that substantially limits one or more of the major life activities." 29 C.F.R. § 1630.2(g)(1); see also 28 C.F.R. § 36.104 (including "specific learning disabilities" in definition of "physical or mental impairment"). To satisfy this standard, Dogon must first show that he suffers from an "impairment" cognizable by the ADA. See Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 155 (1st Cir. 1998). The First Circuit has used the Diagnostic Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") to determine the existence of a "specific learning disability" or "mental impairment." See id. at 155 & n.18. The DSM-IV requires for a diagnosis of reading disorder a substantial discrepancy between current measured cognitive ability and academic achievement relative to reading. (Litchford Aff. ¶ 6); see generally Guckenberger v. Boston Univ., 974 F. Supp. 106, 131-32 (D. Mass. 1997) (discussing the two standard deviation requirements in DSM-IV for the discrepancy between cognitive ability and achievement to diagnose for the

2152433703      NBME                                    02:02:27 p.m.   04-15-2005      4/8

existence of learning disabilities).

The record as a whole supports the finding that Dogon, a man of average cognitive abilities who generally performs at an average level on achievement tests and on tests used to screen for and diagnose learning disabilities, fails to satisfy this element. Even the most favorable reading of the affidavits and reports of Dogon's treating professional, Dr. Hope Schreiber, supports only the conclusion that Dogon mildly suffers from a reading disorder. She makes no reference to the existence of a deviation between Dogon's performance and intelligence, which is required for legal recognition of a "specific learning disability." (See Schreiber Aff. Ex. 2.) In contrast, the three experts testifying on behalf of NBME concur that Dogon's testing indicates that he does not suffer from a mental impairment but rather performs at the average level one might expect given his average IQ.

Dogon did not submit Dr. Cheryl Weinstein's diagnosis of "Adult Attention Deficit Disorder/Working Memory Disorder" until May 1998, after the NBME's reasonable March 1998 deadline and the initial determination rejecting the request for reasonable accommodations. Additionally, even if Dr. Weinstein's diagnosis had been timely, Dr. Kevin Murphy also pointed out that the diagnosis "working memory disorder" is not contained in the DSM-IV and that there is insufficient documentation of childhood onset of ADD to meet the DSM-IV criteria.

At best, the evidence suggests a dispute among highly

3

trained professionals that cannot possibly be resolved in plaintiff's favor in the single day I have had to consider this motion for extraordinary relief.  To end run the NBME evaluation process at the eleventh hour with a rushed court hearing would be contrary to the public interest because it would tend to undermine not only the integrity of the medical boards but also the legitimacy of accommodating those students who have timely documented significant learning disorders.

Because there is insufficient evidence to support a finding of a mental impairment, I need not delve into the more complex debate as to which major life activity is affected by Dogon's claimed impairment.  See Bercovitch, 133 F.3d at 155; 28 C.F.R. § 36.104 (including "learning" and "working" as "major life activities").  Therefore, it is not necessary to decide whether Dogon's claimed mental impairment must be compared to that of "the average person in the general population" or to those engaging in a particular activity for purposes of a licensing exam. See 29 C.F.R. § 1630.2(i) & (j)(1); compare Price v. National Bd. of Med. Exam'rs, 966 F. Supp. 419, 426-27 (S.D. W. Va. 1997) (referring to "learning" as being implicated by Step 1 of the USMLE and holding that the appropriate reference group was the general population) with Bartlett v. New York State Bd. of Law Exam'rs, 970 F. Supp. 1094, 1121 (S.D.N.Y. 1997) (holding that the bar exam for lawyers implicated the major life activity of "working" and that the appropriate reference group was those engaging in that particular activity, i.e., recent law school

4

graduates); see also Bartlett v. New York State Bd. of Law Exam'rs, No. 93 Civ. 4986(SS), 1997 WL 471032, at *4-*5 (S.D.N.Y. Aug. 18, 1997) (in denying Rule 59 and 60 motions argued on the basis of Price, reasoning, in part, that Step 1 of USMLE was more removed from the context of "working" than the bar exam).

I conclude that Dogon has not demonstrated a likelihood of success on his claim he is entitled to receive an accommodation of double time under the ADA, or irreparable harm.  Weighing the equities supports denial.

### ORDER

Dogon's motion for preliminary injunction is **DENIED**.

PATTI B. SARIS
United States District Judge

5