IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEIDI A. BAER, )<br><br>Plaintiff, )<br><br>vs. )<br><br>NATIONAL BOARD OF MEDICAL )<br>EXAMINERS, )<br><br>Defendant. )<br><br> ) | CIVIL ACTION NO. 05-CV-10724-GAO<br><br>**PLAINTIFF'S REPLY<br>MEMORANDUM IN SUPPORT OF<br>PLAINTIFF'S MOTION FOR A<br>PERMANENT AND PRELIMINARY<br>INJUNCTION** |

## INTRODUCTION

In its Opposition to Plaintiff Heidi A. Baer's Motion for a Preliminary and Permanent

Injunction ("Opposition"), Defendant National Board of Medical Examiners justifies its refusal to

provide Ms. Baer the accommodation she is entitled to by mischaracterizing expert statements,

misstating Ms. Baer's arguments for why she is entitled to injunctive relief, relying on the affidavits

of experts who completely ignore substantial factual evidence submitted by Ms. Baer evidencing her

reading and learning disability, and applying the wrong standard for determining when an individual

has a disability under the law. Ultimately, these attempts are unavailing. The record of those

specialists who directly observed and tested Ms. Baer is clear -- she is disabled and she needs an

accommodation from the NBME.

Moreover, in an attempt to avoid Court action on Ms. Baer's reasonable request, Defendant

sets forth absurd arguments challenging the irreparable harm Ms. Baer faces in the absence of

immediate action. Defendant has the temerity to suggest that Baer's impending expulsion from

medical school should she again fail the USMLE Step 1 Exam ("Step 1" or the "Exam"), does not

constitute irreparable harm because she can apply to another medical school.

Ms. Baer's disability causes the USMLE Step 1 to test her disability, not her knowledge of the material. By refusing to provide her with an accommodation to eliminate the negative affect of her disability, the NBME is overstepping its bounds as gatekeeper and unfairly and unlawfully interfering with Ms. Baer's civil rights.

I.    **Ms. Baer Demonstrated That She Will Suffer Irreparable Harm In the Absence of Injunctive Relief.**

A.    **Expulsion From Medical School Constitutes Irreparable Harm**

Ms. Baer demonstrated that if she does not receive the accommodation she has requested and again fails the USMLE Step 1, she will be expelled from medical school at Drexel University.[1] According to Drexel's policy, students are permitted to take the Step 1 exam three times.[2] Students who have failed to pass Step 1 in three attempts are "dropped from the rolls of [the medical school].[3] The policy, however, provides that students may petition Drexel's administration for permission to take Step 1 a fourth time.[4] Given that she failed Step 1 three times, and seeking to forestall her expulsion from medical school, Ms. Baer petitioned Drexel for a fourth opportunity to pass Step 1.[5] In a letter from Dr. Samuel K. Parrish, Jr., M.D., Associate Dean for Student Affairs, Ms. Baer's petition to take the Exam a fourth time was granted, but she was notified that this would be her ***final*** attempt at passing the test.[6] As a result, should Ms. Baer fail to achieve a passing score on the May 5, 2005 administration of the USMLE Step 1 exam, she will be expelled from medical school and her career in medicine will be over.

---

[1]    Affidavit of Heidi A. Baer ("*Baer Aff.*") at ¶¶ 6-7.
[2]    *See Baer Aff.* at ¶ 6; *see also* Affidavit of Barbara Schindler, M.D. (Vice Dean for Educational and Academic Affairs at Drexel University College of Medicine)(*Schindler Aff.*) at ¶ 3 (a copy of the *Schindler Aff.* is submitted herewith); *see also* Drexel College of Medicine's "Academic Policies and Academic Progress," attached as *Exhibit A* to the *Baer* and *Schindler Affs.*
[3]    *Baer Aff.* at ¶ 6; *Schindler Aff.* at ¶ 2.
[4]    *Baer Aff.* at ¶ 6; *Schindler Aff.* at ¶ 2.
[5]    *Baer Aff.* at ¶ 6; *Schindler Aff.* at ¶ 3.
[6]    *Baer Aff.* at ¶ 6; *Schindler Aff.* at ¶ 3; a copy of the letter from Dean Parrish is attached as *Exhibit B* to both the *Baer Aff* and the *Schindler Aff.*

Notwithstanding the undisputed fact that Ms. Baer is facing imminent expulsion from medical school, and for no other purpose but to mechanically contest every element of Ms. Baer's injunctive relief case, Defendant disingenuously suggests that such expulsion does not amount to irreparable harm.[7] In Defendant's warped worldview, even if Ms. Baer was to fail the Step 1 exam for a fourth time, she could simply transfer to any one of the 42 accredited medical schools in the U.S. that purportedly do not require passage of the Step 1 exam in order for students to progress to the third-year of medical school.[8] Defendant's inherently flawed logic assumes that Ms. Baer could approach these schools regarding a transfer and expect to be readily admitted into their programs *despite her expulsion from Drexel and having failed the Step 1 Exam a total of four times.* The absurdity of this proposition is manifest.

Simply stated, if Ms. Baer is not permitted to take Step 1 with an accommodation, she will likely fail the Exam for a fourth time and be disenrolled from Drexel.[9] It is highly unlikely, if not outright impossible, for Ms. Baer to expect to matriculate into any other medical school program after her expulsion from Drexel.

In support of this specious argument, Defendant relies on *Dogan v. National Bd. of Med. Exam'rs*, No 98-10967-PBS, slip op. at 2 (D. Mass. June 10, 1998), for the proposition that delayed graduation from medical school is not a basis for irreparable harm. There was no evidence, however, that the plaintiff in *Dogan* had ever taken and failed Step 1, or that he was facing expulsion from medical school should he fail it again. *Id.* at 1-2. In fact, as the *Dogan* court noted, the plaintiff's medical school was one of the few accredited schools in the nation that did not require students to pass Step 1 before advancing to third-year. *Id* at 2. Here, on the other hand, Ms. Baer is facing imminent expulsion from medical school should she fail to achieve a passing score on the

---

[7]    Opposition ("*Opp.*") at p. 7.
[8]    *Id.*
[9]    *Baer Aff.* at ¶¶ 6-7.

3

next administration of the Step 1 exam -- a prospect not facing the plaintiff in *Dogan*. *Dogan*, therefore, is readily distinguishable.

Moreover, not only is Defendant's reliance on *Dogan* misplaced, it ignores volumes of precedent clearly stating that an individual's expulsion from school constitutes irreparable harm. *Rodiriecus, v. Waukegan School District No. 60*, 90 F.3d 249, 254 (7th Cir. 1996)("There is no doubt that the expulsion of a [person] from school may result in irreparable harm."); *Murphy v. Ft. Worth Independent School District*, 258 F.Supp.2d 569, 575 (N.D. Tex. 2003)(*vac'd on other grounds*)(expulsion of individual and denial of his right to complete education at the school where his education began constitutes irreparable harm); *Johnson v. Collins*, 233 F.Supp.2d 241, 251 (D.N.H. 2002)(*citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18-19 (1st Cir. 1996)); *Thomas v. Davidson Academy*, 846 F.Supp. 611, 619 (M.D. Ten. 1994); *Parker v. Trinity High School*, 823 F.Supp. 511, 518 (N.D. Ill. 1993). As a result, Ms. Baer's imminent expulsion from Drexel should she fail to pass the May 5th administration of the Step 1 exam, constitutes, beyond any doubt, irreparable harm sufficient to justify the issuance of an injunction.

### B.    Ms. Baer Must Take Step 1 on May 5, 2005, to Increase Her Chances of Passing Step 1 Should Her Accommodation Be Denied

Furthermore, Defendant shamelessly minimizes the significance of May 5th as the date on which Ms. Baer must take the exam.[10/] Despite Defendant's assertion to the contrary, the timing of the exam is critical to Ms. Baer's chances for success. As set forth in Ms. Baer's affidavit, she is currently enrolled in an intensive four-month long test preparation course, which requires her to be in review classes from 8:30 A.M. to 6:30 P.M., five days a week.[11/] In addition, Ms. Baer spends her weekends taking practice administrations of the Step 1 exam.[12/] Given the intensity of the review course and the volume of material covered, Ms. Baer was advised by the program's administrators to

---

[10/]    *Opp.* at. p. 7.
[11/]    *Baer Aff.* at ¶ 8.

4

schedule her next attempt on Step 1 within a week to ten days of the review course's completion.[13/] Indeed, the beneficial effects of the very class she is taking to increase her chances of success on Step 1 should she not receive an accommodation, are virtually erased if Ms. Baer does not take the Exam shortly after completion of the review course. Ms. Baer's review course is currently scheduled to end on April 29, 2005.[14/]

Thus, if Ms. Baer is forced to postpone her test date, particularly if she is not granted the accommodation she deserves, she will lose any assistance this intensive course was intended to provide. Defendant would not only deny Ms. Baer the accommodation she is entitled to, but also destroy any chance Ms. Baer has at passing Step 1 without accommodation by pushing her test date back to a time when the effects of her review course would have virtually no impact. Such a result is manifestly unjust, and militates in favor of a finding that Ms. Baer will suffer irreparable harm in the absence of immediate relief.

To be sure, Ms. Baer's medical career is in jeopardy. In a desperate last-ditch attempt to take every step possible to increase her chances to pass the Step 1, she has enrolled in this intensive review course. To lose the benefit of this course *and* potentially be deprived of her right to an accommodation would almost surely result in Ms. Baer's failure on Step 1, as it has the past three times she has attempted to take the exam. Notwithstanding Defendant's vain protestations to the contrary, it cannot be understated that Ms. Baer's medical career is at stake, and she will suffer irreparable harm in the absence of immediate injunctive relief.

---

12/  *Id.*

13/  *Id.* at ¶ 9; *see also* the letter from Dr. Gordon L. Pullen, Ph.D., dated April 20, 2005, attached as *Exhibit C* to the *Baer Aff.* ("We require that the students [enrolled in the review course] schedule their [Step 1] exam date for about a week after the program ends . . . success rates for students who postpone taking the exam…decrease significantly.")

14/  *Baer Aff.* at ¶ 10.

II.  **Ms. Baer Has Demonstrated That She Suffers From a Disability Under the ADA and the Massachusetts Public Accommodation Statute.**

In its Opposition, Defendant concludes that Ms. Baer does not suffer from a disability by (1) relying heavily on the technical definitions set forth under the DSM-IV, despite the fact that those definitions are not determinative as to whether an individual has a disability under the ADA; (2) concluding, contrary to the evidence, that Ms. Baer's only limitation is in her ability to take a timed test; and (3) referring to inapposite caselaw to support its conclusory statement that Baer's impairment is not substantially limiting.  It is only able to reach its conclusions by picking and choosing from among various pieces of evidence submitted by Ms. Baer, mischaracterizing expert statements, and ignoring the real life effects of Ms. Baer's disability.

A.  **Ms. Baer Suffers From a Disability Under the ADA and Massachusetts State Law**

Ms. Baer has been examined and diagnosed by no less than five experts in the field of learning disabilities and reading disorders.[15/]  Each has concluded that Ms. Baer suffers from a disability, specifically a reading and/or learning disorder that inhibits her ability to read and comprehend the written word.[16/]  Moreover, as set forth in the Second Affidavit of Dr. Cheryl Weinstein, Ms. Baer does have a learning disorder, not otherwise specified, DSM-IV 315.9.[17/]

Yet, despite the fact that Ms. Baer has submitted extensive documentation evidencing her disability and provided Defendant with her expert's DSM-IV diagnoses of her disability, Defendant continues to refute that Ms. Baer suffers from any impairment whatsoever.  Instead, Defendant places heavy reliance on the technical definitions of a learning disability in the DSM manual and argues that Ms. Baer's experts have failed to provide sufficient evidence to support a DSM diagnosis.

---

[15/]    Verified Complaint ("*Compl.*") at ¶¶ 24-25, 32-36, 39 and 43-50.

[16/]    *Id.* at ¶ 24, 32, 35, 41 and 48.

[17/]    Second Affidavit of Dr. Cheryl Weinstein, Ph.D. ("*Second Weinstein Aff.*") at ¶ 11. (A copy of the Second *Weinstein Aff.* is submitted herewith). Notably, Dr. Weinstein specifically commented on the DSM-IV's failure to address "language based" and "non-verbal" learning disorders. In Dr. Weinstein's expert opinion, the absence of commentary in the DSM concerning these two specific types of learning disorders renders the manual's coverage of learning disorders

Defendant's heavy reliance on the DSM-IV is misplaced.[18/]  The DSM-IV definitions are not meant to identify whether someone is a protected individual under the ADA, and the DSM-IV sets standards for diagnosis that do not relate to the standard Ms. Baer must meet to show that she has a disability.

As Defendant notes, both the DSM drafters and the courts have found that the DSM-IV and the ADA do not mirror one another and that the DSM cannot be used to prove the existence of a disability. *See Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 155 n.18 (referring to the DSM's commentary that there is an "imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis"). Nevertheless, Defendant repeatedly points to its experts' conclusions that Ms. Baer's assessors did not establish DSM diagnoses to contend that Ms. Baer is not disabled.

In fact, despite the fact that the ADA and the DSM are not complementary standards, it is clear that Defendant uses a DSM-IV diagnosis as its *floor* for assessing disability and requires applicants to demonstrate that their conditions meet the very technical DSM definitions as a baseline for demonstrating disability to its satisfaction. In other words, Defendant admits that the DSM-IV definitions are an "imperfect fit" with the ADA, but only so far as fits its own purposes – to argue the absence of a disability. This it cannot be allowed to do. Just as the DSM-IV definitions are not

---

incomplete.

[18/]        Defendant also improperly relies on two cases to support its contention that the opinions of Ms. Baer's experts concerning her academic and test-taking difficulties does not mean that she suffers from a learning impairment. These cases simply are not analogous. In *Dogan*, the court found insufficient evidence to support a finding of mental impairment when defendant's experts testified that the plaintiff performed "at the average level one might expect given his average IQ." *Dogan*, at pp. 3-4. In contrast, Ms. Baer possesses a superior IQ (99th percentile), and yet still performs poorly on examinations. Moreover, Defendant cites *Tatum v. NCAA*, 992 F.Supp. 1114, 1123 (E.D. Mo. 1998), which found that the plaintiff's poor performance could be explained due to lack of effort or preparation. In this case, however, Ms. Baer has gone to extreme lengths to prepare herself for exams throughout her academic career (private tutors, countless hours spent improving organization skills, extensive work with her parents to complete assignments, and enrollment in multiple test preparation programs to assist her in taking the SAT, MCAT and USMLE Step 1 Exam). Thus, it cannot be said that Ms. Baer, like the plaintiff in *Tatum*, has failed to adequately prepare herself for examinations. Rather, her disability has prevented her from demonstrating her considerable knowledge of the very material tested on academic examinations, and continues to hamper her to this day.

an appropriate measure to prove the existence of a disability, so they are equally inappropriate to *disprove* the existence of a disability.

In assessing whether Ms. Baer suffers from a disability under the ADA, the Court must assess whether she satisfied the three-pronged statutory inquiry. The ADA is very clear on this point: an individual must demonstrate that she suffers from (i) a physical or mental impairment, (ii) that substantially limits, (iii) a major life activity. *Bercovitch*, 133 F.3d at 141. Nothing in this definition requires a DSM-IV diagnosis. The implication is unmistakable -- had Congress required a DSM-IV diagnosis to establish a learning or reading disability, it would have refrained from instituting the aforementioned three-pronged analysis, and, instead, simply required that individuals meet the mechanical definitions of such disabilities as they are stated in the DSM-IV manual. Such a requirement is improper.

DSM-IV diagnoses are based on technical medical definitions while the ADA is not meant to be a medical statute. By relying solely on the DSM definitions, and ignoring other indicia of disabilities, Defendant is setting up an almost impossible barrier for many individuals who suffer from learning and reading impairments to meet. This is particularly true given the NBME's insistence that there is only one right way to demonstrate a DSM diagnosis.[19]

Indeed, the manner in which the NBME reaches or discounts DSM diagnoses proves why these standards are inapplicable. For example, Defendant relies heavily on particular tests, such as the Woodcock-Johnson test, but it completely fails to acknowledge Ms. Baer's substandard performance on the California Verbal Learning Test (Second Edition). In that test, which measures language retrieval, Ms. Baer scored two standard deviations below the mean, which, in Dr. Weinstein's assessment, is a "*substantial deficit as compared to the general population*".[20] Defendant's complete dismissal of this test result indicates that it is picking and choosing among evidence, and

---

[19]     *Opp.* at p. 13.

not considering the full body of evidence demonstrating Ms. Baer's impairment. In contrast, Dr. Weinstein explains that reliance on the specific tests mandated by the Defendant are not the only accepted methods to demonstrate that an individual suffers from a learning disability.[21/]

In addition, by relying on DSM standards, the Board sets up requirements that are impossible for many adults ever to hope to prove. For example, Defendant relies heavily on the idea that Ms. Baer has not shown a childhood history of ADHD necessary to meet the strict ADHD DSM-IV definition. To begin, Ms. Baer is thirty years old. Twenty to twenty-five years ago, during her childhood, ADHD and learning disorders simply were not as well understood as they are today. As a result, students were not nearly as likely to be diagnosed with the condition or even to be sent to specialists for assessment. Thus, the statement that Ms. Baer was not diagnosed with ADHD during her childhood is illusory, given the fact that ADHD, as it is now known and understood, was not yet fully recognized during Ms. Baer's formative years.

In addition, Defendant argues that Ms. Baer has failed to produce any expert reports from her childhood specifically diagnosing her with ADHD, and that she appears to have done well in school without "formal" accommodation.[22/] This argument, however, completely ignores Ms. Baer's real life experiences in favor of mechanical textbook definitions. Further, Defendant simply has the facts wrong. While in the fifth grade, Ms. Baer was referred to Dr. Patricia Boyle for evaluation due to her continued difficulty taking exams and concentrating in class.[23/] Dr. Boyle noted that Ms. Baer, although very bright, read and processed information slowly, and recommended that she be given extra time to complete exams.[24/] While she did not use technical terms to deliver her message, the message is clear: Ms. Baer needed help to address a problem processing information.

---

[20/]    *Weinstein Second Aff.* at ¶ 9 (emphasis added).
[21/]    *Id.* at ¶ 10.
[22/]    *Opp.* at p. 12.
[23/]    *Compl.* at ¶ 15.
[24/]    *See* "Dr. Cheryl Weinstein's Neurological Consultation" at p. 3, attached as *Exhibit A* to the Complaint.

Moreover, contrary to Defendant's assertion, Ms. Baer received accommodations from a very young age, after at least one of her teachers questioned whether she had specific problems that were interfering with her ability to perform well in school.[25/] Although these accommodations were never formalized, Ms. Baer's Milton Academy teachers regularly provided her with extra time to take exams.[26/] In addition, Ms. Baer regularly self-accommodated her disabilities through the use of tutors, enrolling in numerous test preparation courses, and adjusting her course schedule to focus on areas where she knew she would be less likely to encounter the timed-test situations that plagued her educational career.[27/] Defendant ignores all of this in favor of an unsupported conclusion that she did well in school "without formal treatments or accommodations."

Indeed, the proof of Ms. Baer's impairment is in the effect that it has on her achievement potential. Given her superior IQ (99th percentile), the fact that Ms Baer has had to receive informal accommodations throughout her elementary and high school education and engage in so many self-help techniques demonstrates that an impairment was interfering with her ability to capitalize on her intellect.[28/] Ms. Baer's IQ is well above normal, yet she struggles to demonstrate that intelligence. While, by all rights given her intellect, Ms. Baer should excel in academics, something is substantially interfering with her ability to do so.

In fact, this discrepancy between her achievements and her IQ is a hallmark of a learning disability. *See Gonzales v. National Board of Medical Examiners*, 225 F.3d. 620, 629 (6th Cir. 2000) (noting that "[Defendant's expert] testified that 'one of the major indicators of just about every definition of a learning disability is a significant ability achievement discrepancy" and declining plaintiff's request for an accommodation where his average performance corresponded with his average IQ). *See also Dogon*, at pp. 3-4 (relying on the fact that the tests suggested that the plaintiff

---

[25/]     *Compl.* at ¶ 14.
[26/]     *Id.* at ¶¶ 14-15.
[27/]     *Id.* at ¶ 17.

there, of *average* intelligence, performed at an *average* level to deny plaintiff's request). In short, Ms. Baer's struggles despite her exceptional IQ are themselves the best evidence of her disability.

Moreover, in those instances where Ms. Baer applied for and was granted an accommodation for her disability (i.e., on the MCAT and in medical school), her performance improved dramatically.[29/] In effect, the accommodations referred to above allowed Ms. Baer's intellect and her grasp of the underlying subject matter to be tested, rather than her disability, and bear upon the utility of her reasonable accommodation request in the current matter. *See Rush v. National Board of Medical Examiners*, 268 F. Supp. 2d 673, 675, 678 ((N.D. Tex. 2003) (time-extension accommodation on USMLE Step 1 appropriate in light of plaintiff's history of similar accommodation on MCAT examination).

Dr. Weinstein, the most recent specialist that has personally observed and tested Ms. Baer for a learning disability, recognizing that Ms. Baer has, in fact, been accommodated for her disability since her childhood, has attempted to reconcile her superior IQ with her below average performance on tests, which require extensive reading.[30/] Indeed, Dr. Weinstein specifically concluded, after extensive observation and testing of Ms. Baer, that an impairment exists, which substantially affects her ability to read and comprehend the written word as quickly as others.[31/]

## B.    Ms. Baer is Substantially Limited in The Major Life Activities of Reading and Learning

Defendant also argues that Ms. Baer does not suffer from a disability, which substantially limits a "major life activity."[32/] Based on a review of Dr. Weinstein's report, Defendant would have this Court believe that Ms. Baer is limited only with respect to her performance on timed-

---

[28/]    *Id.* at ¶¶ 7, 18, 19, 21.
[29/]    *Id.* at ¶¶ 25-27.
[30/]    *Id.* at ¶ 12.
[31/]    *Id.* at ¶ 43-50.
[32/]    *Opp.* at p. 15-16.

11

examinations, which, in Defendant's opinion, does not constitute a "major life activity."[33/]  Contrary

to Defendant's strained analysis of Dr. Weinstein's report, she does not conclude that the only

activity that is impaired is that of taking timed tests.[34/]  Instead, Dr. Weinstein, in her expert opinion,

has concluded that Ms. Baer's impairment substantially limits the major life activities of learning,

reading and comprehension:

> While [Baer's] intellect is well above average to superior and while
> she has very strong reasoning abilities, it is clear that a learning
> impairment that substantially limits her ability to read rapidly, to
> organize information and rapidly plan how to proceed is present and
> represents a deficit when compared to the general population. . . .
> Moreover, her problems rapidly retrieving language make it harder
> for her to learn and quickly demonstrate what she knows.[35/]

As even Defendant implicitly recognizes in its Opposition, reading is a clearly recognized

major life activity.[36/] *See Bartlett v. New York State Board of Law Examiners,* 226 F.3d 69, 80 (2nd Cir.

2000)(holding that reading is a "major life activity" for purposes of the ADA); *Gonzales,* 225 F.3d. at

626; *Rush,* 268 F.Supp.2d at 678.  Hand in hand with reading is the ability to comprehend what one

is reading.  Thus, Ms. Baer has demonstrated that she has an impairment that limits a major life

activity (reading and comprehension).

### C.    Baer Is Substantially Limited In The Major Life Activities of Reading and Learning

Defendant's last defensive maneuver is to argue that Ms. Baer is not "substantially limited"

because her test scores, in its contention, place her in the low average of the population in terms of

her reading and comprehension ability.  In support of this, Defendant's experts refer to test scores

---

33/    *Id.*

34/    *Compl.* at ¶ 46; *see also Second Weinstein Aff.* at ¶ 12.

35/    *Compl.* at ¶ 46.

36/    Defendant relies on *McGuiness v. Univ. of N.M. Sch. of Med.,* 170 F.3d 974, 979 (10th Cir. 1998), for the proposition that the ability to pursue one's career does not constitute a severe impact on a "major life activity." Defendant's reliance on *McGuinness* is misplaced.  In that case, the plaintiff argued that the major life activity that was substantially limited was that of "working."  The analysis of whether one's ability to work is impaired is complex and differs greatly from the analysis of the other, more basic major life activities, such as reading and learning.  Ms. Baer has not alleged that she is impaired in the major life activity of working but instead refers to Dr. Weinstein's conclusion that

that place her in the 17th[nd] to 25th percentiles for reading ability and comprehension and assert that

anything above 16th percentile is not sufficient to show a substantial impairment. This lacks

common sense and is contrary to the law. The ADA standard requires that Ms. Baer demonstrate

that she is substantially limited as compared to most people in the general population. *Gonzales,* 225

F.3d. at 626. Nowhere in the ADA or the supporting regulations does it require that she perform

worse than 84% of the population, yet that is exactly the requirement Defendant wishes to impose

on Ms. Baer. Defendant's insistence on a 16% standard is arbitrary and too closely tied to its

experts' over-reliance on the DSM standards.[37/]

Defendant admits that Ms. Baer's scores show that she performed in the 25% or worse

percentile on the following tests:

- Woodcock Johnson -III Reading Fluency Subtest -- 13th Percentile;

- Nelson Denny Reading Test-G, Reading Comprehension -- 25th Percentile;[38/]

- Woodcock Johnson Diagnostic Reading Battery Sound Blending Subtest -- 22nd Percentile;

- Woodcock Johnson Diagnostic Reading Battery Listening Comprehension Subtest -- 18th Percentile; and

- Woodcock Johnson -III Rapid Picture Naming Subtest -- 17th Percentile.[39/]

Clearly, if *75-80% or more* of the population reads faster and comprehends better than she does, then

*most* people do better than her. Defendant's reliance on strict DSM guidelines is again misplaced and

contrary to the clear guidance of the ADA. In addition, as noted previously, Ms. Baer also scored

well below the standard deviation on the California Verbal Learning Test -- a fact completely

ignored by Defendant and its experts.

---

she is substantially impaired in the major life activities of learning and reading.

[37/]    *Bernier Aff* at ¶ 14; *see also Second Weinstein Aff.* at ¶ 5.

[38/]    Note that this score is the score assessed by Defendant's expert, Dr. Bernier. Dr. Weinstein assessed a score of 3rd Percentile. *Second Weinstein Aff.* at ¶ 3.

[39/]    *Bernier Aff.* at ¶¶ 18-25.

Further, Defendant tries to minimize the substantial nature of her impairment by suggesting that generally, she is completely capable of learning as well as others.[40]   In support of this contention, they note that academically, she has done quite well, although they factually err by asserting that she had no accommodations during her education.  In fact, she had multiple accommodations, including extra time for exams during her elementary and high school education. In any event, this broad overgeneralization is inapplicable here.  Ms. Baer has never alleged that she is incapable of learning or achieving.  Instead, Ms. Baer repeatedly stated that her learning disability "seriously impairs her ability to read, comprehend and process written material."[41]   Indeed, her obviously high intellect demonstrates that she can learn.  Rather, it is Ms. Baer's difficulties in reading and comprehending the written word that must be the focal point for any analysis of her disability.  As stated above, Ms. Baer is unable to process the written word as quickly as others.  It takes Ms. Baer longer to comprehend what she has read than it does other people, and, as a result, her ability to showcase her knowledge and understanding of source material is severely impaired when she is required to display this knowledge on exams, such as Step 1.  By working harder than most people and taking longer than most people, she is able to learn and comprehend.  But the effect of her impairment is to substantially impair the time within which she can accomplish and demonstrate this learning.

Moreover, Ms. Baer's impairment affects her life in multiple ways.  Since she has been a student for the past 25 years, the effects of her disability most noticeably manifest themselves in the academic and testing environment.  This does not mean, however, that her impairment only affects her ability to take tests.  Indeed, Dr. Weinstein notes that because of her impairment, Ms. Baer will

---

[40]      *Opp.* at p. 17.
[41]      *See Compl.* at ¶¶11, 17, 45-46; *see also Memorandum In Support of Plaintiff's Motion for a Permanent and Preliminary Injunction,* at pp. 1, 2, 8 and 13.

have difficulty throughout her life with tasks involving reading.[42/]  In addition, Ms. Baer stated that

tasks involving reading just seem harder for her than they do for her peers.  As a result, she spends

more time studying than do her peers and takes longer to complete assignments and exams.[43/]

Of course, practically speaking -- and given her life experiences thus far -- the effect of her

impairment is best seen in timed-test circumstances.  As noted in her Verified Complaint,

throughout her educational career, despite her high intellect, she has struggled with timed tests.  The

effect of her slowed reading capabilities is that a timed-exam tests her reading speed -- *i.e.,* her

impairment -- as opposed to her knowledge of the material.  This is precisely the problem that the

ADA was designed to correct in its application to professional exams such as Step 1:

> an examination covered by [42 U.S.C. § 12189] must assure that (i) the
> examination is selected and administered so as to best insure that,
> when the examination is administered to an individual with a
> disability that impairs sensory, manual, or speaking skills, the
> examination results accurately reflect the individual's aptitude or
> achievement level or whatever other factor the examination purports
> to measure, rather than reflecting the individual's impaired sensory,
> manual, or speaking skills (except where those skills are the factors
> that the examination purports to measure).     28  C.F.R.  §
> 36.309(b)(1)(i).[44/]

Without accommodation for her disability, Step 1 will continue to test Ms. Baer's ability to

manage her disability, rather than her substantive medical knowledge of the material present on the

Exam.  As a result, Step 1 will not "accurately reflect [Baer's] aptitude or achievement level," but, instead

---

[42/]    *Second Weinstein Aff.* at ¶ 12.

[43/]    *See* "Personal Statement of Heidi A. Baer," dated May 7, 2004, and submitted to the NBME in support of her request for a reasonable accommodation.  A true and accurate copy of this Personal Statement is attached hereto as *Exhibit A.*

[44/]    At least one court has interpreted this regulation as supporting an argument that the "disparity between [a plaintiff's] inherent capacity and performance on a test may, in some circumstances, permit the inference that an individual has a learning disability, even though that individual's performance has met the standard of the ordinary person." *Pazer v. New York State Board of Law Examiners,* 849 F.Supp. 284, 287 (S.D.N.Y. 1994).  While the *Pazer* court held that the plaintiff in that case failed to establish sufficient indicia of disability, it did leave open the possibility that where a plaintiff has a superior IQ, yet continuously performs below average on examinations covered by 28 C.F.R. § 36.309(b)(1)(i), a court may infer that a disability exists even though diagnostic test scores may indicate that the plaintiff performs at a similar level with regard to reading as the "ordinary person."  Such is the case here.

expose her reading and learning disorders -- a result clearly violative of the ADA. *Rush,* 268 F. Supp. 2d at 677.

## CONCLUSION

For all of the foregoing reasons, Heidi A. Baer is entitled to a reasonable accommodation under the ADA. She suffers from a learning disability that substantially limits a major life activity. The effect of this disability will continue to result in timed-exams, such as the USMLE Step 1, testing her disability rather than her achievement level and knowledge of the material. For these reasons, Baer requests this Court to issue a preliminary and permanent injunction ordering Defendant National Board of Medical Examiners to provide her with time and one-half within which to complete Step 1 of the USMLE.

Respectfully Submitted,

**HEIDI A. BAER**

By her attorneys,

Bret A. Cohen, BBO #637830
Carolyn A. Wiesenhahn, BBO #641596
James M. Nicholas, BBO #653892
MINTZ, LEVIN, COHN, FERRIS
 GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111
(617) 542-6000

Dated: April 26, 2005

EXHIBIT A

Heidi Alexandra Baer
SS# 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
USMLE ID # 5-099-376-5
USMLE Step 1
Request review for time and one half
05/07/2004
Phone # 267 971 4595

**Personal Statement Requesting Time and One-Half for USMLE**

National Board of Medical Examiners
3750 Market Street
Philadelphia, Pa. 19104

To Whom It May Concern:

I submit this personal statement in connection with my Applicant's Request for Test Accommodations. I am requesting additional time to complete the USMLE Step 1 as a reasonable accommodation under the ADA. I have a learning disability and AD/HD. Without an accommodation for this exam, I fear that my lifelong goal of becoming a doctor (a goal toward which I have worked very hard for many years) is in jeopardy.

I am 29 years old. I have been coping with my learning disability for as long as I can remember. In fact, there is some speculation that my learning disability has an organic basis. I was born with a difficult forceps delivery and subsequently suffered a grand mal seizure that I experienced when I was two. The seizure itself may have been caused by the fact that I was delivered with forceps. Subsequently, I became left-handed, which I understand may be consistent with brain damage. Shortly thereafter, I was given an EEG. The doctor interpreted the EEG as "abnormal", and suggested that I had a possible cicatrix. In more recent times, I had an EEG which was interpreted as being consistent with possible earlier injury or current migraines.

I have always had problems reading and comprehending material as quickly as others. Throughout my education, this has manifested itself most obviously in my substantial difficulty in taking tests within the time frame allotted by the teachers or -- in the case of standardized tests -- by the testing agency. It also has manifested itself in the following ways:

- I have problems concentrating and am easily distracted by noises;
- My spelling skills are fairly weak (beginning fourth grade I was placed in the bottom three tiers for spelling);
- I spend significantly more time studying than friends and peers;
- I have trouble recalling names of people and movies on demand;
- I have problems with tests and trivia games that require instant recall of names and dates; and
- I have great difficulty reading maps and I am easily disoriented to direction.

I was fortunate enough to attend Milton Academy from kindergarten through high school, where my disability was identified from an early age. Specifically, when I was in the fifth grade, my grades were suffering and I was not having much success with examinations despite tremendous effort. My teacher suspected that I may have a learning disability and formally requested that I be evaluated. My parents and I met with Dr. Patricia Boyle, who administered a number of tests. In her analysis, I read and process

1

Heidi Alexandra Baer
SS# 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
USMLE ID # 5-099-376-5
USMLE Step 1
Request review for time and one half
05/07/2004
Phone # 267 971 4595

written information slowly. However, Dr. Boyle concluded that despite my struggle, I was "very bright" and, as much as I was able, compensated for my learning issues with motivation. Still, I began to take extra time to finish exams. Fortunately for me, Milton encourages students to take their time; so I was not rushed to finish exams. If time ran out during an exam, we were permitted to finish and arrive at the next class late. I regularly took advantage of this opportunity throughout the remainder of my education at Milton Academy. In addition to taking extra time with exams, I also took the following measures to compensate for my reading and comprehension difficulties during middle and high school:

- I have always used tutors;
- my parents worked with me every night on my homework, summer reading and other school-related projects; and
- I practiced organization skills, including:
    a. I pre-read by using the table of contents;
    b. I pre-read by skimming the first sentence of every paragraph;
    c. I outline what I read;
    d. I use end of chapter questions when available;
    e. I ask people to quiz me over and over again on the same material so that I can learn to think of how material might be presented in different question formats;
    f. I study with one other person who asks as an additional tutor to clear up any confusion from lecture, reading or exam type questions;
    g. I purchase scribe notes whenever possible for lectures;
    h. I videotape lectures whenever possible so that I may watch them over and over until they make sense to me;
    i. I purchase online video material from Kaplan as a study aide for exam preparation;
    j. I re-review material often so as not to forget; and
    k. I try to use the aide of mnemonics when I still have trouble memorizing lists.

Like most other students, I took the SAT during my senior year of high school. I actually took it twice, because the first time that I took the exam, my scores were not high enough to get me into any of the schools I wanted to attend. Even then, I wanted to be a doctor, and knew that my choice of undergraduate school could be critical to my entry into a good medical school. In preparing for the SAT, I took both a Kaplan prep course and a Princeton review prep course. Still, my SAT score of 1250 was lower than expected for the courses I took and the grades I earned in high-school. I simply could not finish any section of the test. It took me too long to answer each individual question.

I didn't even think to request extra time on the SAT. The accommodations provided to me at Milton Academy were provided to me very informally, so I did not have the mindset to understand that I truly do read and process information more slowly than other people. Looking back, I wish I had requested extra time. Fortunately, I was very accurate in the questions that I did manage to answer and was able to achieve a relatively successful result.

2

Heidi Alexandra Baer
SS# 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
USMLE ID # 5-099-376-5
USMLE Step 1
Request review for time and one half
05/07/2004
Phone # 267 971 4595

Following graduation, I attended Duke University. While there, I continued to use tutors and work hard on my organizational skills. Still, I had difficulty finishing timed multiple choice-style exams. My grades in courses with multiple choice exams were significantly lower than my grades in other courses. The struggle to complete the exams in the allotted time was such a challenge that despite my desire to become a physician, I chose to major in English. In smaller seminar courses, I could participate in class discussions and write papers to demonstrate my mastery of material. However, in order to learn the basic sciences, I still had a number of math and science courses which were taught in an auditorium and were assessed by timed multiple choice style exams. For each of these courses, I had a tutor, and I practiced my timing by taking old tests. I tried to learn to think like the test makers so that it would not take me as long to understand a question or answer choices. Nonetheless, I still needed more time to complete even the most straightforward exams. When examining my Duke transcript, it is quite clear that I struggled in all courses that graded my understanding solely based on timed multiple choice tests. Consequently, I looked for courses that complimented my learning style. (I learn best by reading to prepare for group discussions). By taking seminar courses that weren't subject to timed multiple choice exams, I could again be graded competitively by a means which evaluated comprehension without penalizing for slow rate.

I began preparations to take the MCAT during my final year at Duke. In preparing for the MCAT, I took a Princeton review course and scored a 19 on the exam. Under the time constraints, I could not complete any sections of the exam. I blamed my knowledge of the material rather than my learning disability, still not realizing the scope of my disability. In fact, after graduating from Duke, I spent the following 2 years re-taking all of my basic science courses at Harvard Extension School to see if I could learn the material more thoroughly. I also took a Kaplan review course during this time. I repeated the MCAT and again I was unable to complete any sections of the exam. I scored a 20. I continued courses at Harvard Extension School and again enrolled in the 4 month Kaplan intense program. I followed up this program with a personal tutor from Kaplan. Although I had a great knowledge of the basic sciences, I still could not complete any section of the exam. I simply could not process the information quickly enough and again I scored a 20. After my third attempt at taking the MCAT, it occurred to me that as much as I hated to concede, maybe I was different and experiencing difficulties that other people just didn't face.

In October 1998, following this frustrating experience, I met with a psychologist, Dr. Christopher Connolly, who determined that I had dyslexia. I then applied for and received additional time to take the MCAT, and I nearly finished each section. My score jumped from 19 and 20 to a 28.

This was good enough for acceptance to Drexel College of Medicine, where I began my studies in 2000. From the beginning, despite feeling that I had a solid grasp of the material, I struggled with my exams, which were mostly multiple-choice. I could not finish the exams in the time allotted. As a result, I was failing most of my classes within a few months of beginning medical school. One of the deans then asked me to meet with various advisors and professors. When it was clear that I understood the material but was not able to finish the exams, I was urged to take my exams with time and one-half. I initially declined, believing that accepting accommodations during medical school would only be a barrier to a

3

Heidi Alexandra Baer
SS# 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
USMLE ID # 5-099-376-5
USMLE Step 1
Request review for time and one half
05/07/2004
Phone # 267 971 4595

career in medicine and to passage of the boards. I still failed. As a result, I was forced to split up my first year into two years in order to salvage my grades. Since then, I have used time and one-half to complete all of my exams. I honored one course and high-passed three others during my 2nd year academic year.

As you can see, I have been successful at every stage of my education. Nevertheless, my disability has proven to be a substantial barrier to passage through the various "gateways" into each next phase of my education. I struggled with the SAT and the MCAT and now am facing yet another barrier with USMLE Step 1. When it came time to take the practice NBME exam at Drexel in March 2003, I did so with time and one-half and failed with a score of 60. The passing score was a 64. I scored better than 30% of my class at this time. After studying for and passing all finals in May 2003, I took the 2nd practice NBME exam. I chose to take this exam without additional time. That time, I did much worse, scoring a 52, with the passing score again being a 64. A score of 52 put me in the bottom 5% of my class.

In early 2003, I applied for extra time to take the USMLE Step 1 but was denied because my submission was deemed insufficient. I took the test in late June 2003 and scored a 167. I again applied for extra time and again was rejected. I took the test a second time, in December 2003, scoring a 176.

Most frustrating for me is the fact that I know that I am not able to demonstrate my true knowledge and ability on standardized tests, and yet those tests are often set up as mandatory gateways to educational and professional advancement. I have accomplished a great deal over my life, none of which I take for granted. I have worked very hard to reach this point in my education, because I am committed to becoming a doctor. My parents are both doctors. My brother and I began medical school in 2000 and this year I will watch him graduate without me. I have been focused on medicine since an early age. And I am fully confident that I can be successful as a doctor. I know I have the same grasp of information as my fellow classmates. My grades, with accommodation in test-taking, bear this out. Likewise, I am fully confident that I am progressing well toward becoming a competent, skilled doctor. My limited clerkships have been uniformly positive. But without accommodation for the USMLE Step 1, I am facing the possibility that despite my years of work and my general success, I may never be able to have a career as a doctor.

Since my last attempt at the USMLE Step 1, I have been reevaluated and rediagnosed with a learning disability and AD/HD. That evaluation, along with a great deal of other information supporting my request, is submitted with the present application. I request for you carefully consider the impact that my disability has had on my ability to demonstrate my knowledge on standardized tests. Without additional time, the USMLE Step 1 exam will not accurately assess my capabilities.

Thank you for your consideration,

Heidi Alexandra Baer

Heidi Alexandra Baer