UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEIDI A. BAER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 05-CV-10724-GAO |
| NATIONAL BOARD OF ) | |
| MEDICAL EXAMINERS, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S SURREPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION**

Defendant NBME submits this surreply memorandum of law in opposition to Plaintiff's motion for a preliminary injunction.[1]

**I.  PLAINTIFF'S ATTEMPT TO REDEFINE "AVERAGE" IS WITHOUT SUPPORT IN THE PSYCHOLOGICAL LITERATURE.**

In its Opposition Brief, the Board decisively demonstrated that, notwithstanding Plaintiff's alleged learning disabilities and ADHD, her test scores place her squarely within the average or normal range of ability.  As such, she is unable to demonstrate any real impairment as compared to the general population, is not disabled within the meaning of the ADA, and is not entitled to any accommodation on the USMLE, Step 1.  In a last-ditch effort to salvage her claim of entitlement to an accommodation, Plaintiff attempts to redefine the term "average" as meaning between the 25th and 75th percentiles, notwithstanding the fact that the universally accepted view in psychology and other scientific fields defines "average" as the middle 68 percent of the bell curve, or between the 16th and 84th percentiles.  In support of this position, Plaintiff offers only

---

[1] All capitalized terms not defined herein are used as defined in NBME's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary and Permanent Injunction (the "Opposition Brief").

the testimony of Dr. Weinstein, who opines that the 16th to 84th percentile approach is "simply too harsh." [2] This argument is wholly without merit.

Psychological tests, like many other scientific tests, are designed so that results exhibit a "normal distribution," which can be mapped on a "bell curve." Using a standard bell curve methodology, scores that are between the 16th and 84th percentile fall within one standard deviation of the mean and are within the average range. In other words, the 68% of the population are within the average range, or "normal," for the purpose of analyzing diagnostic tests of ability and achievement in the field of psychology. To be sure, the average range encompasses low average, average, and high average. However, deficits are defined only by performances that fall outside and below the average range, <u>i.e.</u>, below the 16th percentile. <u>See, e.g.</u>, Anastasi & Urbina, <u>Psychological Testing, 7th edition</u>, 1997; Petrie & Sabin, <u>Medical Statistics at a Glance</u>, 2000; Stein & Cutler, <u>Clinical Research in Allied Health and Special Education</u>, 3rd edition, 1996; Hinkle, Wiersma & Jurs, <u>Applied Statistics for Behavioral Sciences, 5th edition</u>, 2003. Indeed, this point is so widely accepted that it is even expressed in <u>Statistics for Dummies</u>. <u>See</u> Rumsey, <u>Statistics for Dummies</u>, 2003 ("As long as the distribution has a mound in the middle – and the normal distribution certainly fits that criterion – you can make some general statements about where most of the values will be. . . .About 68% of the values will lie within one standard deviation of the mean. . . .").[3]

The standard for disability protected by the ADA is whether the plaintiff is substantially limited in a major life activity as compared to <u>most</u> <u>people</u>, or as stated by the First Circuit: "[I]mpairment is to be measured in relation to <u>normalcy</u> . . . ." <u>Soileau v. Guilford of Me., Inc.</u>, 105 F.3d 12, 15-16 (1st Cir. 1997). The First Circuit has previously determined that the mere

---

[2] <u>See</u> Amended Second Affidavit of Dr. Cheryl Weinstein at ¶ 5. Dr. Weinstein also criticizes the definition of the average range as between the 16th and 84th percentiles by stating: "[S]omeone who scores worse than 75% of the population scores worse than most people." <u>Id.</u> This argument is nonsense. Under Dr. Weinstein's reasoning, anyone who scored below 50% of the population is not average because she scored "worse than most people."

[3] It bears noting that, even under Plaintiff's invented standard, still Plaintiff scored in the average range on the overwhelming majority (23 out of 27) of the tests of reading skills and reading-related cognitive ability conducted on Plaintiff from August 2003 through November 2004. <u>See</u> Bernier Aff. at ¶¶ 18-25.

fact that test scores are below the mean does not mean that plaintiff's ability to learn is not within the normal range.  Calef v. Gillette Co., 322 F.3d 75, 84  (1st Cir. 2003) (finding that plaintiff was not substantially limited in learning in general because his test scores were within the normal range – even though he had specific subtest scores "significantly below the mean").  As such, as long as an individual's test scores do not fall below the normal range, which is defined in the scientific literature as between the 16th and 84th percentiles, even if they fall below the mean, there is no impairment and no disability under the ADA.  In this case, because her test scores fall, overwhelmingly, within the average or normal range, Plaintiff cannot show that she is substantially limited as compared to most people, and she is not disabled under the ADA.[4]

      Moreover, even if her test results were below average and this Court found she has some sort of impairment, still the most important inquiry is whether the impairment substantially limits her in a major life activity.  The relevant inquiry on this question is not whether Plaintiff's alleged "impairment makes it impossible to keep up with a rigorous medical school curriculum," but rather "whether [her] impairment substantially limits [her] ability to learn as a whole, for purposes of daily living, as compared to most people."  Wong, 379 F.3d at 1108.  Here, Plaintiff's record of academic achievement dooms her claim of a substantial limitation in the major life activity of learning.  See, e.g., Calef, 322 F.3d at 75; Price v. National Bd. of Med. Exam'rs, 966 F. Supp. 419, 423-24 (S.D.W.Va. 1997) (finding plaintiffs' ADD had not resulted in substantial limitation when they graduated from college and there was "little evidence" of significant impairment of functioning).  Similarly, plaintiff cannot show that her alleged impairment substantially limits her reading in comparison to most people because she has not

---

[4] See, e.g., Wong v. Regents of Univ. of Cal., 379 F.3d 1097, 1108 (9th Cir. 2004) (defendant conceded impairment but plaintiff was found not to be disabled under the ADA because he could not show substantial limitation); Calef, 322 F.3d at 75 (rejecting plaintiff's claim of substantial limitation in learning because plaintiff "has a high school GED, has taken other courses, and received on-the-job training where he learned new job skills. . . . These facts doom the claim."); Bercovitch v. Baldwin School, 133 F.3d 141, 155 (1st Cir. 1998) ("Although Jason's hyperactivity and disability may affect his capacity to achieve his absolute maximum learning and working potential, there is practically no evidence that it has substantially impaired his basic learning abilities."); Marlon v. Western New England College, No. 01-12199-DPW, 2003 WL 22914304, at * 8 (D. Mass. 2003) ("While I might be able to infer from the evidence that the impairments affect her ability to learn to some degree, that is not enough to satisfy Marlon's burden under the ADA.").

established an "inability to read newspapers, government forms, street signs or the like" that would evidence a substantial limitation in comparison to most people. Wong, 379 F.3d at 1110. Indeed, any allegations that she was substantially limited in this way would be inconsistent with her prior success on timed standardized exams such as the PSAT and SAT without accommodation. See Gonzales v. National Bd. of Med. Exam'rs, 225 F.3d 620, 628 (6th Cir. 2000) (finding plaintiff's testimony that his reading disability resulted in plaintiff having difficulties completing consumer transactions and that his attorneys had to read him the complaint line by line inconsistent with his unaccommodated success on the SAT and MCAT).

## II.     MERE DISPARITY BETWEEN PERFORMANCE AND ABILITY DOES NOT EQUAL DISABILITY UNDER THE ADA.

Unsuccessful in her attempt to redefine "average" to further her effort to obtain an unwarranted accommodation, Plaintiff next resorts to the argument that, even if she is not impaired as compared to the general population, still her alleged learning disabilities and ADHD prevent her from performing up to her inherent capacity and thereby qualify as a disability under the ADA. This argument, too, is without merit.

As an initial matter, Plaintiff's life achievements are not inconsistent with her IQ scores, which are generally (although not exclusively) high. It is not surprising that a person with IQ scores such as Plaintiff's would, for example, score 1090 (well above the mean) on the SAT, gain admission to prestigious Duke University, make the Honor Roll during her senior year at Duke, or graduate with a 2.95 GPA.

Moreover, even if there were a vast discrepancy between Plaintiff's inherent capacity and test scores (which there is not), still such discrepancy would not support a finding of legally cognizable disability under the ADA. In both the First Circuit and elsewhere, courts have repeatedly held that, in order to have a disability under the ADA, a plaintiff must prove that her impairments substantially limit her in a major life activity in comparison to most people, rather than comparison to her theoretical absolute maximum potential. See, e.g., Bercovitch, 133 F.3d at 155 ("Although Jason's hyperactivity and disability may affect his capacity to achieve his

absolute maximum learning and working potential, there is practically no evidence that it has substantially impaired his basic learning abilities."); Price, 966 F. Supp. at 426 (rejecting plaintiffs' contention that "disparity between inherent capacity and performance may, in some circumstances, permit the inference that an individual has a learning disability" and stating that the relevant inquiry is how the individual's functioning compared to "most people").

In support of her discrepancy argument, Plaintiff cites only dicta from one case, Pazer v. New York State Board of Law Examiners, 849 F. Supp. 284, 287 (S.D.N.Y. 1994), suggesting that disparity between inherent capacity and performance on a test might permit an inference that an individual has a learning disability, even though that individual's performance has met the standard of the ordinary person. However, the Pazer court did not find that the plaintiff in that case was disabled within the meaning of the ADA. See id. Furthermore, the Pazer court held that such discrepancies between inherent capacity and performance do not, as a matter of law, equal disability, because such "disparity could reasonably be the result of many other factors, such as stress, nervousness, cautiousness, or lack of motivation." Id.[5] Plaintiff does not and cannot cite a single case holding that disparity between ability and performance equals a disability recognizable under the ADA, and, as such, her discrepancy argument must fail.

### III.  MERE DELAY IN POST-SECONDARY EDUCATION DOES NOT CONSTITUTE IRREPARABLE HARM.

Finally, Plaintiff erroneously asserts that expulsion from Drexel would constitute irreparable harm. As the Board pointed out in its Opposition Brief, Plaintiff has alleged only that her medical education might be delayed if she is not allowed to take the exam on May 5, 2005, either because she must miss an academic semester before she can begin her third year at Drexel or because she must transfer to another medical school that does not require passage of the USMLE, Step 1 as a condition to promotion or graduation. However, "mere delay of

---

[5] The other cases Plaintiff attempts to cite for the related, but distinct, proposition that disparity equals impairment do not even go as far as Pazer. Gonzales relates the testimony of an expert and Dogon simply notes that plaintiff was of average intelligence and performed at an average level. Gonzales, 225 F.3d at 629; Dogon v. National Bd. of Med. Exam'rs, No. 98-CV-10967-MLW, slip op. at 2 (D. Mass. 1998). In neither of the cases did the court find the plaintiff was disabled or that under the ADA disparity equals disability.

educational opportunities does not constitute irreparable harm." Rothberg v. Law School Admissions Council, 102 Fed. Appx. 122, 2004 WL 1345130, at *3 (10th Cir. June 16, 2004). See also Dogon, No. 98-CV-10967-MLW, slip op. at 2 ("Even the possibility of delayed graduation from medical school is not a basis for irreparable harm necessary to satisfy the standard for preliminary injunction.").

In support of her contention that expulsion from Drexel would constitute irreparable harm, Plaintiff asserts "volumes of precedent clearly stating that an individual's expulsion from school constitutes irreparable harm." See Reply Br. at 4. The cases Plaintiff cites for this proposition, however, are inapposite. Specifically, three of the cases stand for the proposition that individuals have a right to attend public primary and secondary school in their educational districts, the abridgement of which may constitute irreparable harm in the absence of due process.[6] The other two cases hold only that preventing an individual from participating in his or her high school graduation may constitute irreparable harm, as that occasion has significant ceremonial and emotional value.[7] In short, not one of the cases cited by Plaintiff supports her contention that expulsion from Drexel – a private graduate school – would constitute irreparable harm, and Plaintiff has no response to the Board's showing to the contrary.

---

[6] See, e.g., Johnson v. Collins, 233 F. Supp. 2d 241, 251 (D.N.H. 2002) ("stating that "[t]he value of a free public education is beyond dispute," court finds that expulsion of public school student who allegedly made bomb threat during pendency of lawsuit would constitute irreparable harm"). See also Rodriecus, L. v. Waukegan School Dist. No. 60, 90 F.3d 249, 254 (7th Cir. 1996) (expulsion of a disabled child from local public school district may result in irreparable harm); Murphy v. Fort Worth Indep. School Dist., 258 F. Supp. 569, 575 (N.D. Tex. 2003) (finding that plaintiff would suffer irreparable harm if "denied, without having his procedural due process rights recognized, the valuable right to continue his education at his home school [the public school in his district]").

[7] See, e.g., Parker v. Trinity High School, 823 F. Supp. 511, 518 (N.D. Ill. 1993) (stating that "high school graduation is one of life's most significant occasions," court finds irreparable harm in denying private school plaintiff the right to "associate with her classmates during the concluding weeks of school or to participate in any of the culminating graduation ceremonies"). See also Thomas v. Davidson Academy, 846 F. Supp. 611, 619 (M.D. Tenn. 1994) (irreparable harm to deprive teenager of the "experience of receiving her diploma at graduation alongside her friends and classmates of the last twelve years").

## **CONCLUSION**

For all of the foregoing reasons, NBME requests that the Court deny in all respects Plaintiff's request for a preliminary injunction and other equitable relief.

                                          Respectfully submitted,

                                          NATIONAL BOARD OF MEDICAL
                                          EXAMINERS

                                          By its attorneys,


                                          /s/ Inez H. Friedman-Boyce
                                          Joseph F. Savage, Jr. (BBO#443030)
                                          Inez H. Friedman-Boyce (BBO#630910)
                                          Melissa Briggs Hutchens (pro hac vice)
                                          GOODWIN PROCTER LLP
                                          53 State Street
                                          Boston, Massachusetts 02019
                                          (617) 570-1000

Dated: April 27, 2005

- 8 -

## **CERTIFICATE OF SERVICE**

    The undersigned certifies that on April 27, 2005, I caused a copy of the foregoing to be served by facsimile on all counsel of record for the other party.

                                        /s/ Inez H. Friedman-Boyce
                                        Inez H. Friedman-Boyce

LIBA/1534700